## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA—ORLANDO DIVISION

| | |
|---|---|
| PHYLLIS GRAYSON; and PHILLIP PENSON; individually and on behalf of all other similarly situated, | Case No.: 20-cv-01770 |
| Plaintiffs, | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| LOCKHEED MARTIN CORPORATION | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Phyllis Grayson and Phillip Penson, individually and on behalf of putative classes of all other similarly situated persons (the "Classes" or "Members of the Classes"), sue Defendant Lockheed Martin Corporation and, based on personal knowledge and on investigation of counsel and review of public documents and information, alleges as follows:

## INTRODUCTION

1.      Plaintiffs bring this class action against Lockheed Martin Corporation, the owner and operator of weapons manufacturing facilities at 5600 Sand Lake Road, Orlando, FL 32819 ("Orlando Facility") for damages resulting from Defendant's dangerous and reckless mismanagement of extremely hazardous toxins, including, but not limited to, heavy metals, persistent environmental pollutants, and Volatile Organic Compounds ("VOC").

2.     Lockheed Martin's dangerous failures at the Orlando Facility occurred over decades. The Orlando Facility manufactures weaponry and associated components and began operations in 1957. The operations at the Orlando Facility utilize chemicals that are among the most toxic to human health on earth and require the utmost care and handling.

3.     Instead of carefully managing these toxins from the moment they arrived at the facility, and ensuring they were properly used, stored, and disposed of, Lockheed Martin stored toxins in leaking storage tanks, collected and transported waste materials in leaking underground piping systems, and dumped thousands of tons of highly toxic waste sludges into trenches dug throughout the Orlando Facility.

4.     Lockheed Martin's stunning indifference to environmental protection and human health resulted in staggering levels of contamination at the Orlando Facility. For instance, the EPA has set a regulatory limit of five parts per billion, and a goal of 0 parts per billion ("ppb"), for contaminants such as trichloroethylene and methylene chloride. Trichloroethylene has been detected in concentrations as high as 386,000 ppb in groundwater under the Orlando Facility. Methylene Chloride has been detected in concentrations as high as 213,600 ppb in groundwater under the Orlando Facility.

5.     Trichloroethylene and methylene chloride, like many of the contaminants Lockheed Martin dumped into the soil and groundwater at the Orlando

Facility, are chemicals that do not occur naturally. They are known as Volatile Organic Compounds because they are unstable and vaporize into the air from contaminated soil and groundwater. Once these chemicals are airborne, they can be inhaled and cause profoundly harmful effects to the human body.

6.     The contaminants Lockheed Martin dumped into soil and groundwater at the Orlando Facility damage virtually every human bodily system. These contaminants have intense effects on the central nervous system, cause blood disorders, are toxic to the liver, kidneys, skin, heart and the immune system. These contaminants damage the respiratory system, skeletal system, reproductive system, and endocrine system and cause birth defects and developmental disorders.

7.     Many of the contaminants Lockheed Martin dumped into soil and groundwater at the Orlando Facility are powerful carcinogens and cause a wide array of cancers.

8.     The contaminants Lockheed Martin dumped into soil and groundwater at the Orlando Facility are harmful to humans through any route of exposure. They will damage human health if they are inhaled, swallowed, or dermally contacted.

9.     The severe and widespread soil and groundwater contamination at the Orlando Facility poses extreme risks to those who live and work nearby. Plaintiffs and Members of the Medical Monitoring Class have been and continue to be exposed to this contamination by activities that cause contaminated soils to become airborne

and move offsite. Due to the volatile nature of the contaminants originating from the Orlando Facility, Plaintiffs and Members of the Medical Monitoring Class have also been exposed to contaminants that have off-gassed from the soil and groundwater.

10.     After creating an environmental nightmare at the Orlando Facility, Lockheed Martin's subsequent efforts to treat contaminated soil and groundwater Orlando Facility have perversely increased the risks of exposure and harm to those working and living nearby.

11.     Lockheed Martin installed numerous packed tower air strippers and air sparge systems designed to separate contaminants from millions of gallons of groundwater. Likewise, several soil vapor extraction systems were installed to remove contaminants from millions of tons of soil.

12.     These air strippers, air sparge systems, and soil vapor extraction systems do not destroy the contaminants, they merely induce a phase change which causes the pollutants to become gaseous.  To protect residents and workers nearby from exposure, the air strippers and soil vapor extraction systems would have to collect the gaseous toxins in sealed collection systems.

13.     Astonishingly, Lockheed Martin failed to contain the gaseous toxins extracted from the soil and groundwater treatment systems, but instead expelled concentrated amounts of these harmful chemicals directly into the air that Plaintiffs and Members of the Medical Monitoring Class breathe.

14.     In doing so, Lockheed Martin addressed a situation which was already hazardous to Plaintiffs and Members of the Medical Monitoring Class, by recklessly increasing their risks and the amounts of exposure to the contamination at the Orlando Facility.

15.     Over the years, Lockheed Martin sold certain parcels of the Orlando Facility, and near the Orlando Facility, for redevelopment, further increasing the number of individuals who would be exposed to Lockheed Martin's contamination. After selling these parcels, Lockheed Martin remained responsible for and continued to engage in activities that caused its contamination in soil and groundwater to become airborne, and inhaled by Plaintiffs and Members of the Medical Monitoring Class.

16.     Throughout this time, Lockheed Martin continued to engage in manufacturing operations at the Orlando Facility that caused numerous additional tons of hazardous air pollutants and VOCs to enter the air and be inhaled by Plaintiffs and Members of the Medical Monitoring Class.

17.     The illnesses, diseases, and disease processes that exposure to Lockheed Martin's toxic wastes can cause is often latent, meaning not easily detected without diagnostic testing, particularly in their early stages.

18.     As a result of Lockheed Martin's irresponsible and reckless conduct, Plaintiffs and Members of the Medical Monitoring Class have been exposed to toxic

wastes known to cause cancer and other serious debilitating diseases. As a result of their exposure, Plaintiffs and Members of the Medical Monitoring Class suffer a presently increased risk of illnesses, diseases, and disease processes. This present and increased risk of illnesses, diseases, and disease processes has caused Plaintiffs and Members of the Medical Monitoring Class to have a present medical need for diagnostic testing (also known as medical monitoring) for the early detection of those illnesses, diseases, and disease processes, including cancer, multiple sclerosis, and other serious debilitating diseases that can be caused by Lockheed Martin's toxic wastes. Monitoring procedures exist which make possible the early detection of cancer, multiple sclerosis, and other serious debilitating diseases caused by Lockheed Martin's toxic wastes and differ from those that would be prescribed in the absence of exposure. Medical monitoring is reasonably and medically necessary for those exposed to ensure that latent disease processes can be immediately identified and aggressively treated. Plaintiffs and Members of the Medical Monitoring Class have been injured by the present need to incur the costs of diagnostic testing for the early detection of illness, diseases, and disease processes.

19.    As a result of Lockheed Martin's irresponsible, reckless, and continued conduct, Plaintiff Phyllis Grayson and Members of the Homeowners Class have suffered a diminution in the value of their homes.

20.     Plaintiffs, individually and on behalf of Members of the Classes, seek compensatory damages arising out of chemical releases, discharges, and leaks from the Orlando Facility. These damages include the cost of a medical monitoring program for continual screening and detection of illnesses, diseases, or disease processes necessitated by the exposure to toxic wastes released by Defendant, and a diminution in the value of their homes.

## PARTIES

21.     Plaintiff Phyllis Grayson is a citizen of Florida and lives in Orange County, Florida. Because of Defendant's operations at the Orlando Facility, Plaintiff Grayson has been exposed to and consumed harmful levels of contamination and has suffered a diminution in the value of her home.

22.     Plaintiff Phillip Penson is a citizen of Florida and lives in Orange County, Florida. Because of Defendant's operations at the Orlando Facility, Plaintiff Penson has been exposed to and consumed harmful levels of contamination.

23.     Defendant Lockheed Martin Corporation is a Delaware corporation with its headquarters and principal place of business at 6801 Rockledge Drive, Bethesda, Maryland 60093. At all relevant times, Lockheed Martin and its predecessors in interest in law and fact owned and operated the Orlando Facility.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative Members of the Classes, and at least some Members of the proposed Classes have a different citizenship from the Defendant.

25.     This Court has jurisdiction over Lockheed Martin because Lockheed Martin operates the Orlando Facility in this District. Through its regular business operations in this District, Lockheed Martin intentionally and regularly avails itself of the markets and jurisdiction in this District, conferring this Court with personal jurisdiction over Lockheed Martin.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events and omissions giving rise to this action occurred in this District, Defendant's operations in this District caused contamination to be emitted within this District, causing harm to Plaintiffs and Members of the Classes residing and working in this District.

## STATEMENT OF FACTS

**A.     THE ORLANDO FACILITY**

27.     The Orlando Facility was built and began operations in 1957. The facility was initially owned and operated by the Martin Company, which became

Martin Marietta in 1961. In March 1995, Martin Marietta and Lockheed Corp. merged to become Lockheed Martin.

28.     The facility occupies a site approximately 2.5 miles by 1.8 miles between Sand Lake Road to the north, Bee Line Expressway to the south, and Universal Boulevard (formerly known as Republic Drive) to the west. It is approximately a half mile from Sea World and a mile from Universal Studios.

29.     Throughout the course of its operations, the Orlando Facility has been used to manufacture heavy weaponry and artillery, including nuclear capable Pershing ballistic missiles, nuclear capable Sprint antiballistic missiles, Walleye and Bullpup guided missiles, Lacrosse and Patriot surface to air missiles, and Hellfire air to surface missiles. The facility also produced communications and microelectronics systems, processed and reproduced photographic imagery, and engaged in plating and micro-plating activities. Lockheed Martin serviced and modified helicopters and armored vehicles at the facility and operated a two-mile long laser target range. Other areas of focus at the Orlando Facility include electro-optics, smart munitions, anti-armor, and air defense technologies.

30.     Since beginning operations at the Orlando Facility, Lockheed Martin has been storing, utilizing, and disposing of toxic chemicals for process operations.

## B.     LOCKHEED MARTIN'S TOXIC MISMANAGEMENT

31.     The operations at the Orlando Facility generated dangerous wastes including metal cuttings and scraps, oils and greases, electroplating solutions and sludge, metallic hydroxide sludge, acid and alkali solutions, cyanide, chromate rinse waste, spent acid solutions, waste-cutting oils, and various solvents used to degrease machinery and weaponry. Additionally, the Orlando Facility stored large volumes of chemicals to be used in the facility's operations.

32.     The chemicals stored and used at the Orlando Facility and the wastes generated by the facility's operations are extremely dangerous to human health. The utmost care and attention are required to ensure that these materials are properly stored, transported, collected, and disposed.

33.     Because of the danger inherent to the toxins used at the Orlando Facility, the risks posed to human health can never be eliminated. However, the risks of exposure can be greatly exacerbated if these toxins are mismanaged, as they were by Lockheed Martin.

34.     Lockheed Martin's storage, transportation, collection, and disposal practices at the Orlando Facility were outrageously and recklessly indifferent to human health.

35.     The Main Plant area, at the northern portion of the Orlando Facility, has been involved in electroplating and waste treatment operations since becoming

10

operational in 1958. The electroplating operations involved heat treatment, vapor degreasing, electro/electroless plating of chromium, copper and nickel into various components, and the chemical conversion coating of aluminum. Wastewater treatment operations consisted predominantly of the treatment of electroplating rinse water.

36.    Since 1958, electroplating operations have included an initial degreasing step which utilized a solvent bath of either trichloroethylene ("TCE") or tetrachloroethylene ("PCE") and 1,1,1-trichloroethane ("Methyl Chloroform"). Cyanide was then used in plating bath operations. Acid and alkaline rinse water wastes from the plating operations were neutralized with concentrated sodium hydroxide or sulfuric acid. Hexavalent chromium was a byproduct of these operations as well. The sludges remaining from these operations were pumped to a sludge storage tank. Cyanide wastes were transferred to cyanide captive pits and batch tanks.

37.    The initial system design at the Orlando Facility collected plating operation wastes in concrete troughs that transferred the wastes to captive pits. These troughs leaked into underlying soils for many years, perhaps as early as the late 1950's. Further, lines carrying solvents to collection and treatment systems leaked, causing further contamination.

38.    The contamination underneath and surrounding the Main Plant is extensive, both in soil and groundwater. Multiple additional sites of soil and

groundwater contamination exist at the facility within close proximity to the Main Plant.

