## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| PHYLLIS GRAYSON; and PHILLIP PENSON; individually and on behalf of all other similarly situated, | |
| | Case No.: 6:20-cv-01770 |
| Plaintiffs, | |
| v. | |
| LOCKHEED MARTIN CORPORATION | |
| Defendant. | |

### PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF MR. EMSBO-MATTINGLY PURSUANT TO FED. R. EVID. 702 AND INCORPORATED LEGAL MEMORANDUM

Come the Plaintiffs, though counsel, and move this Honorable Court to exclude the expert report and testimony of Stephen Emsbo-Mattingly, M.S. pursuant to Federal Rule of Evidence 702. In support of this Motion, Plaintiffs state as follows:

## I.    INTRODUCTION

Defendant Lockheed Corporation ("Lockheed") has designated Mr. Emsbo-Mattingly to "determine if current or historical activities at the Sand Lake Road Complex (SLRC) caused offsite impacts of 36 constituents of concern (COCs) to the Class Area . . . ."[1] Mr. Emsbo-Mattingly offers a series of opinions based on deeply flawed methodology.

The Federal Reference Guide on Exposure Science warns that:

---

[1] Emsbo-Mattingly Rpt. (ex.1) at p. 7.

> Sampling events may provide a good snapshot of current conditions, but in circumstances in which concentrations could be changing over time, and where the health concerns involve long-term exposures, snap-shots could be highly misleading. This type of problem may be especially severe when attempts are being made to reconstruct past exposures, based on snapshots taken in the present.[2]

Yet this is precisely what Mr. Embso-Mattingly attempts to do. Mr. Emsbo-Mattingly makes conclusions about the historical impacts of COCs to air and soil merely by evaluating a limited number of samples taken in 2022. Mr. Emsbo-Mattingly also admittedly divides sampling areas in an arbitrary manner when determining spatial trends and soil concentrations. Despite recognizing the limitations of his sampling data, Embso-Mattingly fails to identify any methodological support for his conclusions. Ultimately, Mr. Emsbo-Mattingly's conclusions stem from his unquantifiable personal experience and instinct, not from scientific theory and reasoning.

Defendants have not met their burden of proof to show that Mr. Embso-Mattingly's testimony is both reliable and helpful to the trier of fact.  Accordingly, for the reasons outlined below, this Court should exclude under Fed. R. Evid. 702 the entirety of the testimony and opinions of Stephen Emsbo-Mattingly, M.S.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 imposes on district courts a gatekeeping function to "ensure that any and all scientific testimony or evidence admitted is not only

---

[2] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 529 (3d ed. 2011) (ex. 2); also cited at Exhibit 21 to Emsbo-Mattingly's Deposition.

relevant, but reliable." *Daubert v. Merrell Dow*, 509 U.S. 579, 598 (1993). Importantly, the proponent of the testimony bears the burden of proving that their expert's testimony is admissible by a preponderance of the evidence. *See id*. at 592 n.10; *see also Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) ("*Hendrix II*"). Federal Rule of Evidence 702 provides:

> A witness who is qualified by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the produce of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of the requirements: qualifications, reliability, and fit. *Id.*

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix*, 609 F.3d at 1193 (*citing* Fed. R. Evid. 702), *aff'g* 255 F.R.D. 568 (N.D. Fla. 2009) ("*Hendrix I*"). To meet the reliability requirement, an expert's opinion needs to be based on scientifically valid principles, reasoning, and methodology and be properly applied to the facts at issue. *See In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1305 (N.D. Fla.

3

2018). This analysis is guided by several factors, which can include: "(1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community." *Id.* (*citing Daubert*, 509 U.S. at 593-94, 113 S. Ct. 2786). The list is not exhaustive; the district court may take other relevant factors into account, such as "(1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses." *Hendrix*, 255 F.R.D. at 578–79 (N.D. Fla. 2009). When a party contends that an expert's opinion is misconstrued, misrepresented, overstated, or biased, courts in the Eleventh Circuit determine that these challenges are typically better suited for cross-examination. *See, e.g., In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 373 (M.D. Fla. Dec. 4, 2018) (allowing expert testimony over defendant's objections claiming weaknesses in expert testimony). However, "where a flaw is large enough that the expert lacks good grounds for his or her conclusions, the expert's opinions should be excluded." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 948839, at *7 (N.D. Fla. Mar. 13, 2021).

