# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PHYLLIS GRAYSON; and PHILLIP PENSON,

     Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION,

     Defendant.

Case No. 6:20-cv-1770

## LOCKHEED MARTIN CORPORATION'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, DR. JEFFREY ZABEL

Pursuant to Federal Rule of Evidence 702, Lockheed Martin Corporation (LMC) moves to exclude the proffered testimony of Dr. Jeffery Zabel.  LMC has also filed a Glossary of Scientific and Technical Terms in support of this and other Rule 702 motions and oppositions (Doc. 208).

## SUMMARY

Dr. Zabel's testimony should be excluded because he performed no work necessary to demonstrate any relevant fact about property values in the class area. As Dr. Zabel admitted: "*I do not know **anything** about what has happened to house prices in the area, because I have **not performed any empirical analysis** for this case.*"[1]

Dr. Zabel has not tried to apply his methodology to the facts of this case and so he cannot opine on whether his method is reliable or even helpful.  Likewise, Dr. Zabel has not specified what inputs he will use in his proposed hedonic

---

[1]   (Doc. 207-1 63:13–15 (emphasis added).)

regression approach.  He explained the determination of what to include was "data dependent."[2]  Even with that, Dr. Zabel did not analyze or try to analyze any data. In fact, Dr. Zabel estimated that up to his deposition, *he had only spent **twelve hours** working on this case.*[3]  Dr. Zabel offers only an intent to apply an untested hedonic regression approach and the function he has disclosed is incomplete.   In short, Dr. Zabel has yet to do any of the work required to offer an admissible opinion.

## STANDARD

District courts in the Eleventh Circuit must perform a "full Daubert" analysis "when an expert's testimony is critical to the class certification." *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 369 (N.D. Fla. 2017) (quoting *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin'l Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014)).  Federal Rule of Evidence 702 requires "the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244–45 (11th Cir. 2018) (citation omitted).

> To properly serve as a gatekeeper, the trial court must perform a preliminary assessment of whether the reasoning or methodology underlying the testimony is ***scientifically valid*** and of whether that reasoning or methodology ***properly can be applied to the facts in issue***. When doing so, the court must consider the testimony with the understanding that the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.

*Id.* at 1244–45 (cleaned up and emphasis added).  That standard applies here.

---

[2]   *Id.* at 112:1–9.
[3]   *Id.* at 32:4–6.

# ARGUMENT

**I.**   **Dr. Zabel failed to define or apply his proposed methodology to the facts of the case.  Accordingly, his testimony is unhelpful to the trier of fact and unreliable.**

Dr. Zabel's proffered testimony offers no insight into the putative class beyond what Plaintiffs alleged in the Fourth Amended Complaint and some of the press coverage that he received from Plaintiffs' counsel.[4]  Accordingly, Dr. Zabel proposes a hypothetical approach based on Plaintiffs' allegations as opposed to any examination of data about residential real property in the proposed class areas.  Such a proffer is neither helpful nor reliable.

At the class certification stage, the required proof is more than "a pleading requirement."  *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014).  Indeed, Plaintiff must prove "more than just a prima facie case, i.e., more than just a 'pretty good case.'"  *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) (citing *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003)).  It is not enough to state that they "*intend* to rely on common evidence and a single methodology to prove both injury and damages, and that whether the evidence and

---

[4]   *See generally* Doc. 207-2 at 2–3.  Notably, when challenged, Dr. Zabel admitted that the news coverage was not coverage of actual contamination but coverage of the allegations of contamination made in the Complaint:

> Q. Sir, what is the timeline or the timing of public knowledge in this case?
> \* \* \*
> A. The first date on the spreadsheet was September 28th, or maybe a day or two after that.  That's – that's what they sent me as the first piece of evidence, information they have about public news media reports about this case.
> Q. Okay.  And is that September 28th, 2020?
> A. Correct.

(Doc. 207-1 62:4–18.)

the methodology are sound and convincing is a question going to the strength of the plaintiffs' case and should be postponed to summary judgment proceedings or trial." *Parko*, 739 F.3d at 1086.

