## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PHYLLIS GRAYSON; and
PHILLIP PENSON,

      Plaintiffs,

v.

LOCKHEED MARTIN
CORPORATION,

      Defendant.

Case No. 6:20-cv-1770

## LOCKHEED MARTIN'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF DR. MUNDT

Lockheed Martin Corporation (LMC) opposes Plaintiffs' Motion to Exclude the Expert Report and Testimony of Dr. Kenneth Mundt (Doc. 194).

### SUMMARY

Dr. Mundt is a highly credentialed epidemiologist who is undisputedly qualified to offer his expert opinions. In response to Plaintiffs' general-causation allegations and the proffered opinions of their experts, Dr. Mundt intends to opine, among other things, that the available epidemiological literature does not support an inference that the substances to which Plaintiffs claim to have been exposed can cause any of their health conditions at environmentally relevant exposure levels. If Plaintiffs' experts opine otherwise, Dr. Mundt will testify that their opinions are unreliable because they failed to adequately explain and reliably apply scientifically accepted analytical methodologies, for lack of support in the underlying epidemiological studies, and for

other reasons addressed in his report.

In his report, Dr. Mundt explains the well-established methodologies he used to compile relevant epidemiological literature, analyze each study, and form his conclusions.  His opinions are thus reliable under Rule 702.  Dr. Mundt's opinions also reflect reasoned and valid criticisms of Plaintiffs' experts' analyses, making his opinions independently admissible as rebuttal testimony.

Plaintiffs' arguments otherwise should be summarily rejected.  Each fails to earnestly engage the substance of Dr. Mundt's analyses.  Plaintiffs say Dr. Mundt's critique of their experts' unsystematic reviews holds them to too high a standard.  But their failure to employ in the courtroom the same rigor they employ in their publications is fair game—particularly given that Drs. Mattison and Kantor admittedly failed to reproducibly employ their weight-of-the-evidence and Bradford Hill analyses, and Dr. Panigrahy plagiarized his epidemiological review.  Plaintiffs also accuse Dr. Mundt of fabricating one of his cited sources when, in fact, the source undeniably exists and was the subject of deposition testimony Plaintiffs fail to disclose to the Court.  And Plaintiffs distort Dr. Mundt's testimony to claim that he insufficiently disclosed study results, inadequately considered study limitations, and endorsed an incorrect evidentiary standard.  A review of the context of his testimony and report, however, refutes these allegations, which would go only to the weight of Dr. Mundt's testimony even if they were true.  For these reasons, Plaintiffs' motion to exclude Dr. Mundt's opinions related to general causation should be denied.

## BACKGROUND

**Dr. Mundt's qualifications.**   Dr. Mundt is highly qualified to offer his opinions.  As detailed in his expert report and attached curriculum vitae, Dr. Mundt earned a Ph.D. in Epidemiology from the University of North Carolina and an M.S. in Epidemiology from the University of Massachusetts.  (Doc. 213-1 at 5.)  He has worked full-time as an epidemiologist for 35 years, first as a professor and then as a consultant.  (*Id.*)  Among other academic roles, Dr. Mundt has served since 2004 as an Adjunct Professor in the Department of Biostatistics and Epidemiology at the University of Massachusetts.  (*Id.*)  He is a Fellow and former Ethics Committee member of the American College of Epidemiology.  (*Id.*)  Dr. Mundt is an editor of several scientific journals, a prolific publisher of his own research, and a human health risk evaluator for regulatory and other decision-making organizations.  (*Id.*)

**Dr. Mundt's opinions and methodology.**   As explained in his expert report, Dr. Mundt intends to offer several opinions in the related Sand Lake Road Complex cases, some of which concern class certification in *Grayson*, and others relate to general causation issues common to all cases.