39.     Beginning in 1959, Lockheed Martin received and stored hazardous materials and toxic chemicals at the northwest boundary of the Orlando Facility, adjacent to Sand Lake Road. The hazardous materials and toxic chemicals stored in this area were repeatedly mismanaged by Lockheed Martin, causing the soil and groundwater in this area to become heavily contaminated. Processes undertaken in this area further contributed to the contamination. Lockheed Martin discharged wastes from oil filled transformers and drained industrial wastewaters and process discharges directly to soil in this area.

40.     Between 1958 and 1964, Lockheed Martin operated an incinerator in an area used for assembling and testing nuclear capable Pershing Ballistic Missiles. This area was also used to dump equipment, printed circuit boards, scrap metal, and toxic contaminants from 1958 to 1998. These activities caused this area to become heavily contaminated.

41.     From 1958 to 1967, Lockheed Martin dumped 5,180 tons of metallic hydroxide sludge and other hazardous wastes in an unlined 3.5 acre landfill in the central area of the facility.

42.     In the late 1960's and early 1970's, Lockheed Martin dug shallow unlined trenches across eight acres of land on the west-central portion of the Orlando

Facility and filled the trenches with 1,700 cubic feet of toxic sludge and 3,700 tons of other hazardous wastes.

43.    In the early 1970's, Lockheed Martin dug shallow unlined trenches across 3.5 acres on the western boundary of the Orlando Facility and filled the trenches with 1,200 cubic feet of toxic sludge. Lockheed Martin then constructed a canal, called the New-Over Canal, that received wastes from these trenches and carried them off in surface waters.

44.    From 1973 to 1983, Lockheed Martin dumped 7,800 tons of hazardous wastes in an 11-acre landfill on the Southeast portion of the Orlando Facility. Three sludge ponds adjacent to the landfill were filled to capacity with sludges, including metal hydroxide sludge generated from spent plating solutions and cyanide bearing wastes. A large "sludge cake" was also disposed at this site.

45.    In 1981 and 1982, Lockheed Martin dug shallow unlined ditches across five acres on the south-central portion of the Orlando Facility and filled them with 1,900 tons of hazardous wastes.

46.    For many years prior to 1985, Lockheed Martin collected, stored, and transported toxic wastes from the Orlando Facility's Microelectronics Center in an inaccessible and complicated maze of underground piping and solvent holding tanks. Lockheed Martin operated this collection system for many years despite the piping being in a state of disrepair and leaking highly toxic wastes into soil and groundwater.

47.     These activities, along with others undertaken by Lockheed Martin at the Orlando Facility have resulted in extensive and profound contamination of soil and groundwater throughout the site. There are, and have been, numerous plumes of highly contaminated groundwater underneath the Orlando Facility. Additionally, large areas of highly toxic soil exist, and have existed, throughout the Orlando Facility.

48.     Lockheed Martin's ongoing operations continue to utilize large volumes of VOCs, hazardous air pollutants, and other toxic substances. These operations have resulted in further emission of harmful chemicals and additional exposure to Plaintiffs and Members of the Classes, further increasing their risks of illness.

## C.     CONTAMINATION LOCKHEED MARTIN DUMPED INTO THE SOIL, GROUNDWATER, AND AIR AT THE ORLANDO FACILITY

49.     Trichloroethylene ("TCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 28,000 ppb, TCE has a sweet odor similar to ether or chloroform.[1] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless, and egregious conduct, dangerous levels of TCE are, and

---

[1] EPA Fact Sheet—TCE, January 2017.
https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/trichloroethylene.pdf

14

have been, present in the soil and groundwater at the Orlando Facility. The concentrations of TCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, kidneys, immune system, endocrine system, reproductive system, neurological defects, and developmental defects.[2] TCE is a potent human carcinogen. It is classified by the International Agency for Research on Cancer ("IARC") as "carcinogenic to humans" and classified as a "known human carcinogen" by the U.S. Department of Health and Human Services ("HHS"). The U.S. Environmental Protection Agency ("EPA") has characterized TCE as "likely to be carcinogenic to humans by all routes of exposure."[3] TCE can cause numerous types of cancer, including but not limited to, kidney cancer, liver cancer, malignant lymphoma, non-Hodgkin's lymphoma, leukemia, testicular cancer, and lung tumors.[4]

50.     Tetrachloroethylene ("PCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 1,000 ppb, TCE has a sharp, sweet odor.[5] Because it is

---

[2] ATSDR Toxicological Profile for TCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[3] ATSDR Toxicological Profile for TCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[4] ATSDR Toxicological Profile for TCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp19.pdf
[5] EPA Fact Sheet—PCE, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/tetrachloroethylene.pdf

volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of PCE are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of PCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, kidneys, reproductive system, unborn children, brain chemistry, and developmental defects.[6] PCE is a potent human carcinogen. It is classified by the IARC as "probably carcinogenic to humans," and the EPA has characterized PCE as "likely to be carcinogenic to humans by all routes of exposure."[7] PCE can cause numerous types of cancer, including but not limited to, bladder cancer, multiple myeloma, non-Hodgkin's lymphoma, liver cancer, kidney cancer, and cancers of the blood system.[8]

51.     1,1,1-Trichloroethane ("Methyl Chloroform"), is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 120,000 ppb, Methyl Chloroform has a sharp,

---

[6] ATSDR Toxicological Profile for PCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf
[7] ATSDR Toxicological Profile for PCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf
[8] ATSDR Toxicological Profile for PCE, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp18.pdf

sweet odor similar to chloroform.[9] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Methyl Chloroform are or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methyl Chloroform detected at the Orlando Facility can cause harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage to the nervous system, liver, kidneys, reproductive system, and unborn children.[10]

52.     Vinyl Chloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 3,000,000 ppb, Vinyl Chloride has a mild, sweet odor.[11] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Vinyl Chloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Vinyl Chloride detected at the Orlando Facility can cause extremely harmful

---

[9] EPA Fact Sheet— Methyl Chloroform, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/methyl-chloroform.pdf
[10] ATSDR Toxicological Profile for Methyl Chloroform, July 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp70.pdf
[11] ATSDR Toxicological Profile for Vinyl Chloride, July 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf

effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, lungs, liver, kidneys, reproductive system, unborn children, and nerve damage.[12] Vinyl Chloride is a potent human carcinogen. It is classified by the IARC as "carcinogenic to humans," and the EPA has characterized PCE as "a human carcinogen."[13] Vinyl Chloride can cause numerous types of cancer, including, but not limited to liver cancer, brain cancer, breast cancer, and hematopoietic cancers.[14]

53.     Methylene Chloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 200,000 ppb, Methylene Chloride has a mild, sweet odor.[15] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Methylene Chloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methylene Chloride detected at the Orlando Facility can cause

---

[12] ATSDR Toxicological Profile for Vinyl Chloride, July 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[13] ATSDR Toxicological Profile for Vinyl Chloride, July 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[14] ATSDR Toxicological Profile for Vinyl Chloride, July 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp20.pdf
[15] ATSDR Toxicological Profile for Methylene Chloride, September 2000.
https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf

extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, ocular system, unborn children, nervous system, cardiovascular system, and lungs.[16] Methylene Chloride is a potent carcinogen. The EPA has characterized Methylene Chloride as "a probable cancer causing agent in humans."[17] Methylene Chloride can cause numerous types of cancer, including but not limited to, lung cancer, liver cancer, breast cancer, and mouth cancer.[18]

54.     Toluene is a VOC that is found naturally in crude oil. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 2,140 ppb, Toluene has a sweet, pungent odor.[19] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Toluene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Toluene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to,

---

[16] ATSDR Toxicological Profile for Methylene Chloride, September 2000. https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[17] ATSDR Toxicological Profile for Methylene Chloride, September 2000. https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[18] ATSDR Toxicological Profile for Methylene Chloride, September 2000. https://www.atsdr.cdc.gov/toxprofiles/tp14.pdf
[19] ATSDR Toxicological Profile for Toluene, June 2017. https://www.atsdr.cdc.gov/toxprofiles/tp56.pdf

damage and toxicity to the nervous system, brain, immune system, kidney, liver, lungs, reproductive system, unborn children, and developmental defects.[20]

55.    Benzene is a VOC that is found naturally in crude oil. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 60,000 ppb, Benzene has a sweet odor.[21] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Benzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Benzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the blood, bone marrow, immune system, reproductive system, and unborn children.[22] Benzene is a potent human carcinogen. It is classified by HHS as a "known carcinogen"; IARC and EPA have both determined that benzene is "carcinogenic to humans," and the EPA has characterized Benzene as "a human

---

[20] ATSDR Toxicological Profile for Toluene, June 2017.
https://www.atsdr.cdc.gov/toxprofiles/tp56.pdf
[21] ATSDR Toxicological Profile for Benzene, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[22] ATSDR Toxicological Profile for Benzene, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf

carcinogen."[23] Benzene can cause numerous types of cancer, including, but not limited to leukemia.[24]

56.     Chlorobenzene is an artificial VOC that does not occur in nature. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Chlorobenzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Chlorobenzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the blood, bone marrow, liver, kidneys, immune system, and nervous system.[25]

57.     Ethylbenzene is a VOC that is found naturally in coal tar. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 2,300 ppb, Ethylbenzene has a sweet, gas-like odor.[26] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious

---

[23] ATSDR Toxicological Profile for Benzene, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[24] ATSDR Toxicological Profile for Benzene, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf
[25] ATSDR Toxicological Profile for Chlorobenzene, December 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp131.pdf
[26] ATSDR Toxicological Profile for Ethylbenzene, November 2010.
https://www.atsdr.cdc.gov/toxprofiles/tp110.pdf

conduct, dangerous levels of Ethylbenzene are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Ethylbenzene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the inner ear and hearing, kidney, respiratory system, nervous system, eyes, and blood.[27]

58.    1,2-dichlorobenzene ("1,2-DCB") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 50,000 ppb, 1,2-DCB has a pleasant, aromatic odor.[28] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,2-DCB are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,2-DCB detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal

---

[27] ATSDR Toxicological Profile for Ethylbenzene, November 2010.
https://www.atsdr.cdc.gov/toxprofiles/tp110.pdf; EPA Fact Sheet—Ethylbenzene, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/ethylbenzene.pdf
[28] ATSDR Toxicological Profile for DCBs, August 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf

contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, liver, blood, kidneys, thyroid, pituitary gland, and nervous system.[29]

59.     1,3-dichlorobenzene ("1,3-DCB") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 50,000 ppb, 1,3-DCB has a pleasant, aromatic odor.[30] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,3-DCB are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,3-DCB detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, liver, blood, kidneys, thyroid, pituitary gland, and nervous system.[31]

60.     Carbon Disulfide is a VOC that is used to produce rubber chemicals and pesticides. Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Carbon Disulfide

---

[29] ATSDR Toxicological Profile for DCBs, August 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf
[30] ATSDR Toxicological Profile for DCBs, August 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf
[31] ATSDR Toxicological Profile for DCBs, August 2006.
https://www.atsdr.cdc.gov/toxprofiles/tp10.pdf

are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Carbon Disulfide detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, brain, nervous system, blood, liver, kidneys, eyes, cardiovascular system, reproductive system, unborn children, and developmental problems.[32]

61.     Carbon Tetrachloride is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 10,000 ppb, Carbon Tetrachloride has a sweet odor.[33] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Carbon Tetrachloride are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Carbon Tetrachloride detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and

---

[32] EPA Fact Sheet—Carbon Disulfide, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/carbon-disulfide.pdf
[33] EPA Fact Sheet—Carbon Tetrachloride, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf

toxicity to the liver, kidneys, nervous system, respiratory system, unborn children, and reproductive system.[34] Carbon tetrachloride is a potent human carcinogen. The EPA has characterized Carbon Tetrachloride as "a probable human carcinogen."[35] Carbon Tetrachloride can cause numerous types of cancer, including, liver cancer.[36]

62.    1,1-Dichloroethane ("1,1-DCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 120,000 ppb, 1,1-DCA has a mild, sweet odor similar to ether.[37] Because it is volatile, it readily converts to a gas and travels through air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,1-DCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,1-DCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, kidneys, and unborn children.[38] 1,1-DCA

---

[34] EPA Fact Sheet—Carbon Tetrachloride, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf
[35] EPA Fact Sheet—Carbon Tetrachloride, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf
[36] EPA Fact Sheet—Carbon Tetrachloride, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/carbon-tetrachloride.pdf
[37] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf
[38] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf

can cause cancer and is classified by the EPA as "a possible human carcinogen."[39] 1,1-DCA can cause numerous types of cancer, including, but not limited to cancer of the blood vessel walls, breast cancer, liver cancer, and endometrial cancer.[40]

63.     1,2-Dichloroethane ("1,2-DCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 6,000 ppb, 1,2-DCA has a mild, sweet odor similar to chloroform.[41] Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,2-DCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,2-DCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, cardiovascular system, respiratory system, liver, kidneys, and immune system.[42] 1,2-DCA is a potent human carcinogen and has been classified by