Finally, to satisfy the helpfulness, or fit requirement, the expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *Abilify*, 299 F. Supp. 3d at 1305. Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *Id.* (*quoting McDowell v. Brown*, 392 F.3d 1283, 198-99 (11th

4

Cir. 2004)).

## III.   ARGUMENTS

### A.   Emsbo-Mattingly's Analyses are Contrary to Core Scientific Principles, and Highly Misleading

Emsbo-Mattingly attempts to make conclusions about historical impacts to air and soil by evaluating a limited number of samples taken in 2022.[3] This is directly contrary to appropriate scientific practice, and is directly criticized in the Federal Reference Guide on Exposure Science:

> How can we be sure that the samples taken represent contaminations over long periods?
>
> Sampling events may provide a good snapshot of current conditions, but in circumstances in which concentrations could be changing over time, and where the health concerns involve long-term exposures, snap-shots could be highly misleading. This type of problem may be especially severe when attempts are being made to reconstruct past exposures, based on snapshots taken in the present.[4]

At his deposition, Mr. Emsbo-Mattingly seemed to acknowledge the limitations of sampling data:

> Q:   So did I understand your testimony correctly to say that an air sample is only really going to inform you about emissions that occurred on that day or the day before?

---

[3] Emsbo-Mattingly Rpt. (ex. 1) at p. 17-18, 65; Emsbo-Mattingly Tr. (ex. 3) at 125:10-14.
[4] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 529 (3d ed. 2011) (ex. 2); also cited at Exhibit 21 to Emsbo-Mattingly's Deposition.

A:      Within a short time period around the emissions. That's what we are trying to detect with the air sampling program that we implemented.[5]

. . .

Q:      Just concepts. If I—in other words, if I do a PIANO analysis for an air sample taken on May 18th, 2022, that does not really inform anything about conditions that occurred in December 4th of 1996, right?

A:      That is correct.

Q:      Or even December 4th, 2021, right?

A.      That is also correct.[6]

. . .

Q.      They do not contain—the soil analysis do not contain any information about historical vapor emissions, is that correct?

A.      Well, they do in the sense that the gas—the emissions can come out as a combined stream, particulates and vapor, and so vapor were not capturing in the soil data. We are not expecting it to, but the particulate traction we would expect to see a pattern.[7]

. . .

A.      But as it relates to the air data, which is what you are asking me about, we are not using the air data to reconstruct the historical emissions.

Q.      Why not?

---

[5] Emsbo-Mattingly Tr. (ex. 3) at 122:13-19.
[6] Emsbo-Mattingly Tr. (ex. 3) at 122:13-19.
[7] Emsbo-Mattingly Tr. (ex. 3) at 125:23-126:03.

> A.    Because they tell us about the emissions that are occurring today.
>
> Q.    They don't tell you about the emissions that occurred last year, right?
>
> A.    No.
>
> Q.    Or 15 years ago?
>
> A.    The air data does not, no.[8]

Furthermore, when confronted with air samples from June 6, 2017 showing air trichloroethylene concentrations at over 6,000,000 μg/m3, Mr. Emsbo-Mattingly admitted that his sampling program and analyses were incapable of determining whether there were off-site impacts on that day.[9]