Dr. Zabel only says that he *intends* to run a hedonic regression, he does not justify its usefulness or reliability by attempting to apply it to the facts of this case. Importantly, however, when an expert "has not performed the method he proposes, the Court cannot evaluate whether the method that provides evidence for class certification can be tested and was subjected to peer review, whether the potential error rate can be ascertained, and whether his method is generally accepted in the scientific community." *Morgan v. Orlando Health, Inc.*, No. 617CV1972ORL41GJK, 2019 WL 7423514, at *5 (M.D. Fla. Oct. 23, 2019). Accordingly, Dr. Zabel's failure to "reliably appl[y] the [proposed] principles and methods to the facts of the case" renders his proffered testimony "inadmissible and due to be stricken." *Id.*

Dr. Zabel has not attempted to apply his hedonic regression approach to the facts of the case, because he has not investigated the alleged facts. For example, Dr. Zabel has not investigated whether sellers in the relevant markets are disclosing environmental contamination in real property transactions:

> Q. Have you seen any contamination disclosures in any sales in the proposed class area in any of your work in this case?
>
> A. I have not.
>
> Q. Have you asked anyone in the proposed class area whether they believe -- excuse me. Let me re-ask that. Have you asked anyone in the proposed class area whether they believe they need to make some sort of contamination disclosure?

A. No.

Q. Have you attempted to investigate any contamination disclosures in any sales in the proposed class area?

A. No.

Q. Have you attempted to investigate any environmental due diligence in connection with any developments, real estate developments, in the proposed class area?

A. No.[5]

Indeed, Dr. Zabel has not investigated when any alleged contamination may have impacted prices, if at all:

Q. You have not performed any analysis to try to develop a sense of how long it would have taken this information to allegedly impact prices if there was any impact on prices --

MR. ALBANIS: Object to the form.

BY MR. TORRES:

Q. -- is that right?

A. And you're referring to this case?

Q. This case, yes, sir.

A. I have not.[6]

Similarly, Dr. Zabel has not attempted to determine how long any alleged impacts would last:

Q. How long would information of an alleged contamination -- or let me ask the question again.  For how long would information of an alleged contamination impact home prices?

MR. ALBANIS: Object to the form.

---

[5]   (Doc. 207-1 50:18–51:12.)
[6]   *Id.* at 99:6–15.

THE WITNESS: That's an empirical question. It can only be answered empirically.[7]

In addition to not attempting to assess alleged impacts in any way, Dr. Zabel could not even define the putative class area. When asked about how the proposed class was defined, he could not provide any information:

Q. Can you tell us how the class area was defined?

A. That was not my decision.

Q. Was the answer no?

A. I do not have precise information about how the class area was defined.[8]

\* \* \*

Q. *Do you have any information as to how the size of the class area was determined?*

MR. ALBANIS: Objection. Form. But go ahead.

THE WITNESS: *I believe it was determined to cover Tangelo Park.*

BY MR. TORRES:

Q. *Was there any other basis for the size of the class area that you are aware of?*

A. *No.*[9]

Worse, Dr. Zabel could not explain how he would handle problems created by the proposed class area's arbitrary boundary, which is a perfect circle from the middle of SLRC with a 1.75-mile-radius. When asked how he would apply his

---

[7]   *Id.* at 97:2–8.
[8]   *Id.* at 43:21–44:1.
[9]   *Id.* at 44:9–17.

proposed hedonic regression approach to a property on the class boundary that was

partially within the class area and partially outside the class area, he had no answer:

> Q. And what if the class boundary, you know, bisects a home, how do you -- how would you propose treating that in your proposed approach?
>
> MR. ALBANIS: Objection. Form. But go ahead.
>
> THE WITNESS: I don't ever remember a case where the class boundary was determined to the extent that I knew exactly which particular homes were in and outside of the class boundary. And I think it would be very difficult for almost anyone to be able to do that in this case in terms of showing that the class boundary goes exactly through a single house.[10]

Dr. Zabel also had no answer for how to handle a similarly bisected

neighborhood:

> Q. Okay. Let's -- is it your opinion that properties in a bisected neighborhood just right outside the proposed class area are unaffected by the issues that are apparently affecting the properties within the boundary?
>
> MR. ALBANIS: Objection. Form. Foundation.
>
> THE WITNESS: *Since I have **no opinion** about the effect of the alleged contamination on the values of properties in the class area, I would have **no opinion** about the impact of properties that are outside the class area.*[11]

Nor had Dr. Zabel considered how potential alternative sources, besides

SLRC could have affected the area:

> A. The Pitts report lists a whole bunch of different potential contaminants. And I would say "potential" because there's no evidence that any of them -- from those sources have contaminated the class area, so that -- I did see that in the Pitts report, that there was a bunch of sites listed that may have potentially -- and, again, I emphasize "potentially" -- impacted the class area.

---

[10]   *Id.* at 60:20–61:6.
[11]   *Id.* at 61:8–18.