Plaintiffs focus on Dr. Mundt's opinions about "chemicals of potential concern," or "COPCs."  (Doc. 213-1 at 7.)  LMC requested an analysis of whether Plaintiffs' "claimed associations between the COPCs and the alleged human health effects scientifically can be established to be causal."  (*Id.* at 12.)  In particular, LMC asked "whether the Plaintiffs' experts (i.e., those rendering opinions on any of the

alleged exposures to the specific COPCs discussed) scientifically were able to establish that the COPCs they addressed can and do cause any of the claimed health problems." (*Id.*) If Dr. Mundt were to conclude that any exposure/health-effect associations "might reflect a causal relationship," then LMC requested more evaluation of the "exposure conditions under which a causal relationship is probable." (*Id.*)

Dr. Mundt detailed how he and his team answered these questions. They "first identified and reviewed the most recent and comprehensive health agency reviews of the potential health effects of each COPC." (Doc. 213-1 at 12.) Relevant agency review documents included *Monographs* from the International Agency for Research on Cancer (IARC), Integrated Risk Information System (IRIS) assessments from the Environmental Protection Agency, and toxicological profiles from the Agency for Toxic Substances and Disease Registry (ATSDR). (*See id.*) For review documents that were more than 8–10 years old, Dr. Mundt and his team searched PubMed for more recent systematic reviews or independent studies of the relevant COPCs.[1] (*Id.*)

---

[1]   Notably, Dr. Mundt's use of IARC *Monographs* is different in kind from Dr. Panigrahy's inappropriate use of them. As Lockheed Martin explains in its motion to exclude Dr. Panigrahy's testimony, IARC approaches its systematic review from a *prophylactic, regulatory-advisory perspective* that makes its conclusions insufficient to meet the general-causation standard. (*See* Doc. 189 at 13–15) (collecting cases).) Dr. Panigrahy's plagiarism from these *Monographs* therefore renders his opinions unreliable not only because of the academic dishonesty it reflects, but also because IARC's methods aim to support classifications *protective* of public health, *not predictive* of causal relationships sufficient to support a toxic-tort judgment. (*See id.* at 18–22.)

In contrast, Dr. Mundt's use of the *Monographs* and similar documents is reliable for at least two reasons. First, when an entity like IARC employs a systematic review that intentionally errs to some extent on the side of reaching positive carcinogenicity or toxicity conclusions and it *still* does not find support for a relevant exposure/response relationship, that conclusion is necessarily more probative of the corresponding general-causation question than a finding that a relationship exists. Second, and more importantly, Dr. Mundt and his team used *Monographs* and similar reviews to help identify relevant literature, which they then independently reviewed. This approach is scientifically reasonable

Through this first step, Dr. Mundt and his team identified COPCs that other researchers had identified as potentially capable of causing cancers or other health conditions that the Plaintiffs claim to have developed.  (*See id.*)  For all such potential relationships, Dr. Mundt and his team performed a "more focused critical review and analysis of the peer-reviewed literature" to "verify these causal relationships and clarify the exposure conditions that may cause specific cancers or other diseases." (*Id.*)

Dr. Mundt conducted this "more focused critical review and analysis" using well-established epidemiological methods that he first explains generally (*see id.* at 12, 16–17, 20–25, 29), and then applies to specific health outcomes and literature (*see id.* at 30–109).   In essence, epidemiologists compare the incidence, prevalence, and distribution of diseases across groups of people with different exposure and risk-factor profiles.  (*See id.* at 20.)  Thus, they take several approaches to "identify and interpret statistical correlations or 'associations' between various exposures or other risk factors for disease and disease occurrence or 'risk.'" (*Id.*)  These approaches analyze study design, bias, chance, and relative risk.

Study design matters because the most common epidemiological study types have intrinsic limitations.  Dr. Mundt explains cohort studies, case-control studies, cross-sectional surveys, ecological studies, and other study types, along with their design strengths and weaknesses.[2] (*See id.* at 20–22.)

---

and practical, particularly given the extraordinarily large number of alleged substance/response relationships in this case—most of which Plaintiffs have voluntarily abandoned.

[2] Case-control studies, for instance, are susceptible to recall bias in the collection of exposure data from "case" subjects, as well as selection bias in the identification of "control" groups.  (*See id.* at 20.)

Although a study's design alerts epidemiologists to common associated biases, they must be wary of any source of bias that can "distort the apparent association between exposure and the disease outcome of interest." (*Id.* at 22.) "[S]elective participation of certain subsets of individuals can lead to selection bias, survival bias, volunteer bias, etc. and low response rates or systematic errors in measured data can lead to information bias, recall bias, social acceptability bias, etc." (*Id.*) "Additionally, the mixing of possible effects of other strong risk factors for the same disease with the exposure(s) of interest leads to confounding bias . . . ." (*Id.*) "Confounding bias occurs due to the failure to account for other risk factors for the same disease outcome that are correlated with the exposure or risk factor of interest." (*Id.* at 23–24 ("For example, if smoking was more common among coffee drinkers, then a comparison of coffee drinkers and non-coffee drinkers (without considering smoking) would give the appearance that coffee drinking is associated with lung cancer.  Proper consideration of smoking (the confounding factor) would show that there is no independent association between coffee drinking and lung cancer risk.").)