---

[39] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf

[40] EPA Fact Sheet—1,1-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylidene-dichloride.pdf

[41] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf

[42] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf

the EPA as "a probable human carcinogen."[43] 1,2-DCA can cause numerous types of cancer, including, but not limited to colon cancer, rectal cancer, stomach cancer, blood vessel wall cancer, breast cancer, lung cancer, endometrial cancer, and liver cancer.[44]

64.      1,1-Dichloroethene ("1,1-DCE") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 190,000 ppb, 1,1-DCE has a mild, sweet odor similar to chloroform.[45] Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,1-DCE are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,1-DCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to

---

[43] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf
[44] EPA Fact Sheet—1,2-DCA, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-dichloride.pdf
[45] EPA Fact Sheet—1,1-DCE, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/vinylidene-chloride.pdf

the nervous system, liver, kidneys, and lungs.[46] 1,1-DCE can cause numerous types of cancer, including, but not limited to kidney cancer and breast cancer.[47]

65.      1,2-Dichloroethene ("1,2-DCE") is an artificial VOC that does not occur in nature. It is colorless and odorless.[48] Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,2-DCE are, and have been, present in the soil and groundwater at the Orlando Facility. 1,2-DCE has also been found at the Orlando Facility in as Cis-1,2-DCE and Trans-1,2-DCE forms. The concentrations of 1,2-DCE detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, liver, and circulatory system.[49]

---

[46] EPA Fact Sheet—1,2-DCE, Date Unknown.
https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[47] EPA Fact Sheet—1,2-DCE, Date Unknown.
https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[48] EPA Fact Sheet—1,2-DCE, Date Unknown.
https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf
[49] EPA Fact Sheet—1,2-DCE, Date Unknown.
https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-1-2-dichloroethylene.pdf

66.     1,1,2-Trichloroethane ("1,1,2-TCA") is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,1,2-TCA are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,1,2-TCA detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, respiratory system, liver, kidneys, and immune system.[50] 1,1,2-TCA causes cancer, and has been classified by the EPA as "possibly carcinogenic to humans."[51] 1,1,2-TCA can cause numerous types of cancer, including, but not limited to liver cancer and adrenal cancer.[52]

67.     Chloroform is a VOC that readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of chloroform are, and have been, present in the soil and groundwater at the Orlando

---

[50] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf
[51] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf
[52] ATSDR Toxicological Profile for 1,1,2-TCA, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp148.pdf

Facility. The concentrations of chloroform detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, blood, kidney, nervous system, reproductive system, unborn children, and developmental defects.[53] Chloroform is a potent carcinogen and has been classified by the EPA as "likely to be carcinogenic to humans by all routes of exposure."[54] Chloroform can cause numerous types of cancer, including, but not limited to intestinal cancer, rectal cancer, bladder cancer, kidney cancer, and liver cancer.[55]

68.     1,2-Dichloropropane is an artificial VOC that does not occur in nature. It is colorless and odorless unless present in extremely high and dangerous concentrations. Above 250 ppb, 1,2-Dichloropropane has a chloroform-like odor.[56] Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,2-Dichloropropane are, and have been, present in the soil and groundwater at the Orlando Facility. The

---

[53] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[54] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[55] EPA Fact Sheet—Chloroform, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/chloroform.pdf
[56] EPA Fact Sheet—1,2-Dichloropropane, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf

concentrations of 1,2-Dichloropropane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, blood, liver, and reproductive system.[57] 1,2-Dichloropropane is a potent carcinogen and has been classified by the EPA as a "probable human carcinogen."[58] 1,2-Dichloropropane can cause numerous types of cancer, including, but not limited to breast cancer and liver cancer.[59]

69.    Dichlorobromomethane is a VOC that is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Dichlorobromomethane are, and have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Dichlorobromomethane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, immune system, unborn children, and developmental defects.[60]

---

[57] EPA Fact Sheet—1,2-Dichloropropane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[58] EPA Fact Sheet—1,2-Dichloropropane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[59] EPA Fact Sheet—1,2-Dichloropropane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/propylene-dichloride.pdf
[60] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf

Dichlorobromomethane is a potent human carcinogen. The EPA characterizes Dichlorobromomethane as "a probable human carcinogen."[61] Dichlorobromomethane can cause numerous types of cancer, including, but not limited to rectal cancer, kidney cancer, intestinal cancer, and liver cancer.[62]

70.    Bis(2-ethylhexyl)phthalate ("DEHP") is an artificial VOC that does not occur in nature and is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of DEHP are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of DEHP detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, respiratory system, reproductive system, immune system, unborn children, and developmental defects.[63] DEHP causes cancer, and has been classified by the EPA as a "probable human

---

[61] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf
[62] ATSDR Toxicological Profile for Dichlorobromomethane, June 2019. https://www.atsdr.cdc.gov/toxprofiles/tp129.pdf
[63] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf; ATSDR Toxicological Profile for DEHP, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp9.pdf

carcinogen."[64] DEHP can cause numerous types of cancer, including, but not limited to liver cancer, pancreatic cancer, and testicular cancer.[65]

71.     Xylene is a VOC that is colorless and odorless unless present in extremely high and dangerous concentrations. Above 1,100 ppb, Xylene has a sweet odor.[66] Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable and egregious conduct, dangerous levels of Xylene are, and/or have been, present in the soil and groundwater at the Orlando Facility. Xylene has also been found at the Orlando Facility in as m-Xylene, p-Xylene, and o-Xylene. The concentrations of Xylene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation or ingestion. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, gastrointestinal system, nervous system, cardiovascular system, kidneys, unborn children, and developmental defects.[67]

---

[64] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf
[65] EPA Fact Sheet—DEHP, January 2017. https://www.epa.gov/sites/production/files/2016-09/documents/bis-2-ethylhexyl-phthalate.pdf; ATSDR Toxicological Profile for DEHP, December 2019. https://www.atsdr.cdc.gov/toxprofiles/tp9.pdf
[66] EPA Fact Sheet—Xylene, January 2017.
https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/xylenes.pdf
[67] EPA Fact Sheet—Xylene, January 2017.
https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/xylenes.pdf

72.     Methylnaphthalene is a VOC that is found naturally in crude oil. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Methylnaphthalene are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of Methylnaphthalene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the blood, gastrointestinal system, and respiratory system.[68] Methylnaphthalene can cause cancer, and is classified by the EPA as "a possible human carcinogen."[69]  Methylnaphthalene can cause numerous types of cancer, including, but not limited to lung cancer, throat cancer, and colorectal cancer.[70]

73.     Benzo(a)pyrene is a VOC that is found naturally in crude oil. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of Benzo(a)pyrene are, and/or have been, present in the soil and groundwater at the Orlando Facility. Two related

---

[68] ATSDR Toxicological Profile for Methylnaphthalene, August 2005.
https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf
[69] ATSDR Toxicological Profile for Methylnaphthalene, August 2005.
https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf
[70] ATSDR Toxicological Profile for Methylnaphthalene, August 2005.
https://www.atsdr.cdc.gov/toxprofiles/tp67.pdf

compounds with similar effects, Benzo(a)anthracene and Benzo(b)fluoranthene, have also been detected at the Orlando Facility at dangerously high concentrations. The concentrations of Benzo(a)pyrene detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, reproductive system, immune system, unborn children, and developmental defects.[71] Benzo(a)pyrene is a potent human carcinogen and is classified by the IARC as "a known human carcinogen."[72]  Benzo(a)pyrene can cause numerous types of cancer, including, but not limited to gastrointestinal cancer, liver cancer, kidney cancer, throat cancer, and lung cancer.[73]

74.    Polychlorinated biphenyls ("PCBs") are manmade VOCs that do not occur in nature. They are colorless and odorless. Because they are volatile, PCBs readily converts to a gas and travels through the air with wind. They also move through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of PCBs are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of PCBs detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs

---

[71] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf
[72] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf
[73] EPA Toxicological Review of Benzo(a)pyrene, January 2017.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0136tr.pdf

through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the respiratory system, gastrointestinal system, liver, kidney, blood, nervous system, and endocrine system.[74] PCBs are potent human carcinogens, and both the EPA and IARC have determined that PCBs are "probable human carcinogens."[75] PCBs can cause numerous types of cancer, including, but not limited to liver cancer, intestinal cancer, skin cancer, gallbladder cancer, non-Hodgkin's lymphoma, testicular cancer, prostate cancer, pancreatic cancer, lung cancer, ovarian cancer, uterine cancer, throat cancer, pancreatic cancer, and uterine cancer.[76]

75.     Dichlorodiphenyltrichloroethane ("DDT") is an artificial VOC that does not occur in nature. It is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of DDT are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of DDT detected at the

---

[74] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf
[75] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf
[76] ATSDR Toxicological Profile for PCBs, November 2000. https://www.atsdr.cdc.gov/toxprofiles/tp17.pdf; Addendum to ATSDR Toxicological Profile for PCBs, April 2011. https://www.atsdr.cdc.gov/toxprofiles/pcbs_addendum.pdf

Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to unborn children, birth and developmental defects, type 2 diabetes mellitus, liver, and nervous system.[77] DDT is a potent carcinogen and has been classified by the IARC and the EPA as a "probable human carcinogen."[78] DDT can cause numerous types of cancer, including, but not limited to liver cancer and lung cancer.[79]

76.     1,4-Dioxane is an artificial VOC that does not occur in nature. It is colorless and odorless. Because it is volatile, it readily converts to a gas and travels through the air with wind. It also moves through soil and groundwater. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of 1,4-Dioxane are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of 1,4-Dioxane detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the liver, kidneys, respiratory system, and brain.[80] 1,4-

---

[77] ATSDR Toxicological Profile for DDT, December 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf
[78] ATSDR Toxicological Profile for DDT, December 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf
[79] ATSDR Toxicological Profile for DDT, December 2019.
https://www.atsdr.cdc.gov/toxprofiles/tp35.pdf
[80] EPA Fact Sheet—1,4-Dioxane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf

Dioxane causes cancer, and has been classified by the IARC and the EPA as a "probable human carcinogen."[81] 1,4-Dioxane can cause numerous types of cancer, including, but not limited to liver cancer, nasal cancer, and gallbladder cancer.[82]

77.     Dioxins are persistent environmental pollutants used in pesticides such as Agent Orange.  Because dioxins are persistent, they remain in the environment for long periods of time and bioaccumulate in human bodies.[83] Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of dioxins are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of dioxins detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion, or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the epidermis, blood, liver, metabolic system, immune system, reproductive system, unborn children, thyroid, and developmental defects.[84] Dioxins cause cancer, and have been classified by the IARC and the EPA as "probable human carcinogens."[85]

---

[81] EPA Fact Sheet—1,4-Dioxane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf
[82] EPA Fact Sheet—1,4-Dioxane, January 2017.
https://www.epa.gov/sites/production/files/2016-09/documents/1-4-dioxane.pdf
[83] ATSDR Toxicological Profile for Dioxins, December 1998.
https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf
[84] ATSDR Toxicological Profile for Dioxins, December 1998.
https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf
[85] ATSDR Toxicological Profile for Dioxins, December 1998.
https://www.atsdr.cdc.gov/toxprofiles/tp104.pdf

Dioxins can cause numerous types of cancer, including, but not limited to liver cancer, thyroid cancer, and skin cancer.[86]

78.     Perfluoroalkyls ("PFAS") are persistent environmental pollutants used in plating and electronics manufacturing. Because PFAS are persistent, they remain in the environment for long periods of time and bioaccumulate in human bodies.[87] Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of PFAS are, and/or have been, present in the soil and groundwater at the Orlando Facility. PFAS have also been detected at unsafe levels at the Orlando Facility as perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"). The concentrations of PFAS detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation and ingestion. These harmful effects include, but are not limited to, damage and toxicity to the liver, immune system, metabolic system, thyroid, respiratory system, reproductive system, unborn children, and developmental defects.[88] PFAS can cause cancer, and have been classified by IARC and the EPA as "possible human carcinogens."[89] PFAS can cause

---

[86] ATSDR Toxicological Profile for PFAS, December 2018.
https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[87] ATSDR Toxicological Profile for PFAS, December 2018.
https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[88] ATSDR Toxicological Profile for PFAS, December 2018.
https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[89] ATSDR Toxicological Profile for PFAS, December 2018.
https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

numerous types of cancer, including, but not limited to testicular cancer, kidney cancer, liver cancer, and pancreatic cancer.[90]

79.    Cadmium is a heavy metal used in electroplating. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of cadmium are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of cadmium detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, respiratory system, kidneys, gastrointestinal system, musculoskeletal system, liver, nervous system, reproductive system, blood, and immune system.[91] Cadmium is a potent human carcinogen. It has been classified by the HHS as a "known human carcinogen" and by IARC as "carcinogenic to humans."[92] Cadmium can cause numerous types of cancer, including, but not limited to lung cancer, and prostate cancer.[93]