**Table 2**
Summary of Analytical Results
Air Investigation Samples
Lockheed Martin Sand Lake Road Complex

| Analyte Name | Units | VISL | M131-H6 6/16/17 | | M131-H7 6/16/17 | | M211-K7 6/16/17 | | M211-M7 6/16/17 | | SSVMP-1 6/16/17 | | SSVMP-2 6/16/17 | | SSVMP-3 6/16/17 | | SSVMP-4 6/16/17 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chloroform | μg/m³ | 18 | 88 | | 1.7 | U | 16 | | 2.4 | | 19 | I | 70 | I | 17000 | U | 110 | U |
| 1,1-Dichloroethane | μg/m³ | 260 | 6100 | | 2.8 | I | 34 | | 96 | | 940 | | 3800 | | 7.3E+05 | | 59000 | |
| 1,1-Dichloroethene | μg/m³ | 29,000 | 4600 | | 1.9 | U | 2.9 | U | 55 | | 770 | | 3500 | | 1.3E+06 | | 5100 | |
| cis-1,2-Dichloroethene | μg/m³ | -- | 2700 | | 1.3 | U | 3.5 | I | 15 | | 180 | | 1700 | | 1100000 | | 80 | U |
| Tetrachloroethene | μg/m³ | 1,600 | 390 | | 380 | | 100 | | 140 | | 200 | | 42 | I | 13000 | | 79 | U |
| 1,1,1-Trichloroethane | μg/m³ | 730,000 | 32000 | | 540 | | 1000 | | 240 | | 7200 | | 19000 | | 7.9E+06 | | 23000 | |
| Trichloroethene | μg/m³ | 100 | 26000 | | 19 | | 100 | | 120 | | 6600 | | 15000 | | 6.4E+06 | | 990 | |
| Vinyl chloride | μg/m³ | 93 | 4.9 | | 1.1 | U | 1.7 | U | 0.49 | U | 9.1 | U | 32 | U | 11000 | U | 510 | |

Despite the obvious and acknowledged limitations of the sampling data, Emsbo-Mattingly relies entirely on a limited number of sampling events in 2022 to

---

[8] Emsbo-Mattingly Tr. (ex. 3) at 124:04-15.
[9] Emsbo-Mattingly Tr. (ex. 3) at 150:22-152:10; also cited at Exhibit 21 to Emsbo-Mattingly's deposition.

offer the opinion that "The scientific evidence indicates no current or historical impacts from SLRC".[10]

Mr. Emsbo-Mattingly's conclusions that present-day sampling is representative of historical impact conditions are the exact type of unsupported opinions that demand exclusion. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292-1294 (11th Cir. 2005) (affirming exclusion of expert whose analysis was based on flawed temperature data); *see also Montgomery Cnty. v. Microvote Corp*, 320 F.3d 440, 448 (3d Cir. 2003) (affirming exclusion of expert whose opinion rested on unreliable data). An expert "cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). Mr. Emsbo-Mattingly applied no reliable methodology in evaluating historical impacts based on present-day samples; therefore, this Court should prevent Mr. Emsbo-Mattingly from engaging in "speculation, conjecture, or inference …[un]supported by sound scientific principles." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).[11]

Mr. Emsbo-Mattingly's 2022 samples are incapable of providing inferences about historical impacts, "do[] not have a 'valid scientific connection to the pertinent inquiry'" and "should be excluded because there is no fit." *Boca Raton Cmty. Hosp., Inc.*

---

[10] Emsbo-Mattingly Rpt. (ex. 1) at 9-10, 17-18; also cited at Exhibits 6 & 7 to Emsbo-Mattingly's deposition (attached hereto as exs. 4 & 5)

[11] Dr. James stated that Plaintiffs' "biggest exposure was the dry cleaner, not – not Lockheed Martin," *see* James Tr. (ex. 6) at 68:22-25 – 69:1-5, even though such a statement was not a reliable opinion. *See* James Tr. (ex. 6) at 68:22-25 – 69:1-5.

*v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). "Such potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702." *Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir. 1985) ("[T]he assumptions made by Dr. Cohen rendered his seemingly firm opinion quite speculative, and the danger of irrelevance is clear."). The massive analytical gap between the data Mr. Emsbo-Mattingly purported to consider and his conclusions indicates that he did not employ the level of intellectual rigor required of experts in his field. *See McClain v. Metabolife Intern. Inc.*, 401 F.3d 1233, 1235 (11 Cir. 2005) (expert must be excluded where "there is simply too great an analytical hap between the data and the opinion offered.") (quotations omitted*); see also id*. at 1255 (holding that an expert must "employ [] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (quotations omitted). Indeed, a lay jury's "'difficulty in evaluating'" such grossly misleading expert testimony requires exclusion. *See Frazier,* 387 F.3d at 1260, 1263 (courts must be wary of misleading testimony).