Q. Same potential as the Lockheed Martin facility; is that right?

MR. ALBANIS: Object to the form.

THE WITNESS: I do not have any access to any reports to the extent of the Sahu report describing the potential -- the transport mechanisms and the level of contamination on the Lockheed facility, so...

BY MR. TORRES:

Q. *Have you tried to independently determine whether there are other sources of contamination in the proposed class area outside of the Lockheed Martin facility*?

A. ***I have not***.[12]

Although Dr. Zabel visited class area, nothing in his report applies any information from that visit to his proposed hedonic regression approach beyond a listing of neighborhoods he toured.[13]  Dr. Zabel's only observation was that "[w]ithin these areas there is a range of housing styles and quality."[14]  Given the chance to expand on his observations and apply them to his proposed hedonic regression model, he admitted he had no records and little recollection of the visit:

Q. Did you make any observations regarding these communities during the site visit that you reference in this paragraph of your report?

A. Most certainly that's what I did.  I drove around and I observed the different neighborhoods.

Q. *Do you have notes from your visit*?

A. ***No***.

Q. *Do you have photographs from your visit*?

A. ***No***.

---

[12]   *Id.* at 54:1–16.
[13]   (Doc. 207-2 at 4.)
[14]   *Id.* at 4.

Q. Do you have maps of your visit?

A. I have Google Maps.

Q. *Did you analyze zoning when you made your site visit*?

A. **As I said, I have not done any specific analysis for this project**.

\* \* \*

Q. During your site visit, did you speak with or interview any local property appraisers?

A. No.

Q. Did you speak with or interview any real estate agents?

A. I think we did eventually talk to a real estate agent.

Q. And who was that?

A. I don't recall.

Q. And that was at the time of your visit?

A. Yes.

Q. *Did you interview or speak with any home sellers at the time of your visit*?

A. **No**.

Q. *Did you speak with or interview any home buyers at the time of your visit*?

A. **No**.[15]

Incredibly Dr. Zabel admits that he "**has not performed any empirical analysis for this case**."[16]  He has only expressed a future intent to do so.  "But if intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be out the window."  *Parko v. Shell Oil Co.*, 739 F.3d

---

[15]   (Doc. 207-1 75:3–76:14.)
[16]   *Id.* at 63:13–15.

1083, 1086–87 (7th Cir. 2014).   This is true of the other requirements of Rule 23. "Nothing is simpler than to make an unsubstantiated allegation."   *Parko*, 739 F.3d at 1086.  But that is all Plaintiffs have done.

Dr. Zabel's intent to run a regression provides no insight on the appropriateness of class certification and is not demonstrably reliable.   Also, Dr. Zabel has failed to establish that a hedonic regression is appropriate *in this case*. The only residential property expert to analyze the class area, LMC's property appraisal expert Jennifer Pitts, opined that "[t]he proposed class area consists of diverse residential property types that cannot be meaningfully or reliably analyzed together, on a class-wide basis, for purposes of determining market value or alleged property value diminution."[17]   She provided tables detailing the diverse nature of property types within the class area, including single-family residential, condominiums, HOA common areas, timeshares, townhomes, and vacant properties.[18]  Ms. Pitts  found that even among the single-family residential, there is a high degree of variability in value, lot size, square footage, and year built.[19]

---

[17]   (Doc. 207-4 at 4.)
[18]   *See id.* at 5, Table 1.
[19]   *Id.* at 11.

| Table 2. Characteristics of Single-Family Residential Properties[20] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | OCPA Just Value ($) | | Lot Size (Acres) | | Living Area (SF) | | Year Built | |
| | Range | Average | Range | Average | Range | Average | Range | Average |
| Big Sand Lake | $300,981 to $612,097 | $441,937 | 1.01 to 5.21 | 3.05 | 1,246 to 4,936 | 2,553 | 1952 to 1988 | 1965 |
| Sand Lake Sound | $292,283 to $876,666 | $678,690 | 0.11 to 1.78 | 0.48 | 2,374 to 4,160 | 3,617 | 2019 to 2020 | 2020 |
| Spring Lake | $245,718 to $420,248 | $277,567 | 0.11 to 0.21 | 0.13 | 1,483 to 2,728 | 1,746 | 1985 to 2002 | 1987 |
| Tangelo Park | $87,045 to $325,585 | $131,434 | 0.14 to 0.49 | 0.16 | 764 to 3,836 | 1,281 | 1958 to 2020 | 1960 |
| Toscana | $351,916 to $999,320 | $467,653 | 0.09 to 0.28 | 0.14 | 2,788 to 4,201 | 3,190 | 2004 to 2020 | 2008 |
| Williamsburg | $191,779 to $279,978 | $230,962 | 0.13 to 0.23 | 0.16 | 1,171 to 2,379 | 1,707 | 1979 to 1980 | 1980 |