Epidemiologists must also understand the "role random error or chance" plays in statistical analyses.  (*Id.* at 23.)  Tests of statistical significance can help "evaluate the probability that an observed result may be due to chance alone," but, by definition, even "some proportion (typically 5%) of statistically significant results is expected to

---

Cross-sectional surveys measure exposure and disease at the same time and are thus particularly prone to self-reporting bias.  (*See id.* at 21.)  Ecological studies, which use population-level data instead of individual-level data, are "limited in their ability to account for confounding factors and often require the use of proxy measures of exposure and outcome." (*Id.* at 22.)

arise simply due to chance." (*Id.*)   Relatedly, epidemiological studies often report results in terms of *relative risk,* an indicator of the strength of association between an exposure and a health condition of interest. (*Id.* at 20.)   For instance, case-control studies, "in which exposure history among individuals with disease ('cases') is compared with exposure history among individuals without the disease ('controls')," estimate relative risk through exposure "odds ratios." (*Id.* at 21.)   An odds ratio of 1.5 means that individuals in the case group were 50% more likely to have been exposed to the substance of interest than individuals in the control group.   Low relative risks (e.g., less than 2.0) are less likely to reflect a causal relationship. (*See id.*)

After explaining these and other methods of determining whether and to what extent epidemiological studies can support a causal inference, Dr. Mundt proceeds to conduct a series of COPC-specific epidemiological assessments.   For 1,1,1-trichloroethane, arsenic, hexavalent chromium, formaldehyde, lead, methylene chloride, styrene, PCE, toluene, TCE, vinyl chloride, xylene, and "solvent mixtures," Dr. Mundt discloses the epidemiological literature he identified as relevant to Plaintiffs' health conditions, analyzes the strengths and weaknesses of the studies, and explains the bases for his ultimate conclusions about whether each COPC can cause each health condition and, if so, under what exposure conditions. (*See id.* at 30–64.)

Next, Dr. Mundt analyzes the epidemiology of Plaintiffs' health conditions, assessing not just their relationships to the COPCs, if any, but also the established risk factors for each condition. (*See id.* at 65–109.)   After explaining the methodologies he used to identify and analyze relevant literature, Dr. Mundt analyzes the risk factors

and strength of COPC-specific epidemiological evidence relating to dozens of different cancer and non-cancer health endpoints.  (*See id.*)

Finally, building on these prior analyses, Dr. Mundt critiques and responds to opinions disclosed in the reports of Plaintiffs' experts, Drs. Panigrahy, Kantor, and Mattison.  (*See id.* at 134–71.)  Dr. Mundt's critiques are varied, ranging, for instance, from high-level analyses of Plaintiffs' experts' failures to explain their methodologies or tailor their opinions to plausible exposure conditions, to specific indicia of unreliability, such as Dr. Panigrahy's plagiarism.  (*See id.*)

Dr. Mundt ultimately concludes, among other things, that:

- The epidemiological literature indicates that few of the specific COPCs are associated with one of the alleged cancers (e.g.., hexavalent chromium and lung cancer), or *may* be associated with one of the alleged cancers (e.g., vinyl chloride and angiosarcoma of the liver); however, the vast majority of the claimed chemical-cancer (or other disease) associations epidemiologically cannot be substantiated adequately to validly conclude there is any causal relationship.  For the few specific chemical-disease relationships that may be causal, all were observed under extreme exposure circumstances that do not inform causality at environmentally relevant exposures . . . .

- [T]he numerous hypotheses that Plaintiffs' experts advance as evidence of causality – regardless of their biological plausibility – do not meet any standard for establishing causality. . . . Plaintiffs' experts' representations of the epidemiological literature are unreliable for assisting the court in understanding whether any of the Plaintiffs' presumed exposures to COPCs can and do cause the claimed cancers and diseases.