80.    Chromium is a heavy metal used in plating operations. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of

---

[90] ATSDR Toxicological Profile for PFAS, December 2018.
https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[91] ATSDR Toxicological Profile for Cadmium, September 2012.
https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf
[92] ATSDR Toxicological Profile for Cadmium, September 2012.
https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf
[93] ATSDR Toxicological Profile for Cadmium, September 2012.
https://www.atsdr.cdc.gov/toxprofiles/tp5.pdf

chromium are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of chromium detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the lungs, respiratory system, stomach, gastrointestinal system, blood, reproductive system, immune system, reproductive system, epidermis, and eyes.[94] Chromium is a potent human carcinogen. It has been classified by the EPA as a "known human carcinogen" and by IARC as "carcinogenic to humans."[95] Chromium can cause numerous types of cancer, including, but not limited to gastrointestinal cancer, mouth cancer, and lung cancer.[96]

81.     Lead is a heavy metal used in the manufacture of munitions. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of lead are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of lead detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the nervous system, kidneys, cardiovascular system, blood, immune

---

[94] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf
[95] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf
[96] ATSDR Toxicological Profile for Chromium, September 2012. https://www.atsdr.cdc.gov/toxprofiles/tp7.pdf

system, reproductive system, unborn children, developmental defects, respiratory system, endocrine system, liver, musculoskeletal system, and gastrointestinal system.[97] The toxic effects of lead have been observed in every organ system studied.[98] Lead is a potent human carcinogen. It has been classified by the EPA as a "probable human carcinogen" and by IARC as "probably carcinogenic to humans."[99] Lead can cause numerous types of cancer, including, but not limited to lung cancer, respiratory tract cancer, stomach cancer, gastrointestinal cancer, throat cancer, and glioma.[100]

82.     Arsenic is a heavy metal used in rat poison, ammunition and semiconductors. Due to Lockheed Martin's unreasonable, reckless and egregious conduct, dangerous levels of arsenic are, and/or have been, present in the soil and groundwater at the Orlando Facility. The concentrations of arsenic detected at the Orlando Facility can cause extremely harmful effects whether exposure occurs through inhalation, ingestion or dermal contact. These harmful effects include, but are not limited to, damage and toxicity to the epidermis, gastrointestinal system, blood, cardiovascular system, nervous system, respiratory system, unborn children,

---

[97] ATSDR Toxicological Profile for Lead, August 2020.
https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[98] ATSDR Toxicological Profile for Lead, August 2020.
https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[99] ATSDR Toxicological Profile for Lead, August 2020.
https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf
[100] ATSDR Toxicological Profile for Lead, August 2020.
https://www.atsdr.cdc.gov/toxprofiles/tp13.pdf

kidneys, and bladder.[101] Arsenic is a potent human carcinogen. It has been classified by the EPA as a "known human carcinogen" and by IARC as "carcinogenic to humans."[102] Arsenic can cause numerous types of cancer, including, but not limited to skin cancer, liver cancer, bladder cancer, and lung cancer.[103]

## D.     LOCKHEED MARTIN EXPOSES THE COMMUNITY TO TOXIC WASTE

83.     Lockheed Martin was well aware of the risks to human health posed by the toxic materials it stored, used, handled, and disposed of at the Orlando Facility, including those described herein. Lockheed Martin knew, or should have known, that mismanagement and mishandling of these harmful chemicals could pose egregious risks of exposure, and result in debilitating, life-changing, and fatal illnesses and diseases.

84.     Instead of taking proper, or in some cases, any precautions to protect against potential exposures, Lockheed Martin created a toxic stew of contamination at the Orlando Facility. This contamination is the result of years of callous and reckless indifference to the health and safety of the environment and individuals living and working nearby and around the Orlando Facility.

---

[101] ATSDR Toxicological Profile for Arsenic, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf
[102] ATSDR Toxicological Profile for Arsenic, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf
[103] ATSDR Toxicological Profile for Arsenic, August 2007.
https://www.atsdr.cdc.gov/toxprofiles/tp2.pdf

85.     These failures are Lockheed Martin's original sin, from which further harm to Plaintiffs and Members of the Classes flowed.

86.     Lockheed Martin clearly knew, or at the very least should have known, that burying toxic wastes in crude trenches, transporting toxic wastes in leaking and inaccessible piping, dumping toxic sludge in ponds, and engaging in the other reckless conduct described herein, would cause profound and widespread soil and groundwater contamination throughout the Orlando Facility.

87.     Lockheed Martin also knew, or should have known, that the contamination resulting from these activities, and present at the Orlando Facility, would pose significant health risks to Plaintiffs and Members of the Medical Monitoring Class.

88.     Lockheed Martin knew, or should have known, that thousands of people lived and worked near the Orlando Facility, and that it was completely inappropriate to use and handle hazardous contaminants at this location.

89.     Lockheed Martin knew, or should have known, that Plaintiffs and Members of the Medical Monitoring Class would be exposed to Lockheed Martin's contamination through inhaling, ingesting, and coming into dermal contact with contaminated soils that are regularly disrupted by the operations at the Orlando Facility, and thereafter become airborne and travel offsite.

90.     Lockheed Martin also knew, or should have known, that Plaintiffs and Members of the Medical Monitoring Class would be exposed to Lockheed Martin's contamination through inhaling VOCs that off-gassed from the soil and groundwater.

91.     Lockheed Martin knew, or should have known, that Plaintiffs and Members of the Medical Monitoring Class would be exposed to Lockheed Martin's contamination by coming into contact with contaminants carried offsite through groundwater migration.

92.     Lockheed Martin also knew, or should have known, that Plaintiffs and Members of the Medical Monitoring Class would be exposed to contamination by Lockheed Martin's continuing operation of the Orlando Facility, and the resulting emission of toxic wastes.

93.     Lockheed Martin knew, or should have known that, because of the dangerous constituents it dumped into the soil and groundwater, the toxic nature of emissions from ongoing operations, and the high levels of contamination present in the soil and groundwater, such offsite exposures could, and would, cause severe and debilitating illnesses and diseases to individuals living and working near and around the Orlando Facility.

94.     Nevertheless, Lockheed Martin continued to expose Plaintiffs and Members of the Medical Monitoring Class to toxic contaminants from the Orlando Facility.

95.     In fact, Lockheed Martin's efforts to treat the soil and groundwater at the Orlando Facility increased the risks of exposure to toxic contaminants to Plaintiffs and Members of the Medical Monitoring Class.

96.     Lockheed Martin utilized contaminated groundwater for spray irrigation, causing underground contaminants to make contact with air, vaporize, be carried offsite with wind, and inhaled by Plaintiffs and Members of the Medical Monitoring Class.

97.     Lockheed Martin installed numerous Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility. These technologies remove harmful contaminants from soil and groundwater by inducing a phase change that causes VOCs to become gaseous. These systems then separate the gaseous VOCs from the soil or groundwater that they are treating.

98.     However, these treatment systems do not destroy the harmful contaminants, they simply separate contaminants from the treated soil or groundwater. To prevent exposing nearby residents and workers to the harmful toxic gases remaining after the soil or groundwater is treated, it is necessary to collect, contain, and seal the remaining toxic gases in airtight containers.

99.     Lockheed Martin failed to contain the toxic gases remaining after the soil and groundwater was treated with Air Stripping Towers, Soil Vapor Extraction Systems, and Air Sparging Systems at the Orlando Facility. Instead, Lockheed Martin

recklessly expelled these toxic gases directly into the air breathed by Plaintiffs and Members of the Medical Monitoring Class.

100.   By venting these toxic gases directly into the air, at low heights, Lockheed Martin unearthed high levels of toxic contamination that was present below the ground surface, concentrated the contamination into potent and dangerous gases, and injected the contamination directly into the air supply for the community near and around the Orlando Facility.

101.   Over the years, Lockheed Martin sold certain parcels of the Orlando Facility, and near to the Orlando Facility, for redevelopment, further increasing the number of individuals who would be exposed to Lockheed Martin's contamination. After selling these parcels, Lockheed Martin remained responsible for and continued to engage in activities that caused its contamination in soil and groundwater to become airborne, and inhaled by Plaintiffs and Members of the Medical Monitoring Class. Furthermore, these activities would not have occurred but for Lockheed Martin's original sin—dumping of hazardous toxic wastes into soil and groundwater for decades.

102.   Lockheed Martin's soil and groundwater treatment systems continue to vent large amounts of toxic gases directly into the air supply for the community near and around the Orlando Facility. These emissions are exacerbated by large toxic

releases originating from Lockheed Martin's ongoing operation of the Orlando Facility.

103.   Plaintiffs and Members of the Medical Monitoring Class did inhale, ingest, and come into dermal contact with contaminated soils originating from the Orlando Facility, airborne contaminants resulting from the volatilization of contaminated soil and groundwater originating from the Orlando Facility, contaminants carried offsite through groundwater migration, and contaminants generated and released by the continued operation of the Orlando Facility. As a result, Plaintiffs and Members of the Medical Monitoring Class suffered injuries, including the present need for medical monitoring, as described herein.

104.   Lockheed Martin's continuing operation of the Orlando Facility, and the resultant continued release of toxic contaminants, has caused additional exposure to Plaintiffs and Members of the Medical Monitoring Class, and has also resulted in the present need for medical monitoring, as described herein.

105.   Plaintiffs' and Members' of the Medical Monitoring Class exposures to VOCs were increased and exacerbated by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs and Members of the Medical Monitoring Class breathe. Plaintiffs and Members of the Medical Monitoring Class did inhale concentrated VOCs emitted

from the Air Stripping Towers, Soil Vapor Extraction Systems, Air Sparging Systems, and other contamination systems at the Orlando Facility, and as a result suffer a present increased risk of serious illness, disease, and disease process.

106.   This present increased risk of illness, disease and disease process has caused Plaintiffs and Members of the Medical Monitoring Class to have the present medical need for diagnostic testing (also known as medical monitoring) for the early detection of those illnesses, diseases and disease processes, including cancer, multiple sclerosis, and other serious debilitating illnesses that can be caused by exposure to Lockheed Martin's toxic wastes. Medical monitoring is reasonably medically necessary for those exposed to ensure that latent disease processes can be immediately identified and aggressively treated. Monitoring procedures exist which make early detection of these illnesses, diseases and disease processes, including cancer, multiple sclerosis, and other serious debilitating illnesses that can be caused by exposure to Lockheed Martin's toxic wastes possible, and differ from what would be prescribed in the absence of exposure.

107.   Plaintiffs and Members of the Medical Monitoring Class have been injured by the present need to incur the costs of diagnostic testing for the early detection of illnesses, diseases and disease process, and seek compensation for these economic damages.

108.   For many years, Lockheed Martin successfully concealed knowledge of the egregious contamination it had caused, and the profound risks of debilitating disease its contamination posed to individuals living and working near the Orlando Facility. By doing so, Lockheed Martin was able to prevent broad public awareness of the nature and scope of its contamination and the resulting risks.

109.   However, as knowledge of Lockheed's conduct and contamination has come to light, it has caused justifiable public fear about the safety of areas in proximity to the Orlando Facility. This public fear has caused Plaintiff Phyliss Grayson and Members of the Homeowners Class to suffer a permanent injury to the value of their property, and a diminution in the property's value.

110.   Plaintiff Phyliss Grayson and Members of the Homeowner Class have been further injured by the present need to disclose these facts to potential homebuyers. The facts described herein will cause fear in buyers that will negatively impact the market value of their property.

111.   Plaintiff Phyliss Grayson and Members of the Homeowner Class did not buy their homes with the expectation of living forever in the gloomy shadow of death, or to have fears of toxic exposure interrupt their normal pastimes and peaceful pursuits. However, subsequent potential purchasers will make pricing decisions based on such knowledge. As a result, the public awareness of Lockheed Martin's conduct and contamination, and the need to disclose information about Lockheed

Martin's conduct and contamination, has caused a permanent diminution in the value of Plaintiff Grayson's and Homeowner Class Members' property.

**E.    PLAINTIFFS AND MEMBERS OF THE MEDICAL MONITORING CLASS WERE EXPOSED TO LOCKHEED MARTIN'S TOXIC WASTES, AND REQUIRE MEDICAL MONITORING**

112.   Plaintiffs and Members of the Medical Monitoring Class did inhale, ingest and come into dermal contact with contaminated soils, groundwater, and air borne toxic wastes originating from Lockheed Martin's Orlando Facility.