### B. Emsbo-Mattingly's Sampling Plan is Devoid of any Methodological Underpinning

As the Federal Reference Guide on Exposure Science makes clear, "Standard methods are available to design sampling plans that have specified probabilities of being representative, but they can never provide complete assurance".[12] However,

---

[12] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 529 (3d ed. 2011) (ex. 2); also attached as Exhibit 21 to Emsbo-Mattingly's Deposition.

there is no evidence that Mr. Emsbo-Mattingly employed any method to design his air and soil sampling plan. Mr. Emsbo-Mattingly's Report and Attachments are devoid of any discussion of how his sampling program was designed, how sample locations were selected, or how sample intervals were determined.[13] Likewise, there is no discussion about any specified probabilities or measurements of representativeness, and no evidence that representativeness was a consideration at all in Mr. Emsbo-Mattingly's study design.[14] This is a fatal flaw which renders Mr. Emsbo-Mattingly's analyses incapable of supporting his conclusions.

Mr. Emsbo-Mattingly initially testified that his expert report contained all the bases for his opinions in this case, and all the facts and data he used to render his opinions in this case.[15] Mr. Emsbo-Mattingly also testified that he did not conduct any analyses that were not submitted with his expert report.[16] However, when pressed on the sufficiency of his study design, Emsbo-Mattingly alleged that statistical software was used to perform an undisclosed analysis of sample representativeness.[17] However, Mr. Emsbo-Mattingly's Report contains no mention of this supposed analysis, the software program used or its features, any of the inputs or outputs associated with the alleged analysis, or any of the confidence intervals generated by the alleged analysis.[18] In fact, Mr. Emsbo-Mattingly's Report and attachments contain no statistical analysis

---

[13] Emsbo-Mattingly Rpt. (ex. 1) at 65.
[14] *Id.*
[15] Emsbo-Mattingly Tr. (ex. 3) at 12:8-11, 12:15-21.
[16] Emsbo-Mattingly Tr. (ex. 3) at 16:15-1.
[17] Emsbo-Mattingly Tr. (ex. 3) at 38:01-39:15.
[18] Emsbo-Mattingly Tr. (ex. 3) at 41:19-42:11.

whatsoever.[19] While Mr. Emsbo-Mattingly offered to produce the data and formulas from the alleged analysis, as well as notes relating to statistical parameters he referred to in deposition, he has failed to do so.[20]

Mr. Emsbo-Mattingly acknowledged that a valid analysis of spatial trends must be supported by adequate data.[21] However, there is no evidence that Mr. Emsbo-Mattingly's sampling design was based on a statistically valid dataset as opposed to a biased, clustered or corelated dataset.[22] This renders the entirety of his dataset, and the resulting analyses, unreliable. *See Coffey v. WCW & Air, Inc.,* 2020 WL 4519023, at *2 (N.D. Fla. Mar. 25, 2020); *see also Gardner v. Aloha Ins. Services,* 566 Fed. App'x 903, 907 (11th Cir. 2014) (affirming exclusion of expert testimony and holding that Fed. R. Evid. 702 requires both that an expert use a methodology that is "sufficiently reliable under *Daubert*" and that the expert apply those "principles and methods reliably to the facts of the case"). *See Walden Residential Properties, Inc. v. Genlyte Thomas Group, LLC,* 2003 WL 26112596, at *4 (M.D. Fla. Apr. 4, 2003) ("[E]xpert testimony should generally be excluded if it is purely speculative or conjectural . . . ."); *Richter v. Home Depot, U.S.A., Inc.,* 2009 WL 2914256, at *5 (M.D. Fla. Aug. 4, 2009) (where analysis necessary to support conclusion has not been conducted, expert opinion lacks the necessary "nexus" between conclusion and evidence).

---

[19] Emsbo-Mattingly Tr. (ex. 3) at 43:08-25, 48:16-49:12, 49:18-50:08.
[20] Emsbo-Mattingly Tr. (ex. 3) at 41:19-42:11, 43:08-25, 59:07-60:22, 149:11-25.
[21] Emsbo-Mattingly Tr. (ex. 3) at 99:25-100:04.
[22] Emsbo-Mattingly Tr. (ex. 3) at 138:02-139:22