Dr. Zabel has not analyzed this diverse area, so he cannot offer an opinion on the appropriateness of his proposed hedonic regression approach to account for the variability of these factors. He has not "done any investigation about [the varying property types] yet."[21] In fact, Dr. Zabel testified that he might need more than one hedonic regression model to account for the different property types within the proposed class area, but he could not be certain:

Q. Condominiums, single-family residences.

A. Certainly implicitly. I would not, as I mentioned before, include the condominiums and the single families in a single model, but you can estimate separate models for each property type if you think that they constitute a different market, per se.

Q. Would that require a separate hedonic property price model?

---

[20] These summary statistics refer only to single-family residential properties in these neighborhoods. Some neighborhoods (such as Toscana) include a mix of property types and therefore are included in multiple tables. The neighborhoods of Westgate and North Resorts comprise only timeshare properties and are not included in these tables.

[21] (Doc. 207-1 81:20–21.)

A. It could.  You could generalize into one model, but, typically, you can think of it as two models.[22]

Nor could Dr. Zabel's proposed hedonic regression approach account for differences in alleged contamination:

Q. Dr. Zabel, how does the proposed hedonic property price model account for nonuniformity of impact in the class area?

A. Well, I would say at least in this general form here it does not account for nonuniformity.  What I'm picking up is an average effect. Now, if I had specific information on levels of contamination across the class area, I could include those that would allow for some potential nonuniformity.  As it's stated here, generally, this would give me an average impact over the -- over the class area.[23]

None of Dr. Zabel's testimony of proposed future work can be tested or applied because he has marshalled no data, specified no model, and performed no analysis.  This exacerbates the challenge associated with class certification involving allegations of environmental contamination in a large area: "[i]t is difficult to see how these issues can be managed in the class action format.  But in any event they must be engaged by the district judge before he can make a responsible determination of whether to certify a class."  *Parko*, 739 F.3d at 1086–87.  Dr. Zabel has not provided an opinion that can "be engaged by [Judge Dalton] before he can make a responsible determination of whether to certify a class."

---

[22]  (Doc. 207-1 79:22–80:7.)
[23]  *Id.* at 110:10–20.

**II.    Dr. Zabel explained none of the variables, inputs, or assumptions needed to run his proposed hedonic regression model or models making his proffer so incomplete as to be inadmissible.**

Dr. Zabel offers the following formula as his evidence that he can determine damages across the putative class.[24]

$$\log\left(P_{ijat}\right) = \beta_0 + X_{it}\beta_1 + N_{jt}\beta_2 + Z_j\beta_3 + T_a\beta_t^3 + C_a\beta_t^{na} + e_{ijat} \, ,$$

Beyond the problems with an unapplied model discussed above and the fact that he has not tested his proposed approach in any way, Dr. Zabel does not provide nearly enough information for the Court to assess the reliability of his proposed approach.  Dr. Zabel himself describes his unspecified hedonic regression function as "the **general form** of the hedonic property price model" and he admits that the characteristics of the model "will **depend on, to a certain extent, the context** of the problem of the case and the data that are available."[25]

These are serious admissions.   For example, the variable "$X_{it}$" in the regression represents the property characteristics in the model.  But Dr. Zabel was incapable of explaining what specific property characteristics were appropriate to include within the $X_{it}$ regression function variable:

Q. *What structure characteristics do you intend to express in that variable?*

A. *Again, I will not know the extent of those until we get the data.*  But as I mentioned, the typical structure characteristics are number of the bedrooms, bathrooms, the structure size, and the lot size.

Q. Well, will there be any other data in that variable, you know, condition, age?

---

[24]    (Doc. 207-2 at 5.)
[25]    (Doc. 207-1 101:13–25 (emphasis added).)