(*Id.* at 17–18.)  Dr. Mundt also explains why exposure conditions matter to causation analyses, why the scientific community expects epidemiological reviews to be "systematic," and why the linear no-threshold ("LNT") dose-response model is unreliable outside the protective public-health context.  (*See id.*)

# ARGUMENT

## I.   Dr. Mundt's opinions meet Rule 702's reliability and fit requirements and are also independently admissible as rebuttal testimony.

All of Dr. Mundt's opinions relating to general causation are reliable and helpful.[3]   Plaintiffs do not dispute Dr. Mundt's qualifications.   (*See* Doc. 194.)   As addressed below, Plaintiffs have not identified any relevant primary epidemiological studies that Dr. Mundt and his team omitted from their review, meaning Plaintiffs concede that his literature collection was sufficiently comprehensive.   (*See id.*)   And they cannot deny that the methodologies Dr. Mundt used to analyze whether each study supports a causal inference are well-recognized and considered by the epidemiological community to be reliable so long as they are reliably applied.   *See, e.g.*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 556–96 (Fed. Judicial Center, 3d. ed. 2011) (explaining how epidemiologists assess study design, interpret statistical results, account for confounding and other potential sources of false positives, and ultimately evaluate whether associations reflect true cause-and-effect relationships). Moreover, unlike Plaintiffs' experts, Dr. Mundt thoroughly detailed the bases for his opinions in his 171-page single-spaced report.   (*See* Doc. 213-1 at 1–171.)   Plaintiffs did not need to depose Dr. Mundt to know which studies he considered probative, what

---

[3]   Plaintiffs move to exclude Dr. Mundt's opinions "in their entirety" (Doc. 194 at 2), but they make to effort to engage his opinions about class certification in *Grayson* (*see* Doc. 213-1 at 12 ¶ 3, at 18 ¶¶ 9–10, at 110–14, 122–23, 128–33 (Cowan rebuttal).)   Although all of Dr. Mundt's class-certification opinions are reliable, LMC limits its response to Dr. Mundt's general-causation-related opinions and will address his class-certification opinions if necessary in the context of *Grayson* class-certification motion practice.   Plaintiffs' motion to exclude Dr. Mundt's criticisms of Dr. Cowan's Chi-Squared test likewise go to class certification.   (Doc. 194 at 5.)

he viewed the strengths and weaknesses of those studies to be and why, and the extent to which he viewed those studies as sufficient to support a causal inference under varying exposure conditions. (*See id.*)  These analyses and conclusions are directly germane to the key issue of whether the COPCs can be likely causes of any relevant ailment under plausibly case-relevant exposure conditions.  Dr. Mundt's proffered opinions will therefore "help the trier of fact to understand the evidence or to determine a fact in issue," are based on sufficient data, and derive from principles and methods that are reliable and were reliably applied.  *See* Fed. R. Evid. 702.

Further, Dr. Mundt's opinions are largely rebuttal in nature.  About a quarter of the general-causation analyses in Dr. Mundt's expert report are devoted to critiques of Plaintiffs' general-causation experts' reports.  (*See* Doc. 213-1 at 134–71.)  And the analyses that precede these discussions both inform them and fairly address "the same subject matter," which is a term courts broadly construe.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (allowing expert opinions "intended solely to contradict or rebut evidence on the same subject matter identified by another party"); *e.g.*, *Northrup v. Werner Enter., Inc.*, No. 8:14-cv-1627-T-27JSS, 2015 WL 4756947, at *2 (M.D. Fla. Aug. 11, 2015) (collecting cases construing the "same subject matter" standard broadly).  Dr. Mundt's opinions would therefore be admissible as rebuttal opinions even if they did not satisfy Rule 702's requirements for affirmative general-causation opinions (which they do).  *See In re Abilify (Aripiprazole) Products Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018) (explaining that "[t]here is no requirement that a defense expert offer a competing general causation opinion" and that "his opinions

properly may be limited to criticizing the analysis and conclusions presented by another party" (citing *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts."))).  Dr. Mundt "identified alleged shortcomings in Plaintiffs' experts' opinions, provided a reasoned basis for each criticism, and furnished reference materials in support of [his] positions."  *In re Abilify*, 299 F. Supp. 3d at 1368.  This suffices for admissibility.