113.   Plaintiffs' and Members' of the Medical Monitoring Class exposures to VOCs were increased and exacerbated by Lockheed Martin's ongoing operation of the Orlando Facility, and resulting releases of toxic wastes, and by Lockheed Martin's decision to extract harmful chemicals from soil and groundwater at the Orlando Facility, concentrate the contaminants in gaseous form, and vent the contaminants directly into the air that Plaintiffs and Members of the Medical Monitoring Class breathed. Plaintiffs and Members of the Medical Monitoring Class did inhale, ingest, and come into dermal contact with toxic wastes released by Lockheed Martin's continued operation of the Orlando Facility, and with concentrated VOCs emitted from the Air Stripping Towers, Soil Vapor Extraction Systems, Air Sparging Systems and other contamination systems at the Orlando Facility.

114.   As a result of these exposures to Lockheed Martin's toxic wastes, Plaintiffs and Members of the Medical Monitoring Class have been injured by their present need to incur the costs of diagnostic testing for the early detection of illnesses, diseases or disease process.

115.   Plaintiffs' and Medical Monitoring Class Members' claims for medical monitoring are based solely on their exposure to toxic wastes originating from Lockheed Martin's Orlando Facility. Therefore, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and Class Members' claims in this case.   Exposure greater than the minimum specified in the class definition below only increases the risk Plaintiffs and the Class Members suffer over the baseline risk caused by Defendant's negligent and tortious conduct.

116.   Plaintiffs and Class Members have suffered injury proximately caused by Defendants' tortious conduct.  Plaintiffs have a legally protected interest in not being exposed to toxic chemicals, such as Lockheed Martin's contamination, and at levels that can result in an increased risk of illness, disease, or disease process. Plaintiffs and Class Members also have a legally protected interest in avoiding the present and future medical need for expensive diagnostic testing.  The exposure to Lockheed Martin's contamination and resulting increased risk of illness, disease or disease process associated with Lockheed Martin's contamination, and the present and future need to incur the cost of medically necessary diagnostic testing for the

early detection of disease as a result of Lockheed Martin's contamination, constitutes an invasion of the legally protected interests of Plaintiffs and Class Members and injury to Plaintiffs and Class Members.  Plaintiffs and Class Members would not have the present and future need to incur the cost of the diagnostic testing to determine the presence of illness, disease, or disease process related to exposure of Ethylene Oxide but for the tortious conduct of Defendants.

117.   Monitoring procedures exist that make the early detection of cancers and illnesses associated with exposure to Lockheed Martin's contamination possible. These monitoring procedures can lead to the early detection of these disease processes, the progression of biomarker abnormalities indicative of these illnesses, and other early warning signs of illness, disease process and disease associated with exposure to Lockheed Martin's contamination.

118.  Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including lymphomas, such as Hodgkin's Lymphoma and Non-Hodgkin's Lymphoma, possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, erythrocyte sedimentation rate, flow cytometry, fluorescence in situ hybridization panel,

cytogenetic analysis, hematopathology consultation and clonality studies.[104] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[105] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of lymphoma due to their exposure to Lockheed Martin's contaminants.[106]

119.    Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including multiple myeloma possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, magnetic resonance imaging, positron emission tomography scans, bone x-rays, cytogenetic analysis, fluorescence in situ hybridization panel, fat pad aspirate, serum and urine protein electrophoresis and

---

[104] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis
[105] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[106] Moffitt Cancer Center, https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/screening/; https://moffitt.org/cancers/lymphomas-hodgkin-and-non-hodgkin/diagnosis/; Willamette Valley Cancer Institute, https://www.oregoncancer.com/lymphoma/hodgkins-lymphoma/diagnosis/; https://www.oregoncancer.com/lymphoma/non-hodgkins-lymphoma/diagnosis

immunofixation.[107] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[108] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of multiple myeloma due to their exposure to Lockheed Martin's contaminants.[109]

120. Monitoring procedures exist that make the early detection of hematopoietic and bone marrow disorders, including leukemias possible.  These monitoring procedures include screening and diagnostic tools such as peripheral blood smear, immunophenotyping, reverse transcription-polymerase chain reaction tests, cytogenetic analysis, fluorescence in situ hybridization panel, genomic testing, flow cytometry, computerized tomography scans, magnetic resonance imaging, and ultrasound.[110] These procedures are not components of standard preventative

---

[107] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[108] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[109] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html

[110] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-myeloid-

healthcare, and are not recommended for the general population.[111] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of leukemias due to their exposure to Lockheed Martin's contaminants.[112]

121.   Monitoring procedures exist that make the early detection of kidney cancers possible.  These monitoring procedures include screening and diagnostic tools such as intravenous pyelogram, computerized tomography scans, magnetic resonance imaging, and ultrasound.[113] These procedures are not components of standard preventative healthcare, and are not recommended for the general

---

leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/acute-lymphoblastic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-lymphocytic-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/chronic-myeloid-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/hairy-cell-leukemia/screening-and-diagnosis; https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/myelodysplastic-syndrome/screening-and-diagnosis
[111] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[112] Willamette Valley Cancer Institute, https://www.oregoncancer.com/multiple-myeloma/detection-diagnosis; Nau et al., 2008, https://www.aafp.org/afp/2008/1001/p853.html; American Cancer Society, https://www.cancer.org/cancer/multiple-myeloma/detection-diagnosis-staging/testing.html
[113] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

population.[114] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of kidney cancer due to their exposure to Lockheed Martin's contaminants.[115]

122.    Monitoring procedures exist that also make the early detection of other kidney damage, including Chronic Kidney Disease, possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of albumin to creatinine ratio and glomerular filtration rate.[116] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[117] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for

---

[114] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

[115] Moffitt Cancer Center, https://moffitt.org/cancers/kidney-renal-cell-cancer/diagnosis/screening/

[116] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases,
https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis

[117] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

individuals such as plaintiffs and class members, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[118]

123.   Monitoring procedures exist that make the early detection of liver cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound and computerized tomography scans, and the evaluation of tumor markers and biomarkers such as alpha-fetoprotein.[119] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[120]  However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of liver cancer due to their exposure to Lockheed Martin's contaminants.[121]

---

[118] National Kidney Foundation, https://www.kidney.org/atoz/content/know-your-kidney-numbers-two-simple-tests#:~:text=ACR%20is%20a%20urine%20test,will%20be%20tested%20for%20albumin.; NIH National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/kidney-disease/chronic-kidney-disease-ckd/tests-diagnosis
[119] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html
[120] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[121] NIH National Cancer Institute, https://www.cancer.gov/types/liver/patient/liver-screening-pdq; MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/liver-cancer-screening.html

124.   Monitoring procedures exist that also make the early detection of other liver damage possible, including liver disease, liver failure, liver enlargement, and liver necrosis possible.   These monitoring procedures include screening and diagnostic tools such as the evaluation of serum bilirubin, serum albumin, serum alkaline phosphatase, serum aminotranferases, prothrombin time, alanine transaminase, aspartate transaminase, gamma-glutamyl transpeptidase, lactic dehydrogenase, 5'-nucleotidase, alpha-fetoprotein, and mitochondrial antibodies.[122] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[123] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of liver damage due to their exposure to Lockheed Martin's contaminants.[124]

125.   Monitoring procedures exist that make the early detection of biliary cancers, including gallbladder cancer possible.   These monitoring procedures include screening and diagnostic tools such as liver function tests, imaging tests such as

---

[122] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html
[123] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[124] Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/liver-kidneys-and-urinary-system/chronic-liver-disease/diagnosis/liver-function-tests.html; American Liver Foundation, https://liverfoundation.org/for-patients/about-the-liver/the-progression-of-liver-disease/

ultrasound, computerized tomography scans, magnetic resonance imaging, percutaneous trashepatic cholangiography, positron emission tomography, and the evaluation of tumor markers and biomarkers such as carcinoembryonic antigen and cancer antigen 19-9.[125] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[126] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of gallbladder cancer due to their exposure to Lockheed Martin's contaminants.[127]

126.   Monitoring procedures exist that make the early detection of bladder cancers possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as bladder tumor associated antigen, mucin, carcinoembryonic antigen, nuclear matrix protein 22, tests such as UroVysion which evaluate chromosomal changes in bladder cells,

---

[125] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis
[126] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[127] Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/bile-duct-cancer/bile-duct-cancer-diagnosis/bile-duct-cancer-diagnostic-tools; Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/gallbladder-cancer/diagnosis; NIH National Cancer Institute, https://www.cancer.gov/types/gallbladder/patient/gallbladder-treatment-pdq

cystoscopy, and imaging tests such as urography, ultrasound, computerized tomography scans, and magnetic resonance imaging.[128] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[129] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of bladder cancer due to their exposure to Lockheed Martin's contaminants.[130]

127. Monitoring procedures exist that make the early detection of reproductive system damage, including testicular cancer, possible. These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as alpha-fetoprotein, beta-human chorionic gonadotropin, and imaging tests such as ultrasound.[131] These procedures are not components of standard preventative healthcare, and are not recommended for the

---

[128] American Cancer Society, https://www.cancer.org/cancer/bladder-cancer/detection-diagnosis-staging/detection.html#references; Columbia University, https://www.columbiaurology.org/adult-urology/urologic-oncology/bladder-cancer/bladder-cancer-screening-and-diagnosis

[129] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[130] Fradet, Yves. Can. Urol. Assoc J. 2009 Dec; 3(6 Suppl 4). Screening for bladder cancer: the best opportunity to reduce mortality

[131] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis

general population.[132] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of testicular cancer due to their exposure to Lockheed Martin's contaminants.[133]

128.   Monitoring procedures exist that make the early detection of prostate cancer possible.  These monitoring procedures include screening and diagnostic tools such as the evaluation of tumor markers and biomarkers such as prostate specific antigen, kallikrein-related peptidase 2, prostate cancer antigen 3, the TMPRSS2-ERG gene fusion, [-2]proPSA, and imaging tests such as ultrasound.[134] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[135] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for

---

[132] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[133] OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/testicular-cancer/screening-and-diagnosis; UK NHS, https://www.nhs.uk/conditions/testicular-cancer/diagnosis/

[134] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html

[135] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

individuals such as plaintiffs and class members, who have increased risks of prostate

cancer due to their exposure to Lockheed Martin's contaminants.[136]

129.   Monitoring procedures exist that make the early detection of glioma and

other brain and spinal cord cancers possible.  These monitoring procedures include

screening and diagnostic tools such as ultrasound, computerized tomography scans,

magnetic resonance imaging, positron emission tomography scans, and the

evaluation of tumor markers and biomarkers such as C228T and C250T.[137] These

procedures are not components of standard preventative healthcare, and are not

recommended for the general population.[138] However, because these procedures can

lead to earlier treatment and improved outcomes, they are reasonably medically

necessary for individuals such as plaintiffs and class members, who have increased

risks of glioma, brain and spine cancers due to their exposure to Lockheed Martin's

contaminants.[139]

---

[136] American Cancer Society, https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html; https://www.cancer.org/cancer/prostate-cancer/about/new-research.html
[137] Massachusetts General Hospital,
https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor
[138] U.S. Preventative Services Task Force, Recommendations:
https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;
American Academy of Family Physicians; Preventative Healthcare Schedule:
https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[139] Massachusetts General Hospital,
https://news.harvard.edu/gazette/story/2020/10/breakthrough-blood-test-developed-for-brain-tumors/; Weill Cornell Brain and Spine Center, https://weillcornellbrainandspine.org/early-detection-can-be-key-surviving-brain-tumor

130.   Monitoring procedures exist that also make the early detection of other neurological damage, including nerve and brain damage, Multiple Sclerosis, and Parkinson's Disease, possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, and x-rays.[140] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[141] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[142]

---

[140] NIH National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-Diagnostic-Tests-and-Procedures-Fact; World Health Organization, https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf

[141] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[142] NIH National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Neurological-Diagnostic-Tests-and-Procedures-Fact; World Health Organization, https://www.who.int/mental_health/neurology/neurological_disorders_report_web.pdf

131.   Monitoring procedures exist that also make the early detection of autoimmunity and autoimmune disorders possible. These monitoring procedures include screening and diagnostic tools such as antinuclear antibody immunofluorescence assay, evaluation of autoimmunity biomarkers such as anti-dsDNA, anti-RNP, anti-Smith, anti-Sjogren's SSA and SSB, anti-scleroderma, anti-Jo-1, anti-CCP, anti-cardiolipin, and anti-chromatin.[143] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[144] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[145]

132.   Monitoring procedures exist that also make the early detection of cardiovascular disorders possible. These monitoring procedures include screening