Furthermore, assuming *arguendo* that Mr. Emsbo-Mattingly did perform some type of scientific analysis to evaluate the sufficiency of the sampling program, the representativeness of the sampling locations, or the adequacy of the total number of samples (and there is no evidence he performed such analyses), his continued withholding of any data or evidence relating to such analyses renders it impossible to evaluate whether he faithfully adhered to any methodologies that may have guided such analyses. In other words, if Mr. Emsbo-Mattingly indeed generated confidence intervals describing the representativeness of sampling locations and adequacy of the total samples used, there is no evidence to judge whether the sampling locations and sample numbers selected actually met the probability and confidence interval benchmarks employed in such an analysis. Mr. Emsbo-Mattingly's testimony that such analyses were performed cannot, in it of itself, cure his failure to produce such analyses. Mr. Emsbo-Mattingly must actually show that if such analyses were actually performed, that the analyses were reliably performed, and that the methodologies employed were faithfully adhered to. Without demonstrating this, Mr. Emsbo-Mattingly's opinions and testimony are precisely the kind of unscientific and unreliable analyses that the Court must exclude.

"'[R]eproducibility is the *sine qua non* of 'science'.'" *Hanson v. Colgate-Palmolive Co.,* 353 F. Supp. 3d 1273, 1284-1285 (S.D. Ga. 2018) (quoting *U.S. v. Hebshie,* 754 F. Supp. 2d 89, 125 (D. Mass. 2010)). Thus, where an "expert's" analysis and results are incapable of being reproduced, the results cannot be considered valid science. Indeed, *Daubert*'s reliability prong requires that the expert's methodology be capable of being

reproduced. *See Varner v. Dometic Corp.,* 2022 WL 2307002, at *4 (S.D. Fla. Mar. 25, 2022); *see also Dillon v. Sunbelt Rentals, Inc.,* 464 F. Supp. 3d 1333, 1338 (S.D. Fla. 2020) (excluding expert because his analysis seemed "completely separate from those analyses that are reproducible with low to no error rates."). Because Mr. Emsbo-Mattingly continues to withhold all evidence—to the extent it exists—of his adherence to his stated methodology, there is no way of reproducing his analyses, and no way of determining whether his analyses were reliably conducted. As such, his testimony must be excluded. *See Kipperman*, 411 B.R. at 844 ("'any step that renders the analysis unreliable … renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994))).

### C.   Emsbo-Mattingly's Analyses Lack Any Methodological Support, and are merely Ipse-Dixit Testimony

Mr. Embso-Mattingly attempts to perform several arbitrary and unscientific analyses on his unreliable dataset. First, Embso-Mattingly purports to compare surface soil samples with subsurface soil samples to evaluate whether any historical impacts have occurred.[23] Mr. Embso-Mattingly's Report and Testimony are devoid of any methodological support for this analysis—there are no references supporting this type of analysis, no description of how such an analysis should be reliably performed, or any discussion of the potential limitations of such an analysis. When asked about this

---

[23] Embso-Mattingly Rpt. (ex. 1) at 10; Embso-Mattingly Tr. (ex. 3) at 89:03-13

13

purported analysis at his deposition, Mr. Embso-Mattingly was unable to describe any scientific basis for the exercise:

> Q.    And what is the methodology by which you use a sample that's about two inches deep as a subsurface sample for comparison purposes?
>
> A.    Common sense.[24]

Without formal tests or further investigation to confirm such a conclusion, Mr. Emsbo-Mattingly's conclusions are "purely subjective and *ipse dixit*." *See Richter*, 2009 WK 2914256, at *5 (where an analysis necessary to support a conclusion has not been conducted, the expert opinion lacks the necessary "nexus" between conclusion and evidence); *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 786 (D.N.J. 1996) (subjective perceptions of an expert are "not the type of scientific reasoning that the Court may submit to a jury.").

Even if there were some sort of methodological basis to perform a comparison of surface and subsurface soil samples, Mr. Embso-Mattingly's analysis did not incorporate *any subsurface samples*. Embso-Mattingly explained that the A soil interval is "the surface soil that is exposed to air" and admitted that all of his soil samples were collected from the A interval.[25] This definition of surface soil is consistent with U.S.

---

[24] Embso-Mattingly Tr. (ex. 3) at 115:19-22.
[25] Embso-Mattingly Tr. (ex. 3) at 83:03-21.