A. Yes.  Age will definitely be in there.

Q. Okay.  And how about condition?

A. It depends on the data.  Typically, that's not a variable that's provided in these datasets.

Q. And how about other home amenities like a pool or a, you know, garage or –

A. Sure.

Q. Anything else?

A. In particular -- you know, you probably wouldn't put a pool in if it was Massachusetts, but you likely -- I would probably put a pool, whether there's the existence of a pool, as long as it's in the data in this model.[26]

Nor could Dr. Zabel specify what would go into the "$N_{jt}$" regression function variable—the neighborhood characteristics:

> Q. *Are there any other neighborhood characteristics that you would try to collect outside of, you know, school districts and performance and crime and distance to highways*?
>
> MR. ALBANIS: Object to form.
>
> THE WITNESS: ***It's hard for me to say without getting into the data***.  I told you the typical ones that are often collected and used in these studies.[27]

And for the "$Z_J$" regression function variable—jurisdictional characteristics—Dr. Zabel could not even name the relevant jurisdiction:

> Q. In these indicators of jurisdiction as Z sub j, what do you mean by "jurisdiction"?
>
> A. Again, it's contingent on the problem.  It could be a town.  It could be smaller than a town, like a census tract.  Those are typical

---

[26]   *Id.* at 104:9–105:4 (emphasis added).
[27]   *Id.* at 106:18–25 (emphasis added).

jurisdiction variables that are often included in these type of hedonic models.[28]

The "$C_N$" variable denotes a control area.  Yet again, Dr. Zabel could not identify a control area because he had not done any work on identifying one (if one could be found):

Q. *Have you identified any control areas at this point*?

A. ***No.  And that's because I can't identify control areas until I do the actual analysis, which I have not conducted yet***.  Did I drive around and look at other areas that could be potential control areas, that I thought would be potential control areas?  I did that.  But I cannot say for sure that they are going to be good control areas until I actually conduct the analysis, which I have not done at --[29]

Finally, the "$e_{ijat}$" error term and its size also remain undefined:

Q. In the second sentence, Dr. Zabel, you write, "Since the data are a sample from the population of houses, it is understood that these estimates are measured with sampling error."  *We have no sense of the size of the sampling error, do we*?

A. ***Not before conducting the analysis.***[30]

Dr. Zabel could not even describe how he would detail these variables other than to say, "it's data dependent":

Q. And is there a methodology for deciding what characteristics go into each vector in the -- in the proposed model?

A. As I answered before, it's data dependent.  I have to be able to observe the characteristics in the data, and then the hundreds if not thousands of studies that have been done before this and studies that I have done are kind of set up or a typical set of the variables that are included in these models.[31]

---

[28]  *Id.* at 107:2–8.
[29]  *Id.* at 66:2–11 (emphasis added).
[30]  *Id.* at 114:9–15.
[31]  *Id.* at 112:1–9.

"Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). But "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986). Dr. Zabel's "general form" hedonic regression pricing model is an example of such an incomplete, inadmissible regression.

Indeed, statistical models are "not probative" when they omit "major variables." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999). And "[b]ecause the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that the major factors have been accounted for in a regression analysis." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006). Yet, Dr. Zabel has failed to identify (1) the characteristics of the properties' variable; (2) the characteristics of neighborhoods' variable; (3) the type or characteristics of jurisdictions' variable; (4) the control area variable; and (5) the error rate. His variables are "data dependent" and he has no idea, for example, what that data is, what results they may generate, whether the proposed regression model can be calibrated or how, or whether the proposed regression model results may ever resemble reality. Dr. Zabel could not explain if his model could account for varying degrees of contamination in the proposed class area. And he could not even decide whether he would need to run one or more models to account for different property types. In short, Dr. Zabel did nothing other than opine that a hedonic regression pricing model was a model type.

When courts have confronted such empty rhetoric, they have found it inadmissible. Confronted with a similar lack of information on how a hedonic regression would run, one district court in California held:

> Although the methodologies he describes may very well be capable of calculating damages in this action, [the expert] has made no showing that this is the case. He does not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied. The court is thus left with only [the expert's] assurance that he can build a model to calculate damages. Stated differently, his declaration is 'so incomplete as to be inadmissible as irrelevant.'

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014). On occasions when courts have admitted incomplete models, the missing variables tend to be less significant and at least some analysis seems to have been performed. *See, e.g.*, *Hawes v. Macy's Stores W.*, Inc., No. 1:17-CV-754, 2022 WL 194407, at *4 (S.D. Ohio Jan. 22, 2022) ("He has conducted a 'preliminary analysis' showing, without controls, 'the higher the thread count, the higher the prices are.' . . . Boedeker has not identified the variables he will use in his regression. However, Boedeker does provide examples likely to be included: thread-count, size, weave and origin."). But here, Dr. Zabel has not just left minor variables to be determined later, he has left *all variables* to be determined later. He could not opine that his proposed hedonic regression approach fits this class because he does "not know anything about what has happened to house prices in the area" and has "not performed any empirical analysis for this case."[32]

---

[32]   (Doc. 207-1 63:13-15.)