## II.   Plaintiffs' arguments against Dr. Mundt's opinions should be rejected.

Plaintiffs offer five arguments to have Dr. Mundt's opinions excluded.  Each mischaracterizes or outright misrepresents Dr. Mundt's analyses.

### A.   Dr. Mundt's criticisms of Plaintiffs' experts' unsystematic weight-of-the-evidence and Bradford Hill analyses are accurate and helpful.

Acting as if Dr. Mundt opined that weight-of-the-evidence reviews are inherently unreliable, Plaintiffs first argue that he should be precluded from testifying that "systematic" reviews are the only reliable methodologies for evaluating general causation.  (*See* Doc. 194 at 6–11.)

First, this mischaracterizes Dr. Mundt's opinion.  He *repeatedly endorsed* weight-of-the-evidence analyses in his report—so long as they are performed with adequate indicia of reliability.  (*See* Doc. 213-1 at 16 ("Determining causality for human diseases typically requires the critical review and synthesis of the body of published epidemiological studies using a *quality-based weight-of-evidence approach*." (emphasis

added).)  "Systematic review" is a term Dr. Mundt uses to describe these indicia of reliability.  (*See id.* at 24 ("Systematic review is a comprehensive, objective and transparent approach to planning, identifying, presenting, assessing, and synthesizing scientific evidence to answer a research question.").)  There are different means by which a weight-of-the-evidence review could be performed "systematically," but the "key steps" involve principles of transparency, consistency, and reliability.  (*See id.*)

Dr. Mundt's opinion aligns with the law.  As LMC explained in its motions to exclude the testimony of Plaintiffs' experts, Drs. Mattison and Kantor, the weight-of-the-evidence methodology poses an acute risk of being inadmissible *ipse dixit* masquerading as sound science.  Thus, to "ensure that the . . . weight of the evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process . . . *there must be a scientific method of weighting that is **used** and **explained***.'"  *In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) (emphasis added).  Further, "the specific techniques by which the weight of the evidence . . . methodology is conducted must themselves be reliable according to the principles articulated in *Daubert.*"  *Id.*  This was the crux of Dr. Mundt's "systematic review" critique of Plaintiffs' experts—that their reports contain "narrative summaries of apparently arbitrarily and uncritically selected study results"—rather than the required detailed explanations of how the cited studies were identified, selected, analyzed, weighted, and synthesized into conclusions.  (*See* Doc. 213-1 at 16.)

And Dr. Mundt was right.  Plaintiffs' experts all use forms of systematic review in their academic work.  Yet as addressed in LMC's pending *Daubert* motions,

Drs. Mattison and Kantor both conceded at their depositions that they **never** reduced their literature "weighing" processes to writing and, in fact, **never** formally weighed and synthesized the selected studies at all.  (*See* Doc. 191 at 17–22 (Dr. Mattison), Doc. 190 at 16–22 (Dr. Kantor).)  And while Dr. Panigrahy included limited analyses of the studies he cited, those analyses were not his own (and thus not a reliable weighing of evidence); they were plagiarized from IARC *Monographs* and similar reviews.  (*See* Doc. 189 at 12–22 (explaining Dr. Panigrahy's plagiarism).)  Thus, Dr. Mundt's systematic-review opinions are valid, admissible criticisms of Plaintiffs' experts' analyses.  *See In re Abilify*, 299 F. Supp. 3d at 1368.

Plaintiffs also miss the mark with their related argument that Dr. Mundt should not be allowed to opine that their experts should have performed their reviews systematically when he did not conduct a systematic review.  (*See* Doc. 194 at 8–11.)  First, as addressed above, Dr. Mundt had *no obligation* to employ a method of his own, so the comparison between his obligations and those of Plaintiffs' experts is a false equivalency.  *See In re Abilify*, 299 F. Supp. 3d at 1368.  Second, that Dr. Mundt would have felt the need to employ *his* version of a systematic review *if* he had reached the novel conclusion that cause-effect relationships exist between the plausible exposure conditions and Plaintiffs' diseases does not mean that the methodologies he used to assess the epidemiological literature were unreliable.  As between Plaintiffs' experts and Dr. Mundt, only his report contains thorough and independent explanations of the bases of his opinions.  Thus, only Dr. Mundt's analyses are reliable.