---

[143] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf

[144] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[145] Michigan Medical, https://www.uofmhealth.org/health-library/abq5017; Doghramji, Paul. Screening and Laboratory Diagnosis of Autoimmune Diseases using Antibody Immunofluorescence Assay and Specific Autoantibody Testing, https://www.aafp.org/dam/AAFP/documents/about_us/sponsored_resources/Quest_%20ANA-IFA_Monograph.pdf; Harvard Health Blog, https://www.health.harvard.edu/blog/autoimmune-lung-disease-early-recognition-and-treatment-helps-2020062420339

and diagnostic tools such as computed tomography, carotid artery ultrasound, abdominal aorta ultrasound, electrocardiography, echocardiography, stress tests, holter monitoring, magnetic resonance imaging, evaluation of autoimmunity biomarkers such as carotid intima-media thickness, coronary artery calcium, c-reactive protein, lipoprotein(a), and homocysteine.[146] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[147] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[148]

133.   Monitoring procedures exist that also make the early detection of musculoskeletal damage possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, arthrography, radionuclide scanning, dual-energy x-ray absorptiometry, ultrasound

---

[146] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124
[147] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[148] Wallace, Margaret et al. Screening Strategies for Cardiovascular Disease in Asymptomatic Adults. Prim. Care. 2014 Jun; 41(2): 371-397; Bhatnagar, Aruni. Studying Mechanistic Links Between Pollution and Heart Disease. Circulation Research. 2006; 99:692-705; Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-disease/diagnosis-treatment/drc-20353124

and x-rays.[149] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[150] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of neurological damage due to their exposure to Lockheed Martin's contaminants.[151]

134.   Monitoring procedures exist that make the early detection of mouth and oral cancers possible.  These monitoring procedures include screening and diagnostic tools such as tests utilizing toluidine blue or fluorescent light, exfoliative cytology, brush biopsy and fiber optic nasopharyngolaryngoscope exam.[152] These procedures are not components of standard preventative healthcare, and are not recommended

---

[149] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders
[150] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[151] University of Colorado, https://www.colorado.edu/venturepartners/2020/04/15/advanced-early-detection-musculoskeletal-disease; Merck Manual, https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/diagnosis-of-musculoskeletal-disorders/tests-for-musculoskeletal-disorders; Stover, Bert: https://digital.lib.washington.edu/researchworks/handle/1773/5407
[152] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis-cancer-screening-protocols/

for the general population.[153] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of mouth and oral cancers due to their exposure to Lockheed Martin's contaminants.[154]

135.   Monitoring procedures exist that make the early detection of throat cancers possible.  These monitoring procedures include screening and diagnostic tools such as ultrasound, computerized tomography scans, computed axial tomography scans, magnetic resonance imaging, positron emission tomography scans, tests utilizing swallowed barium, laryngeal videostoboscopy, fiberoptic endoscopic examination of swallowing, and the evaluation of tumor markers and biomarkers such as hypermethylated genes.[155] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[156] However, because these procedures can lead to earlier treatment and

---

[153] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp1p738.pdf

[154] American Cancer Society, https://www.cancer.org/cancer/oral-cavity-and-oropharyngeal-cancer/detection-diagnosis-staging/detection.html; Oral Cancer Foundation, https://oralcancerfoundation.org/discovery-diagnosis/cancer-screening-protocols/

[155] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

[156] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of throat cancers due to their exposure to Lockheed Martin's contaminants.[157]

136. Monitoring procedures exist that make the early detection of reproductive system damage, including endometrial and uterine cancers, possible. These monitoring procedures include screening and diagnostic tools such as imaging tests such as transvaginal ultrasound, endometrial biopsy, dilation and curettage, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[158] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[159] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased

---

[157] MD Anderson Cancer Center, https://www.mdanderson.org/cancer-types/throat-cancer/throat-cancer-diagnosis.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/news/media/releases/SwishandSpit_Test_Accurate_for_Cancer

[158] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis

[159] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

risks of endometrial and uterine cancers due to their exposure to Lockheed Martin's contaminants.[160]

137.   Monitoring procedures exist that make the early detection of reproductive system damage, including ovarian cancers, possible.  These monitoring procedures include screening and diagnostic tools such as imaging tests such as transvaginal sonography, and the evaluation of tumor markers and biomarkers such as cancer antigen 125.[161]  These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[162]  However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of ovarian cancers due to their exposure to Lockheed Martin's contaminants.[163]

138.   Monitoring procedures exist that make the early detection of intestinal cancers possible.  These monitoring procedures include screening and diagnostic

---

[160] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/endometrial-cancer-screening.html; Penn Medicine, https://www.pennmedicine.org/cancer/types-of-cancer/uterine-cancer-and-endometrial-cancer/uterine-cancer-and-endometrial-cancer-screening-and-diagnosis
[161] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed
[162] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[163] National Ovarian Cancer Coalition, https://www.ovarian.org/about-ovarian-cancer/how-am-i-diagnosed

tools such as upper gastrointestinal series, enterocylsis, barium enema with X-rays, computerized tomography scans, and endoscopic procedures.[164] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[165] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of intestinal cancers due to their exposure to Lockheed Martin's contaminants.[166]

139.   Monitoring procedures exist that make the early detection of stomach and gastrointestinal cancers possible.   These monitoring procedures include screening and diagnostic tools such as upper endoscopy, imaging tests such as upper gastrointestinal series, computerized tomography scans, postiron emission tomography scan, magnetic resonance imaging, and endoscopic ultrasound.[167] These

---

[164] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis

[165] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[166] Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/intestinal-cancer/about; OSU Cancer Center, https://cancer.osu.edu/for-patients-and-caregivers/learn-about-cancers-and-treatments/cancers-conditions-and-treatment/cancer-types/small-intestine-cancer/screening-and-diagnosis

[167] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer

procedures are not components of standard preventative healthcare, and are not recommended for the general population.[168] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of stomach and gastrointestinal cancers due to their exposure to Lockheed Martin's contaminants.[169]

140.   Monitoring procedures exist that also make the early detection of other gastrointestinal disorders possible.  These monitoring procedures include screening and diagnostic tools such as upper GI series, gastroscopy, endoscopic retrograde cholangiopancreatography, endoscopic ultrasound, pH monitoring, manometry, barium enema, sigmoidoscopy, endoscopy, fecal calprotectin, fecal occult blood test, fecal immunochemical test, stool acidity test, stool culture, lactose tolerance test, hydrogen breath test, magnetic resonance imaging, barium beefsteak meal, colorectal transit study, computerized tomography, defecography, lower GI series,

---

[168] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[169] American Cancer Society, https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/stomach-cancer/detection-diagnosis-staging/how-diagnosed.html; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stomach-gastric-cancer/how-endoscopy-detects-stomach-cancer

oropharyngeal motility, radioscopic gastric-emptying scan, sigmoidoscopy.[170] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[171] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of kidney damage due to their exposure to Lockheed Martin's contaminants.[172]

141.   Monitoring procedures exist that make the early detection of adrenal cancers possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans, positron emission tomography scans, magnetic resonance imaging, ultrasound, x-ray, laparoscopy.[173] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[174] However, because these procedures can lead to earlier

---

[170] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures
[171] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[172] GI Society, https://badgut.org/information-centre/diagnostic-tests-and-procedures/; Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/digestive-diagnostic-procedures; Massachusetts General Hospital, https://advances.massgeneral.org/digestive-health/video.aspx?id=1128
[173] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection
[174] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P;

treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of adrenal cancers due to their exposure to Lockheed Martin's contaminants.[175]

142.   Monitoring procedures exist that make the early detection of pancreatic cancers possible.  These monitoring procedures include screening and diagnostic tools such as endoscopic ultrasound, magnetic resonance imaging, computerized tomography scans, magnetic resonance cholangiopancreatography, endoscopic retrograde cholangiopancreatography, and the evaluation of tumor markers and biomarkers such as cancer antigen 19-9.[176] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[177] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as

---

American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[175] Moffitt Cancer Center, https://moffitt.org/cancers/adrenal-cancer/diagnosis/screening/; Cancer Treatment Centers of America, https://www.cancercenter.com/cancer-types/adrenal-cancer/diagnosis-and-detection; National Cancer Institute, https://www.cancer.gov/types/adrenocortical/patient/adrenocortical-treatment-pdq

[176] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.org/cancers/pancreatic-cancer/screening/

[177] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

plaintiffs and class members, who have increased risks of pancreatic cancers due to their exposure to Lockheed Martin's contaminants.[178]

143.   Monitoring procedures exist that make the early detection of thyroid cancers possible. These monitoring procedures include screening and diagnostic tools such as   imaging tests such as ultrasound, radioiodine scan, magnetic resonance imaging, computerized tomography scans, and positron emission tomography scans.[179] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[180] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of thyroid cancers due to their exposure to Lockheed Martin's contaminants.[181]

144.   Monitoring procedures exist that also make the early detection of other endocrine damage, including adrenal, pancreatic, pituitary and thyroid disorders,

---

[178] Johns Hopkins Medicine, https://pathology.jhu.edu/pancreas/participating-research/caps; Moffitt Cancer Center, https://moffitt.us/cancers/pancreatic-cancer/screening/
[179] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html
[180] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[181] American Cancer Society, https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/detection.html; https://www.cancer.org/cancer/thyroid-cancer/detection-diagnosis-staging/how-diagnosed.html

possible. These monitoring procedures include screening and diagnostic tools such as computerized tomography, magnetic resource imaging, positron emission tomography, single photon emission computed tomography, angiography, molecular pathology, cytogenics, ultrastructural analysis, cerebrospinal fluid analysis, electroencephalography, electromyography, electronystagmography, evoked potentials, myelography, polysomnogram, thermography, ultrasound imaging, rapid dynamic gadolinium-enhanced pituitary imaging, x-rays, evaluation of glucose suppression, growth hormone stimulation, and dexamethasone suppression.[182] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[183] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of endocrine damage due to their exposure to Lockheed Martin's contaminants.[184]

---

[182] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment
[183] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[184] Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/endocrinology-diabetes-and-metabolism/endocrinology-services/diagnosis-and-treatment-of-endocrine-disorders; Sanford Health, https://www.sanfordhealth.org/medical-services/endocrinology; OHSU, https://www.ohsu.edu/brain-institute/pituitary-disorders-diagnosis-and-treatment

145.   Monitoring procedures exist that make the early detection of nasal and paranasal cancers possible.  These monitoring procedures include screening and diagnostic tools such as magnetic resonance imaging, computerized tomography scans, and positron emission tomography scans.[185] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[186] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of nasal and paranasal cancers due to their exposure to Lockheed Martin's contaminants.[187]

146.   Monitoring procedures exist that make the early detection of skin cancers possible.  These monitoring procedures include screening and diagnostic tools such as complete skin exams and regular dermatologic surveillance.[188] These procedures are not components of standard preventative healthcare, and are not

---

[185] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses
[186] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[187] Cedars Sinai Cancer Center, https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/nasal-cavity-and-sinus-cancer.html; Baptist Cancer Center, https://www.baptistcancercenter.com/cancers-we-treat/nasal-cavity-paranasal-sinuses
[188] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin

recommended for the general population.[189] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of skin cancers due to their exposure to Lockheed Martin's contaminants.[190]

147.   Monitoring procedures exist that make the early detection of lung and respiratory tract damage, including lung and respiratory cancers, possible.  These monitoring procedures include screening and diagnostic tools such as computerized tomography scans.[191] These procedures are not components of standard preventative healthcare, and are not recommended for the general population.[192] However, because these procedures can lead to earlier treatment and improved outcomes, they are reasonably medically necessary for individuals such as plaintiffs and class members, who have increased risks of lung and respiratory tract cancers due to their exposure to Lockheed Martin's contaminants.[193]

---

[189] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[190] Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/types/skin/screening-guidelines-skin

[191] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html

[192] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf

[193] MD Anderson Cancer Center, https://www.mdanderson.org/prevention-screening/get-screened/lung-cancer-screening.html

148.    Monitoring procedures exist that make the early detection of rectal and colorectal cancers possible.  These monitoring procedures include screening and diagnostic tools such as highly sensitive fecal immunochemical tests, highly sensitive guaiac-based fecal occult blood tests, multi-targeted stool DNA tests, and imaging tests such as colonoscopy, computerized tomography colonography, and flexible sigmoidoscopy.[194] These procedures may be components of standard preventative healthcare, and recommended for the general population.[195] However, because plaintiffs and class members have increased risks of rectal and colorectal cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and examinations earlier, and more frequently, than what is recommended for the general public.[196]

149.    Monitoring procedures exist that make the early detection of breast cancers possible.  These monitoring procedures include screening and diagnostic tools such clinical breast exams and mammography.[197] These procedures may be

---

[194] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html
[195] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[196] American Cancer Society, https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.html
[197] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf

components of standard preventative healthcare, and recommended for the general population.[198] However, because plaintiffs and class members have increased risks of breast cancers as a result of their exposure to Lockheed Martin's contaminants, it is reasonably medically necessary for them to receive these tests and examinations earlier, and more frequently, than what is recommended for the general public.[199] Due to their increased risks of breast cancer resulting from their exposures to Lockheed Martin's contaminants, it is also reasonably medically necessary for plaintiffs and class members to receive supplemental monitoring procedures that are not recommended for the general population, such as tomosynthesis magnetic resonance imaging.[200]

150.   These monitoring procedures are different than for the unexposed populations.  The monitoring procedures will benefit Plaintiffs and Class Members since they will allow for the early detection of latent disease associated with exposure to Lockheed Martin's contamination.  Plaintiffs and Class Members have the present need of diagnostic testing to diagnose properly the warning signs of the illness,

[198] U.S. Preventative Services Task Force, Recommendations: https://www.uspreventiveservicestaskforce.org/uspstf/topic_search_results?topic_status=P; American Academy of Family Physicians; Preventative Healthcare Schedule: https://www.aafp.org/afp/2016/0501/afp20160501p738.pdf
[199] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf
[200] MD Anderson Cancer Center, https://www.mdanderson.org/content/dam/mdanderson/documents/for-physicians/algorithms/screening/screening-breast-web-algorithm.pdf

disease, or and disease process resulting from exposure to Lockheed Martin's contamination. Finding cancer and other deadly diseases early, when it has not spread or worsened, allows for more treatment options. If left to when the disease becomes obvious, Plaintiffs and Class Members will lose valuable treatment time. These monitoring procedures are different from what would normally be recommended in the absence of exposure to Lockheed Martin's contamination. The monitoring procedures are reasonably medically necessary as a direct and proximate result of Defendants' conduct due to the exposure of Plaintiffs and Class Members to Lockheed Martin's contamination.