EPA Region 4 Soil Sampling Operating Procedures, which are referenced as guidance in Mr. Embso-Mattingly's Soil Sampling Protocol.[26] EPA's Procedures state that

> "Surface soils are generally classified as soils between the ground surface and 6 to 12 inches below ground surface. The most common interval is 0 to 6 inches; however, the data quality objectives of the investigation may dictate another interval, such as zero to 3 inches for risk assessment purposes".[27]

Likewise, EPA defines "subsurface soil" as extending "from approximately 12 inches below ground surface to a site specific depth at which sample collection using manual collection methods becomes impractical".[28] However, Embso-Mattingly admittedly never collected any such sub-surface soil samples—all of his soil samples were collected from the upper 3 inches of surface soil that are exposed to air.[29] When questioned about his rationale for describing these surface samples as subsurface samples, Mr. Embso-Mattingly admitted that he deviated from EPA Protocols without explanation or discussion.[30] Furthermore, Mr. Embso-Mattingly was unable to identify any scientific support for this deviation, or any basis for labeling certain surface samples as subsurface samples.[31]

---

[26] Embso-Mattingly Tr. (ex. 3) at 140:06-15; also cited as Exhibit 19 to Emsbo-Mattingly's deposition, at 15.

[27] Embso-Mattingly Tr. (ex. 3) at 140:20-141:10; also cited as Exhibit 19 to Emsbo-Mattingly's deposition, at 15.

[28] *Id.*

[29] Embso-Mattingly Tr. (ex. 3) at 83:03-21; 142:12-21; *see also* Embso-Mattingly Rpt. (ex. 1), at 19.

[30] Embso-Mattingly Tr. (ex. 3) at 144:13-145:04.

[31] Embso-Mattingly Tr. (ex. 3) at 145:06-146:25.

Mr. Embso-Mattingly's admitted deviation from accepted scientific procedures renders his conclusions unreliable under Rule 702. *See In re Breast Implant Litig.*, 11 F. Supp. 2d at 1237 (excluding expert who could not supply proof that methodology was accepted in his field); *see also MidAmerica C2L Inc. v. Siemens Energy, Inc.*, 25 F.4th 1312, 1327 (11th Cir. 2022) (same). The analytical gap between the data he considered and his erroneous conclusions, indicates that Mr. Embso-Mattingly did not employ the level of intellectual rigor required of experts in his field. *See McClain*, 401 F.3d at 1255 (expert must be excluded where "there is simply too great an analytical gap between the data and the opinion offered."); *see also id.* at 1255  (holding that an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Mr. Embso-Mattingly's conclusions are further unreliable because he did not follow the methodology he claimed to have followed. See *Amorgianos.*, 303 F.3d at 268 (affirming rejection of expert's opinion under Rule 702 where expert "failed to apply his own methodology reliably"); *Kipperman*, 411. B.R. at 844 ("An expert must be able to explain step by step how and why he reached his given conclusions.") (citing *Lippe.*, 99 Fed. App'x at 279). Where analysis necessary to support a conclusion has not been conducted, the expert opinion lacks the necessary "nexus" between the conclusion and the evidence and must be excluded. See *Richter*, 2009 WL 2914256, at *5 (expert opinion excluded as "purely subjective ipse dixit."); *Rutigliano*, 929 F. Supp. at 786

(subjective perceptions of an expert are "not the type of expert scientific reasoning that the Court may submit to a jury.").

In a second set of analyses, Mr. Embso-Mattingly purports to search for patterns of directionality without any methodological basis. In this analysis, Embso-Mattingly arbitrarily divides sample locations into 4 subgroups based on 90 degree directional quadrants.[32] Mr. Embso-Mattingly supplied no rationale or methodological basis for this arbitrary subgroup analysis:

> Q.     Okay. So my question is, is there any discussion or methodological support for that analysis in your report?
>
> A.     It seems pretty logical...[33]
>
>          . . .
>
> Q:     And, again, just to be clear, there's no consideration or method described for this approach; this is just the approach that you selected for this analysis?
>
>          A:     No. I've seen it done elsewhere...[34]

Based on this arbitrary subgrouping, and without performing any statistical analyses, Mr. Embso-Mattingly attempts to draw conclusions about spatial trends, and opine that "surface soil enrichment fail[s] to exhibit sequentially declining concentration gradients".[35] However, the arbitrariness of that analysis is demonstrated by a closer