III.   **Dr. Zabel's statements rest on unreliable assumptions.**

Whatever remains of Dr. Zabel's proffered testimony rests on unreliable assumptions.  For instance, Dr. Zabel assumes that the alleged contamination will affect all properties equally such that an "average effect" is appropriate.[33]  This is an assumption that the Seventh Circuit has explicitly cautioned against:

> Nor could it be assumed that every class member has experienced the same diminution in the value of his property even if every one has experienced the same level of contamination.  For the greater the variance in property values (about which the district judge made no findings), the less likely it is that contamination would affect the value of all or most properties by the same amount of money or the same percentage of market value.

*Parko*, 739 F.3d at 1086.  Yet, Dr. Zabel offers no reason why such an assumption is appropriate under the specific facts and circumstances of this case and proposed class area.  "The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact.  As [the Eleventh Circuit has] held previously, carrying this burden requires more than 'the *ipse dixit* of the expert.'"  *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (quoting *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998)).  Because Dr. Zabel offers opinions based only on assumptions he has not even sought to justify, he has made his entire opinion unreliable.

---

[33] *Id.* at 110:13–15.

Further, Dr. Zabel relies on Dr. Ranajit Sahu—who similarly failed to perform any meaningful work in this case—to quantify any offsite contamination:

> Q. Okay.  Can you tell us how the alleged contamination was transported from the Lockheed Martin facility to the defined or proposed class area?
>
> A. I'm going to let the expert, Sahu, tell you that.  It's all in his report.
>
> *   *   *
>
> Q. Can you tell us when the alleged contamination was transported from the Lockheed Martin facility to the proposed class area?
>
> A. I'm not sure what you mean by that, because it could have happened over a very long period, and I certainly can't tell you the exact period, full period, over which it was allegedly transported.
>
> Q. Would you be relying on Sahu for that as well?
>
> A. Correct.[34]

Dr. Sahu, however, did not sample, model, or provide any evidence that any chemical of concern traveled offsite from SLRC in any amount, let alone at levels sufficient to result in a quantifiable impact.  (Doc. 211 at 11–13.)  Dr. Sahu did not even know what the chemicals of concern were when asked.  *Id.* at 14.  Accordingly, nothing in Dr. Sahu's proffered testimony shows that he can inform Dr. Zabel's model either now or in the future.

As a final example, Dr. Zabel assumes his statements about how real property prices behave and the appraisals of real property are appropriate, without being certified to do so or having any expertise in the standards of that field:

---

[34] (Doc. 207-1 40:23–42:7.)

Q. Are you licensed as a real estate appraiser in the state of Florida or in any other state?

A. I am not.

Q. Are you certified as a real estate appraiser in the state of Florida or any other state?

A. I am not.

Q. Are you familiar with the Uniform Standards of Professional Appraisal Practice?

A. Only very vaguely.

Q. Did you review those standards in connection with preparing your report in this case?

A. No.

Q. Do you know whether your opinions are in compliance with the Uniform Standards of Professional Appraisal Practice?

A. No.[35]

## CONCLUSION

Dr. Zabel's proffered testimony should be excluded under Federal Rule of Evidence 702 for the reasons stated in this motion.

---

[35]   (Doc. 207-1 36:6–21.)

Date: October 28, 2022

Respectfully submitted,

/s/ Christopher Torres

Francis A. Citera*
citeraf@gtlaw.com
Gretchen N. Miller*
millerg@gtlaw.com
**GREENBERG TRAURIG, LLP**
77 West Wacker Dr., Ste. 3100
Chicago, Illinois 60601
Telephone: (312) 456-6583
Facsimile: (312) 899-0320

*Specially admitted*

David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Christopher Torres (FBN 0716731)
torresch@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
Raymond Jackson (FBN 1028350)
jacksonra@gtlaw.com
Christopher R. White (FBN 1022219)
whitech@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Ste. 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

*Attorneys for Defendant Lockheed Martin Corporation*

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), Lockheed Martin's counsel certifies that conferred with Plaintiffs' counsel who advised that Plaintiffs oppose the relief sought in this Motion.

/s/ Christopher Torres
Attorney

## **CERTIFICATE OF SERVICE**

I certify that on October 28, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Christopher Torres
Attorney

mid