## B.  Plaintiffs' argument that Dr. Mundt attempted "to intentionally mislead the Court" are frivolous.

Plaintiffs falsely accuse Dr. Mundt of "fabricat[ing] evidence to create a controversy where none exists." (Doc. 194 at 16.)  Plaintiffs' sole purported support for this serious charge is their claim that Dr. Mundt misattributed a quotation in his report—that "exposure to organic (chemical) solvents" has been identified as one of several "'[u]nproven theories' that 'do not have enough evidence to support whether they may be a cause of MS.'"  (Doc. 194 at 16 (citing Doc. 213-1 at 92).)  According to Plaintiffs, Dr. Mundt attributed the quote to "the National MS Society website" when, allegedly, "*the sole website containing the quoted language is a* Philadelphia acupuncture clinic." (*Id.* at 16–17 (emphasis in original).)  A "Google search," they claim, "yielded no results from the National MS Society." (*Id.* at 16.)

Plaintiffs know that this accusation is false.  Indeed, LMC introduced a printout of the relevant National MS Society (NMSS) website as an exhibit to the deposition of Plaintiffs' multiple sclerosis expert, Dr. Kantor. (Doc. 213-3.)  Counsel for LMC then questioned Dr. Kantor about the contents of that website, including NMSS's statement that solvent exposure as a cause of MS is an unproven theory—which Dr. Mundt accurately reported.  (*Id.* at 3; *see also* Doc. 213-4 (Kantor deposition transcript excerpt).)  The same Plaintiffs' lawyer who made the frivolous accusation that Dr. Mundt misattributed quotations to the National MS Society defended Dr. Kantor's deposition and repeatedly objected to questions about the NMSS website printout. (Doc. 213-4 at 101:11–110:12.)  There can thus be no doubt that he knew of

the website's existence yet still represented to this Court that no such website exists.

What's more, Plaintiffs' counsel are wrong that this website cannot be "Googled." (Doc. 194 at 16.) Using nearly any combination of the terms "cause" and "MS" yields this NMSS website. The full website address is also on the bottom of every page of the printout used at Dr. Kantor's deposition. (Doc. 213-3 (citing https://www.nationalmssociety.org/What-is-MS/What-Causes-MS#).)

Plaintiffs' accusations that Dr. Mundt "fabricate[d] evidence" and attempted to "intentionally mislead the Court" are not just wrong; they are inexcusable.

## C.  Dr. Mundt independently analyzed the limitations of the studies he cited, and Plaintiffs' financial-bias arguments should be rejected.

The Court should next reject Plaintiffs' argument that Dr. Mundt "failed to analyze the limitations of the studies upon which he relied." (Doc. 194 at 17–21.)

Dr. Mundt's report facially refutes this argument. He analyzed study limitations (e.g., selection, reporting, and recall biases; statistical significance and power; and sources of potential confounding) in *every* one of his substance and health-condition reviews. (*See* Doc. 213-1 at 33–107.) There is *not one* page of this 74-page analysis without a discussion of study limitations. (*See id.*) In the face of this expansive limitations analyses, Plaintiffs argue only that that Dr. Mundt needed to, but did not, disclose funding sources or authors' potential economic interests as to five studies in Dr. Mundt's report. (Doc. 194 at 17–21.)

First, these funding sources and potential economic interests are disclosed in the reports themselves, all of which were produced to Plaintiffs and available to their

experts.  (*See* Docs. 213-7–11.)  Second, the studies make clear that entities that provided funding or that had an economic interest in the results had ***no control*** over the methodologies employed or the results.  (*Id.*)  Tellingly, Plaintiffs have identified no design or methodological flaws in any of these studies.  Plaintiffs instead rely on the two-fold insinuation that there were financial conflicts of interest involved in these studies, and that the conflicts of interest render the results unreliable.  But as Dr. Mundt explained at his deposition, companies often fund research because they have an interest in protecting their workers and understanding any human health effects of their operations.  (Doc. 213-2 at 97:19-98:8.)  Plaintiffs unsurprisingly cite *no authority* holding that a disclosed potential economic interest in a study renders it per se unreliable, and, in LMC's review, no such authority exists.  *Cf. In re Abilify*, 299 F. Supp. 3d 1291, 1326 (concluding that concerns about bias influencing a study's results typically go to its weight, not its admissibility).