151. Medical monitoring is recognized as a beneficial service provided to individuals in communities where there is believed to be an increased risk of disease from exposure to hazardous substances released into the environment.[201] The purpose of a medical monitoring program is case-finding in order to refer individuals for further evaluation and, as appropriate, treatment.[202] Moreover, medical monitoring is widely accepted as a response to toxic exposure.[203]

---

[201] ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA, 60 FR 38841. July 28, 1995.
[202] Id.
[203] See C8 Medical Monitoring Program, http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf; Department of Environmental Health, Fernald Medical Monitoring Program, UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE, https://med.uc.edu/eh/research/projects/fcc/fmmp-history, Environmental Health & Safety, Pesticide Users Medical Monitoring Program, UNIVERSITY OF FLORIDA, http://www.ehs.ufl.edu/programs/ih/pesticide/; World Trade Center Health

## **CLASS ALLEGATIONS**

152.   Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a class defined as follows:

> All natural persons who have resided or been employed within five miles of the Orlando Facility for a period of one year or more, at any time between January 1, 1985 and the present (the "Class Period") (collectively, the "Medical Monitoring Class").

153.   Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff Phyllis Grayson seeks certification of a separate class (the "Homeowners Class"), defined as follows:

> All owners, as of September 28, 2020, of residential properties located within five miles of the Orlando Facility (the "Real Property").

154.   Excluded from the Classes are Defendant and any of its affiliates, parents, or subsidiaries; all employees of Defendant; all persons who have separate lawsuits pending against Defendant for the pollution originating from the Orlando Facility; all persons who make a timely election to be excluded from the Classes; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

---

Program, About the Program, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/wtc/about.html.

155.   Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

156.   The proposed Classes meet the criteria for certification under Fed R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

157.   **Numerosity. Fed. R. Civ. P. 23(a)(1).**   Consistent with Rule 23(a)(1), the Members of the Classes are so numerous and geographically dispersed that the joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, the proposed Classes include thousands of current and former residents and workers who were unlawfully exposed to toxic wastes and pollution. Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

158.   **Commonality. Rule 23(a)(2) and (b)(3).**   Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.      Whether Defendant's conduct was negligent;

b.      Whether Defendant's conduct constitutes a public nuisance;

c.      Whether Defendant's conduct constitutes a private nuisance;

d.      Whether Defendant's conduct constitutes an ultrahazardous or abnormally dangerous activity;

e.      Whether Defendant owed a duty of care to Members of the Classes;

f.      Whether the duty of care owed to the Classes included the duty to protect against exposures to unsafe and unnecessarily high levels of toxic wastes;

g.      Whether Defendant breached its duty to warn the Classes of and protect the Classes from the long-term health risks and consequences of exposure to high levels of toxic wastes;

h.      Whether Members of the Medical Monitoring Class are entitled to medical monitoring and early detection of disease;

i.      Whether Members of the Homeowners Class have suffered a diminution in their property value due to Lockheed Martin's contamination;

j.      Whether Lockheed Martin is jointly liable for all damages sought by the Classes; and

k.      Whether Plaintiffs and Members of the Classes are entitled to injunctive relief and the scope of that relief.

159.   **Typicality. Rule 23(a)(3).**   Consistent with Rule 23(a)(3), Plaintiffs'
claims are typical of those of the putative Class Members. Plaintiffs have resided
within five miles of the Orlando Facility for over one year during the Class Period.
Plaintiffs have had significant exposure to toxic wastes released from the Orlando
Facilities as have all Class Members. That exposure has resulted in an increased risk
of illnesses and diseases in Plaintiffs, as it has in all class members. Plaintiffs have
the same, reasonably medically necessary, need to incur the cost of diagnostic testing
for the early detection of illness and disease as all Class Members. Plaintiffs therefore
seek the same relief as all Medical Monitoring Class Members: a court-supervised
medical monitoring program for the early detection of illnesses, diseases, or disease
processes and an injunction against further emission of toxic wastes.

160.   Plaintiff Phyllis Grayson also owns real property within five miles of
the Orlando Facility, and owned that real property on September 28, 2020. The value
of Plaintiff's Real Property and her ability to enjoy it has been diminished by
Defendant's toxic emissions and the contamination originating from the Orlando
Facility. Plaintiff Grayson therefore seeks the same relief as the Homeowners Class:
economic damages for the diminution in value and the loss of use and enjoyment of
her Real Property.

161.   **Adequacy. Rule 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are
adequate representatives of the Classes because Plaintiffs are Members of the

Classes and committed to pursuing this matter against Defendant to obtain relief for the Classes. Plaintiffs have no conflict of interest with the Classes. Plaintiffs' Counsel are competent and experienced in litigating class actions. Plaintiffs intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

162. **Superiority. Rule 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Classes are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

163. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

164. Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

165. Finally, all members of the proposed Classes are readily ascertainable as they are all current or former residents of defined census tracts or employees of registered companies. Class Members can be identified, and their contact information ascertained for the purpose of providing notice to the Classes based upon public records (including but not limited to voter rolls, school records, and property-tax records), private records (including but not limited to Defendant's employment records, other employers' records, lease agreements, and utility records), and declarations.

## COUNT I—STRICT LIABILITY; ULTRAHAZARDOUS ACTIVITY

*(On behalf of Plaintiff Phyllis Grayson and the Homeowners Class)*

166. Plaintiff Grayson repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

167. Defendant's manufacture of rockets, war missiles, weaponry and related components, and the associated handling, storage, use, and disposal of the highly toxic contaminants described herein constituted ultrahazardous activities.

168. Handling, storing, utilizing, disposing and emitting the highly toxic contaminants described herein is abnormally dangerous and cannot be made completely safe by the exercise of the utmost care. The operations at the Orlando Facility resulted in emissions of toxic substances to nearby homes, which posed a high degree of risk to the surrounding community, including Plaintiff Grayson and the Homeowners Class.

169. There was a reasonable likelihood that the handling, storing, usage, disposal, and emission of the toxic substances described herein would result in life-threatening cancer and other devastating illnesses, diseases, and disease processes. These risks cannot be completely eliminated as long as these toxic contaminants are handled, stored, utilized, disposed of, or emitted near populated areas.

170. Manufacturing ballistic missiles and other sophisticated weaponry and component parts is not a manner of common usage but is an extraordinarily rare and unusual enterprise. Likewise, it was completely inappropriate for Defendant to carry out these activities and use, handle, store, dispose of and emit toxic contaminants near populated areas.

171.   The emissions of the toxic substances described herein near homes and businesses is likely to result in great harm to persons and property.

172.   Defendant's handling, storage, usage, disposal and emission of the toxic contaminants described herein created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other devastating illnesses, diseases, and disease processes.

173.   Defendant's handling, storage, usage, disposal, and emission of the toxic contaminants described herein created a high degree of risk that the value of nearby homes would be diminished.

174.   The activities conducted by Defendant are not a matter of common usage, are exceedingly dangerous, and offer little or no value to the surrounding community.

175.   Because these activities are ultrahazardous, Defendant is strictly liable for any injuries proximately resulting therefrom.

176.   As a direct and proximate result of Defendant's ultrahazardous activities, Plaintiff Grayson and the Homeowners Class have experienced a diminution in the value of their Real Property and a loss of the use and enjoyment of their Real Property and residences.

177.   Defendant Lockheed Martin is jointly liable for all damages sought by the Homeowners Class.

178.   Defendant knew or ought to have known that its conduct would naturally and probably result in injury to others, including Plaintiff Grayson and the Homeowners Class. Defendant carried on and continued such conduct in reckless disregard of the consequences. Punitive damages are thus warranted. Plaintiff Grayson and the Homeowners Class are also entitled to declaratory and injunctive relief as set forth in the Request for Relief.

## COUNT II—STRICT LIABILITY; Fla. Stat. §376.313

*(On behalf of Plaintiff Phyllis Grayson and the Homeowners Class)*

179.   Plaintiff Grayson repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

180.   Defendant owned and operated the Orlando Facility, and caused discharges of the contaminants described herein, and polluting conditions which are prohibited by Fla. Stat. §§ 376.30, 376.302 *et seq*.

181.   Defendant discharged hazardous substances, petroleum, petroleum products, and solvents, as described herein, in violation of Fla. Stat. §§ 376.30, 376.302 *et seq*.

182.   Defendant's discharges of contaminants, hazardous substances, solvents, petroleum, petroleum products, and creation of polluting conditions, in violation of Fla. Stat. §376.30 *et seq*., caused the emissions of toxic substances to nearby homes.

183.   As a direct and proximate result of Defendant's ultrahazardous activity, Plaintiff Grayson and the Homeowners Class have experienced a diminution in the value of their Real Property and a loss of the use and enjoyment of their Real Property and residences.

184.   Plaintiff Grayson and the Homeowners Class therefore seek damages for the diminution in value of their Real Property and for the loss of the use and enjoyment of their Real Property and residences as caused by Defendant's toxic emissions.

185.   Defendant Lockheed Martin is jointly liable for all damages sought by the Homeowners Class.

186.   By reason of the foregoing, Defendant is strictly liable to Plaintiff Grayson and the Homeowners Class for compensatory damages resulting therefrom, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper. Plaintiff Grayson and the Homeowners Class are also entitled to declaratory relief as set forth in the Request for Relief.

## COUNT III—PUBLIC NUISANCE

*(On behalf of Plaintiff Phyllis Grayson and the Homeowners Class)*

187.   Plaintiff Grayson repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

188.   The interference with the enjoyment and value of private property rights is a special injury justifying a suit by a private individual to enjoin the nuisance.

189.   By unreasonably and recklessly using, storing, transporting, handling, disposing, and emitting toxic wastes at its Orlando Facility, Defendant is maintaining a place that tends to annoy the community or injure the health of the surrounding community.

190.   By unreasonably and recklessly using, storing, transporting, handling, disposing, and emitting toxic wastes at its Orlando Facility, Defendant is maintaining a place where the laws of the State of Florida are violated.

191.   By unreasonably and recklessly using, storing, transporting, handling, disposing, and emitting toxic wastes at its Orlando Facility, Defendant has interfered with the enjoyment and value of Plaintiff Grayson's and the Homeowners Class's private property rights.

192.   Plaintiff Grayson and the Homeowners Class are entitled to the enjoyment and value of their private property rights.

193.   Plaintiff Grayson and the Homeowners Class have the right to enjoy their private property rights without nearby property owners emitting large and dangerous levels of contamination.

194.   Defendant has substantially and unreasonably infringed upon and transgressed the rights described in this paragraph.

195.   At all times relevant hereto, Defendant knew these toxic wastes to be hazardous and harmful to human beings.

196.   Defendant knew or should have known that the levels of toxic wastes emitted at its Orlando Facility would have a deleterious effect upon the health, safety, and well-being of the surrounding community.

197.   Burgeoning public awareness of Defendant's conduct and contamination has caused public fear that negatively impacts the market value of properties owned by Plaintiff Grayson and the Homeowner's Class. This, along with Plaintiff Grayson's and the Homeowners Class Member's duty to disclose the nearby presence of dangerous levels of contamination to prospective purchasers of their properties, has resulted in a permanent diminution in the value of properties owned by Plaintiff Grayson and the Homeowners Class Members.