---

[32] Embso-Mattingly Tr. (ex. 3) at 94:20-95:05.
[33] Embso-Mattingly Tr. (ex. 3) at 95:06-09.
[34] Embso-Mattingly Tr. (ex. 3) at 96:03-12.
[35] Embso-Mattingly Rpt. (ex. 1) at 63.

look at the directionality of Mr. Embso-Mattingly's soil results. For example, had Embso-Mattingly chosen more precise frames of reference, he may have realized that soil concentrations of certain contaminants in the Class Area exceeded the 99th percentile of what would expect to be seen in Florida soils, and that there are indeed declining gradients of concentrations extending from SLRC:



Mr. Embso-Mattingly's failure to articulate and apply an accepted methodology for determining patterns of directionality, or for the subgroupings that he used to determine spatial trends and soil concentrations, are therefore unreliable. *See In re Breast Implant Litig.*, 11 F. Supp. 2d at 1237 (excluding expert who could not supply proof that methodology was accepted in his field); *see also MidAmerica C2L Inc. v. Siemens Energy, Inc.*, 25 F.4th 1312, 1327 (11th Cir. 2022) (same). The analytical gap between the data he considered and his erroneous conclusions also indicates that Mr. Embso-Mattingly did not employ the level of intellectual rigor required of experts in his field. *See McClain*, 401 F.3d at 1255 (expert must be excluded where "there is simply too great an analytical gap between the data and the opinion offered."); *see also id.* at 1255 (holding that an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). Because Embso-Mattingly failed to provide adequate support for his conclusions, his opinion lacks the necessary "nexus" between the conclusion and the evidence and must be excluded. *See Richter*, 2009 WL 2914256, at *5 (expert opinion excluded as "purely subjective ipse dixit."); *Rutigliano*, 929 F. Supp. at 786 (subjective perceptions of an expert are "not the type of expert scientific reasoning that the Court may submit to a jury.").

## IV.   <u>CONCLUSION</u>

For these reasons, the Court should exclude Defendants' expert Mr. Emsbo-Mattingly's report and testimony in their entireties.

Date: October 28, 2022                              Respectfully submitted,

                                                    T. Michael Morgan
                                                    FL Bar No. 62229
                                                    MORGAN & MORGAN
                                                    20 N Orange Ave., Suite 1600
                                                    Orlando, FL 32801
                                                    mmorgan@ForThePeople.com
                                                    P: (407) 418-2031
                                                    F: (407) 245-3384

                                                    Frank M. Petosa
                                                    FL Bar No. 972754
                                                    MORGAN & MORGAN, P.A.
                                                    COMPLEX LITIGATION GROUP
                                                    8151 Peters Road, 4th Floor
                                                    Plantation, FL 33324
                                                    fpetosa@ForThePeople.com
                                                    P: (954) 327-5366
                                                    F: (954) 327-3018

                                                    Rene F. Rocha*
                                                    MORGAN & MORGAN
                                                    COMPLEX LITIGATION GROUP
                                                    400 Poydras St., Suite 1515
                                                    New Orleans, LA 70130
                                                    rrocha@ForThePeople.com
                                                    P: (954) 318-0268
                                                    F: (954) 327-3018

                                                    Michael F. Ram*
                                                    mram@forthepeople.com
                                                    Marie N. Appel*
                                                    mappel@forthepeople.com
                                                    MORGAN & MORGAN
                                                    COMPLEX LITIGATION GROUP
                                                    711 Van Ness Avenue, Suite 500
                                                    San Francisco, CA 94102
                                                    Telephone: (415) 358-6913
                                                    Facsimile: (415) 358-6923

                                                    *Pro Hac Vice
                                                    Attorneys for the Plaintiffs

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), counsel has conferred in writing and telephonically with counsel for Defendant regarding the relief requested in this Motion but has been unable to reach agreement.

Date: October 28, 2022                    */s/ T. Michael Morgan*
                                           T. Michael Morgan
                                           FL Bar No. 62229
                                           MORGAN & MORGAN
                                           20 N Orange Ave., Suite 1600
                                           Orlando, FL 32801
                                           mmorgan@ForThePeople.com
                                           P: (407) 418-2031
                                           F: (407) 245-3384
                                           MORGAN & MORGAN
                                           COMPLEX LITIGATION GROUP
                                           Counsel For Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2022 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ T. Michael Morgan*
T. Michael Morgan FL Bar No. 62229