Plaintiffs alternatively argue that the results of two LMC-funded cohort studies might have been attributable to the "healthy worker effect," which Dr. Mundt should have disclosed.  (Doc. 194 at 18–19.)  But *any* occupational cohort study could be influenced by the healthy worker effect, which Dr. Mundt squarely addressed in his report and explained why it has little effect on studies of cancer outcomes:

> Results of occupational studies comparing workers to a general population may be viewed by some as unreliable due to a so-called "healthy worker effect."  Differences between workers and the general population can and do arise due to the selective hiring and retention of healthy or fit workers and is seen primarily for cardiovascular diseases when disease patterns for these workers are compared with those of the general population.

(Doc. 213-1 at 22–23.)   Thus, it is not true that Dr. Mundt overlooked the healthy worker effect, nor have Plaintiffs substantiated that it would have any bearing on the cancer considerations in the long-term cohort studies Dr. Mundt cited.

### D.   Dr. Mundt did not "ignore evidence he 'did not agree with.'"

Dr. Mundt did not consider but omit from his report "studies, results, and literature that contradicted his arguments."  (Doc. 194 at 11–15.)

First, Plaintiffs correctly concede that "criticisms of an expert's failure to adequately consider certain data points affect the probative value of the methodology, not its admissibility," unless the oversight is so drastic that it affects the reliability of the expert's opinion.  *See In re 3M Combat Arms Earplug Products Liab. Litig.*, No. 3:19-md-2885, 2021 WL 948839, at *7 (N.D. Fla. Mar. 13, 2021).  Here, however, Plaintiffs cite no primary epidemiological studies that Dr. Mundt purportedly "ignored." (*See* Doc. 194 at 11–15.)

There are only three sets of documents that Plaintiffs claim Dr. Mundt overlooked.  The first are two short letter-style submittals to scientific journals made by scientists seeking to defend a study that Dr. Mundt and his colleagues criticized. (*See* Doc. 213-2 at 141:15–149:15 (discussing the authors' response to Dr. Mundt's criticism of the Zhang 2010 study).)   These are *not* epidemiological studies, and Plaintiffs offer no substantive argument as to why these submittals should have affected any of Dr. Mundt's substance/health-condition analyses.  Second, Plaintiffs argue that Dr. Mundt did not consider a series of meta-analyses of other studies that IARC addressed in its TCE *Monograph*.  (*See* Doc. 194 at 13.)  Plaintiffs claim that

IARC found "statistically significant associations between TCE exposure and cancers of the kidney, liver, intrahepatic bile ducts, and non-Hodgkin lymphoma" that Dr. Mundt allegedly failed to disclose. (*See id.*) On the contrary, Dr. Mundt *did* report IARC's conclusions and analyze the bases for them, including the studies and meta-analyses that led to IARC's conclusions. (*See* Doc. 213-1 at 53 ("IARC lists TCE a Group 1 carcinogen based on what it deemed *sufficient evidence* of an association between TCE exposure and kidney cancer . . . . IARC also states that 'a positive association has been observed between exposure to trichloroethylene and non-Hodgkin lymphoma and liver cancer . . . .'").) Dr. Mundt analyzed the studies that underlie IARC's conclusions, which were different from the meta-analyses Plaintiffs claim Dr. Mundt overlooked. (*See id.* at 53–55.) Third, Plaintiffs fleetingly argue that Dr. Mundt should have cited EPA's **draft** IRIS toxicological review of formaldehyde. (Doc. 194 at 13.) The draft, however, is still in the public review phase and has yet to be peer-reviewed, so the suggestion that this document is authoritative is wrong. Further, Dr. Mundt's uncontroverted testimony is that he used reviews from EPA and similar agencies as a starting point to identify relevant literature, and, with EPA's formaldehyde draft, he knows of and has engaged the primary literature on which EPA based its **draft** conclusion. (Doc. 213-2 at 149:16-150:5.) Plaintiffs have identified no primary literature on formaldehyde that Dr. Mundt purportedly overlooked.