198.   As a proximate result of Defendant's operation of its Orlando Facility, Defendant has caused a diminution in the value of Plaintiff Grayson's and the Homeowners Class' property rights.

199.   Defendant Lockheed Martin is jointly liable for all damages sought by the Homeowners Class.

200.   Defendant's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiff Grayson and the Homeowners Class, and punitive damages are thus warranted.

201.   By reason of the foregoing, Defendant is liable to Plaintiff Grayson and the Homeowners Class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, and all such other relief as the Court deems proper. Plaintiff Grayson and the Homeowners Class are also entitled to declaratory and injunctive relief as set forth in the Request for Relief.

## COUNT IV—PRIVATE NUISANCE

*(On behalf of Plaintiff Phyllis Grayson and the Homeowners Subclass)*

202.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

203.   At all times relevant hereto, Defendant knew its toxic wastes to be hazardous and harmful to human beings.

204.   Defendant's unreasonable and reckless storage, use, transport, handling, disposal and emission of toxic wastes from its Orlando Facility constituted a substantial and unreasonable interference with Plaintiff's and Class Members' interests and rights of reasonable use and enjoyment of their Real Property.

205.   Defendant's unreasonable and reckless storage, use, disposal and emission of toxic wastes from its Orlando Facility constituted negligent or reckless conduct.

206.   Defendant's unreasonable and reckless storage, use, disposal and emission of toxic wastes from its Orlando Facility was an ultrahazardous or

abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

207.   Burgeoning public awareness of Defendant's unreasonable conduct and contamination has caused public fear that negatively impacts the market value of properties owned by Plaintiff Grayson and the Homeowner's Class. This, along with Plaintiff Grayson's and the Homeowners Class Member's duty to disclose the nearby presence of dangerous levels of contamination to prospective purchasers of their properties, has resulted in a permanent diminution in the value of properties owned by Plaintiff Grayson and the Homeowners Class Members.

208.   Defendant Lockheed Martin is jointly liable for all damages sought by the Homeowners Class.

209.   Defendant's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiff and Class Members, and punitive damages are thus warranted.   Plaintiff and Class Members are also entitled to declaratory and injunctive relief as set forth in the Request for Relief.

## <u>COUNT IV—NEGLIGENCE</u>

*(On behalf of Plaintiff Phyllis Grayson and the Homeowners Class)*

210.   Plaintiff Grayson repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

211.   Defendant owed Plaintiff Grayson and the Homeowners Class a duty to operate its Orlando Facility in a manner which would not cause Plaintiff Grayson or the Homeowners Class injury or harm. Plaintiff Grayson and the Homeowners Class were foreseeable victims located within the scope of the risk created by the Defendant's unreasonable and reckless conduct.

212.   Defendant negligently breached its duty of care by mismanaging toxic contaminants at its Orlando Facility in a way that would cause severe and widespread contamination by emitting dangerous levels of toxic wastes from its Orlando Facility, failing to take steps to minimize or eliminate the release of toxic wastes from its Orlando Facility, failing to utilize alternative processes that would not result in widespread contamination of the release of toxic wastes, failing to use proper materials in constructing the facility, failing to institute proper procedures and training,  releasing toxic wastes into a heavily populated community, and further increasing the number of people exposed to its contamination by selling parcels near and of the Orlando Facility for redevelopment.

213.   Defendant owed Plaintiff Grayson and the Homeowners Class a duty of reasonable care commensurate with the risk of operating the Orlando Facility.

214.   Defendant negligently breached its duty by, among other things:

        a.  Filling crude trenches and ponds with toxic wastes;

b. Transporting toxic wastes through defective lines, piping systems, and broken concrete troughs;

c. Draining toxic wastes directly onto soil;

d. Emitting dangerous amounts of toxic wastes into the air;

e. Failing to employ safe methods to adequately control, reduce, or eliminate toxic waste emissions from its Orlando Facility;

f. Failing to use alternative practices and procedures which would not result in the emission of toxic wastes into neighboring communities;

g. Emitting dangerous amounts of toxic wastes into a populated area;

h. Failing to warn neighboring residents and workers that they were being exposed to toxic wastes and of the consequent risks of disease the residents and workers acquired because of that exposure;

i. Failing to take steps to minimize or eliminate the release of toxic wastes, by failing to utilize alternative procedures that would not result in the release of toxic wastes;

j. Failing to install closed loop treatment technologies which would contain toxic wastes in sealed containers;

    k.  Failing to use proper materials in constructing and maintaining the Orlando Facility; and

    l.  Failing to institute proper procedures and training to prevent releases of toxic wastes.

215.  As a direct and proximate result of Defendant's negligence, Defendant emitted toxic substances near homes and businesses, posing a high degree of risk to the surrounding community, including Plaintiff Grayson, the Homeowners Class, and their Real Property.

216.  As a direct and proximate result of Defendant's negligence, Plaintiff Grayson and the Homeowners Class have experienced a diminution in the value of their Real Property and a loss of the use and enjoyment of their Real Property and residences.

217. Burgeoning public awareness of Defendant's conduct and contamination has caused public fear that negatively impacts the market value of properties owned by Plaintiff Grayson and the Homeowner's Class. This, along with Plaintiff Grayson's and the Homeowners Class Member's duty to disclose the nearby presence of dangerous levels of contamination to prospective purchasers of their properties, has resulted in a permanent diminution in the value of properties owned by Plaintiff Grayson and the Homeowners Class Members.

218.   Plaintiff Grayson and the Homeowners Class therefore seek damages for the diminution in value of in their Real Property and for the loss of use and enjoyment of their Real Property.

219.   Defendant Lockheed Martin is jointly liable for all damages sought by Plaintiff Grayson and the Homeowners Class.

220.   At all times relevant, Defendant owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, property, and well-being of Plaintiff Grayson and the Homeowners Class.

221.   Upon information and belief, Defendant was, at all times relevant, aware that the toxic wastes it was storing, handling disposing and emitting at its Orlando Facility were highly carcinogenic, capable of causing debilitating diseases, and/or otherwise harmful to humans.

222.   Upon information and belief, Defendant was, at all times relevant, aware of the considerable health risks associated with the mismanagement and emissions of its toxic wastes at the Orlando Facility, including the risk of causing various forms of cancer and other debilitating diseases in the surrounding population.

223.   Upon information and belief, Defendant was, at all times relevant, aware that its handling, storage, use, disposal, and treatment of toxic wastes at the Orlando Facility actually resulted in the unreasonably dangerous emissions of toxic wastes

into the surrounding communities and near homes and businesses, which posed a high degree of risk to Plaintiff Grayson, the Homeowners Class, and their Real Property.

224.   Defendant's failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable levels of toxic contamination constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff Grayson and the Homeowners Class.

225.   Defendant's conduct was willful, wanton, and in reckless disregard for the rights of others, including Plaintiff Grayson and the Homeowners Class, and punitive damages are thus warranted.  Plaintiff Grayson and the Homeowners Class are also entitled to declaratory and injunctive relief as set forth in the Request for Relief.

## COUNT V—MEDICAL MONITORING

*(On behalf of Plaintiffs and the Medical Monitoring Class)*

226.   Plaintiffs repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 165, and 210 through 225 as if fully set forth herein.

227.   Plaintiffs and Members of the Medical Monitoring Class have been significantly exposed to levels of toxic contaminants and proven hazardous

substances that are far higher than normal background levels. These toxic wastes include dangerous carcinogens that have been proven to cause cancer in humans, and substances which cause numerous other debilitating illnesses.

228.   Plaintiffs and Members of the Medical Monitoring Class came into direct contact with, and consumed, these toxic contaminants due to Defendant's negligence.

229.   As a proximate result of their exposure to these toxic contaminants, Plaintiffs and Members of the Medical Monitoring Class have a significantly increased risk of contracting serious latent disease, including several different types of cancer and other debilitating diseases. These increased risks make periodic diagnostic medical examinations reasonably necessary.

230.   Monitoring procedures exist that makes early detection of these diseases possible. The prescribed monitoring regime for these diseases are different than those normally recommended in the absence of toxic exposures and are reasonably necessary according to contemporary scientific principles.

231.   These measures are essential to preventing and/or mitigating long-term health consequences that will be borne by Plaintiffs and Members of the Medical Monitoring Class, through no fault of their own, due to Defendant's actions in exposing Plaintiffs and Members of the Medical Monitoring Class to dangerous chemicals.

232.   In some cases, these medical monitoring measures are likely to prove life-saving.

233.   As a result, the Court should establish a court supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs and Members of the Medical Monitoring Class for their economic damages.

234.   Defendant Lockheed Martin is jointly liable for all damages sought by Plaintiffs and Members of the Medical Monitoring Class.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Members of the Classes proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

1. For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their counsel to represent the Classes;

2. For an award of declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and Members of the Classes;

3. For a declaration that Defendant acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and Members of the Classes;

4. For injunctive relief as is necessary to protect the interests of Plaintiffs and Members of the Classes, including without limitation and

injunction that Defendant refrain from continuing to emit toxic wastes from the Orlando Facility.

5. For injunctive relief as there is no adequate remedy at law that will fully protect the interests of Plaintiffs and Members of the Classes or ensure that Defendant take the actions requested in this Request for Relief.

6. For an injunction prohibiting Defendant from:

   a. Filling unlined trenches and ponds with toxic wastes;

   b. Transporting toxic wastes through defective lines, piping systems, and broken concrete troughs;

   c. Draining toxic wastes directly onto soil;

   d. Emitting dangerous amounts of toxic wastes into the air;

   e. Failing to employ safe methods to adequately control, reduce, or eliminate toxic waste emissions from its Orlando Facility;

   f. Failing to use alternative practices and procedures which would not result in the emission of toxic wastes into neighboring communities;

   g. Emitting dangerous amounts of toxic wastes into a populated area;

h. Failing to warn neighboring residents and workers that they were being exposed to toxic wastes and of the consequent risks of disease the residents and workers acquired because of that exposure;

i. Failing to take steps to minimize or eliminate the release of toxic wastes, by failing to utilize alternative procedures that would not result in the release of toxic wastes;

j. Failing to install closed loop treatment technologies which would contain toxic wastes in sealed containers;

k. Failing to use proper materials in constructing and maintaining the Orlando Facility; and

l. Failing to institute proper procedures and training to prevent releases of toxic wastes.

7. For an injunction that Defendant pay for a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Class.

8. For an award of damages, including nominal and compensatory damages, and other amounts as allowed by law and in an amount to be determined;

9.      For the Court to supervise and administer a medical monitoring program and trust fund;

10.     For an award of punitive damages as allowed by law and in an amount to be determined;

11.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

12.     For prejudgment interest on all amounts awarded; and

13.     For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

      a.   Injunctive relief under 23(b)(2) as necessary and appropriate to prohibit Defendant's toxic emissions; and

      b.   Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (Strict liability/ultrahazardous activity, strict liability/Fla. Stat. §376.313; public nuisance; negligence; willful and wanton conduct; medical monitoring).

14.     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a jury trial as to all issues so triable.

Date: June 9, 2021                          */s/ Frank M. Petosa*
                                            Frank M. Petosa
                                            FL Bar No. 972754
                                            MORGAN & MORGAN, P.A.
                                            COMPLEX LITIGATION GROUP
                                            8151 Peters Road, 4th Floor
                                            Plantation, FL 33324
                                            fpetosa@ForThePeople.com
                                            P: (954) 327-5366
                                            F: (954) 327-3018

                                            T. Michael Morgan
                                            FL Bar No. 62229
                                            MORGAN & MORGAN
                                            20 N Orange Ave., Suite 1600
                                            Orlando, FL 32801
                                            mmorgan@ForThePeople.com
                                            P: (407) 418-2031
                                            F: (407) 245-3384

                                            Rene F. Rocha*
                                            MORGAN & MORGAN
                                            COMPLEX LITIGATION GROUP
                                            400 Poydras St., Suite 1515
                                            New Orleans, LA 70130
                                            rrocha@ForThePeople.com
                                            P:  (954) 318-0268
                                            F:  (954) 327-3018

                                            Michael F. Ram*
                                            mram@forthepeople.com
                                            Marie N. Appel*
                                            mappel@forthepeople.com
                                            Ra O. Amen**
                                            ramen@forthepeople.com
                                            MORGAN & MORGAN
                                            COMPLEX LITIGATION GROUP
                                            711 Van Ness Avenue, Suite 500
                                            San Francisco, CA 94102

Telephone: (415) 358-6913
Facsimile: (415) 358-6923

*Pro Hac Vice*

**Pro Hac Vice Pending*

*Attorneys for the Plaintiff*

107