Alternatively, Plaintiffs argue that Dr. Mundt cherrypicked study results that he reported. They contend that Dr. Mundt did not disclose a statement from EPA's 2011 toxicological review of TCE indicating that "the weight of the evidence in humans and

experimental animals is suggestive of the potential for developmental toxicity with TCE exposure." (Doc. 194 at 12.) But here again, Dr. Mundt not only reported this alleged association (Doc. 213-1 at 57 ("Several epidemiological studies reported associations between TCE and various developmental effects." (collecting studies))), he analyzed the *updates* to the studies that supported EPA's statement. (*Compare* Doc. 213-5 at 4-558 (citing Yauck 2004 and ATSDR studies of TCE exposures in Endicott, NY), *with* Doc. 213-1 at 71–72 (discussing Yauck 2004, Forand 2012 (an updated Endicott study), and ATSDR's 2019 TCE toxicological profile).)

Finally, Plaintiffs wrongly accuse Dr. Mundt of misrepresenting the results of an ATSDR study of workers exposed to TCE at Camp Lejeune. Plaintiffs point to one table in the Camp Lejeune study showing a crude comparison of Parkinson's disease in workers at two camps. (Doc. 194 at 13–14 (citing Doc. 213-6 at table 11).) That table, based on a very small sample size, showed a higher rate of Parkinson's in the civilian workers at Camp Lejeune than in the control group. But this isolated result does ***not*** reflect ATSDR's conclusion. Parkinson's rates were ***not*** statistically significantly elevated in marines who served at Camp Lejeune, and they were ***not*** statistically significantly elevated at low or high exposures in ***any*** cumulative exposure group, undercutting the existence of any dose-response relationship. (Doc. 213-5 at 73, 74, 76, 80, 86, 88.) For this reason, ATSDR confirmed in its Toxicological Profile for Trichloroethylene that the Camp Lejeune study showed "no indication of increased risk of . . . Parkinson's disease in any [TCE] cumulative exposure group"(Doc. 188-8 at 162–63 (citing Doc. 188-9)), which Dr. Mundt correctly reported.

Thus, Plaintiffs' "cherry-picking" allegations are unfounded. Dr. Mundt consistently engaged the key studies, including those that Plaintiffs claim he overlooked. And even if the few examples Plaintiffs cite in their motion really reflected oversights by Dr. Mundt, such oversights would, when taken in context with the rest of his thorough report, go only to the probative value of his opinions. *See In re 3M Combat Arms Earplug Products Liab. Litig.*, 2021 WL 948839, at \*7.

### E.   Dr. Mundt used the terms "clear" and "convincing" descriptively.

Finally, Plaintiffs claim that Dr. Mundt endorsed a clear and convincing "*evidentiary*" standard, making his opinions not "fit" this case. (Doc. 194 at 22.) Dr. Mundt was ***not***, however, using those terms to endorse any evidentiary standard. Instead, he uses them in his report colloquially to describe whether, in his judgment, epidemiological studies support a causal inference. *See* REFERENCE MANUAL at 598 ("[C]ausation is a judgment for epidemiologists and others interpreting the epidemiologic data."). Plaintiffs' counsel's deposition questions on this topic were objectionably ambiguous and failed to lay the foundation for the argument they now attempt. That is why LMC's counsel objected, and Plaintiffs' counsel tellingly excluded those objections from their deposition quote in their Motion.[4]

### CONCLUSION

For the reasons expressed above, the Court should deny Plaintiffs' Motion to Exclude the Expert Report and Testimony of Dr. Kenneth Mundt (Doc. 194).

---

[4] (*Compare, e.g.*, Doc. 194 at 24 (quoting Doc. 213-1 at 53:5–13 but omitting objections), *with* Doc. 213-2 at 53:5-53:20 (memorializing Lockheed Martin's objections).)

Dated: November 1, 2022

Respectfully submitted,

/s/ David B. Weinstein

Francis A. Citera*
citeraf@gtlaw.com
Gretchen N. Miller*
millerg@gtlaw.com
**GREENBERG TRAURIG, LLP**
77 West Wacker Dr., Ste. 3100
Chicago, Illinois 60601
Telephone: (312) 456-6583
Facsimile: (312) 899-0320

*Specially admitted*

David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Christopher Torres (FBN 0716731)
torresch@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
Raymond Jackson (FBN 1028350)
jacksonra@gtlaw.com
Christopher R. White (FBN 1022219)
whitech@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Ste. 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900

*Attorneys for Defendant Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I certify that on November 1, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ David Weinstein
Attorney