## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PHYLLIS GRAYSON and PHILLIP PENSON, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION,

    Defendant.

Case No. 6:20-cv-1770

## PLAINTIFFS' RESPONSE TO LOCKHEED MARTIN'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' PROPOSED EXPERT, DR. CHARLES COWAN

## I.    INTRODUCTION

In challenging Dr. Cowan's statistical analysis and arguing that it does not support his conclusion that death rates in the Lockheed zip code are significantly higher than other zip codes in Orange County, Lockheed resorts to a warped, meaningless presentation of his data and clear misstatements of Drs. Cowan and Wells' testimony. Dr. Cowan's Chi-square analysis, particularly his calculation of the significance of the difference between the total unduplicated death rates between 32819 and background death rates in Orange County (unaddressed in Lockheed's motion), confirms Dr. Cowan's testimony that "death rates are statistically significantly higher in the Lockheed zip code than in most other zip codes when tested individually, and higher in the Lockheed zip codes when comparing to all other zip codes in Orange County pooled."[1] As discussed below, Lockheed's remaining arguments are undeveloped, devoid of record citations, and meritless.

## II.    LEGAL STANDARD

Even though "Rule 702 … compels a district court to perform the critical gatekeeping function concerning the admissibility of expert scientific evidence," "the *Daubert* standard … is an extremely high burden under which to move a court to exclude an opponent's expert testimony." *Mills by and through Mills v. Kia Motors America, Inc.*, 2011 WL 13187106, at *2 (M.D. Ga. Sep. 30, 2011). A "district court must ensure that its gatekeeping role under *Daubert* does not 'supplant the adversary

---

[1] Cowan Rep. (ex. 1) at 16.

1

system or the role of the jury.'" *Id.* (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999)). "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison*, 184 F.3d at 1312. "While an expert's testimony may be inadmissible if it lacks a logical basis, ... [a]ny weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility." *Metals Mfg. Co. v. Florida Metal Prods., Inc.*, 778 F. Supp. 2d 1341, 1344 (M.D. Fla. 2011).

## III.    BACKGROUND

Charles Cowan, Ph.D., has over fifty years' experience in statistical research and design.[2] He earned a Bachelor of Arts and a Master of Arts in Economics from the University of Michigan,[3] and a doctorate in Mathematical Statistics from George Washington University.[4] Dr. Cowan is the Managing Partner of Analytic Focus LLC, a consulting group focusing on the design, implementation, and evaluation of statistical and sampling techniques for research.[5] He has served as the Chief Statistician of the FDIC, director of quantitative methods at PricewaterhouseCoopers LLP, Chief Statistician of the U.S. Department of Education's National Center for Education Statistics, and Chief of the Survey Design Branch of the U.S. Bureau of the Census.[6] He has authored numerous books and articles on statistical design methods.[7]

---

[2] Cowan Rep. (ex. 1) at 3.
[3] Cowan Rep. (ex. 1) at 3.
[4] Cowan Rep. (ex. 1) at 3.
[5] Cowan Rep. (ex. 1) at 4, 18.
[6] Cowan Rep. (ex. 1) at 20.
[7] Cowan Rep. (ex. 1) at 5, 21-24.

Lockheed does not challenge Dr. Cowan's qualifications.

## IV. ARGUMENT

### A. Dr. Cowan's methodology using Pearson Chi-square testing, whose reliability Lockheed does not challenge, shows that death rates in 32819 were significantly higher than background rates in Orange County.

Dr. Cowan examines whether during the period 1999-2020 mortality rates were significantly higher in the zip code where the Lockheed plant is located ("32819" or, the "Lockheed zip code") from background rates in Orange County.[8] Using population data from the Bureau of the Census and death certificate data from the state of Florida,[9] he calculates the rate of death for 27 causes of death in each of 43 zip codes.[10] To test the null hypothesis that the death rates were equal between the comparison groups, he conducts Chi-square tests applied to two-way tables, comparing death rates in the Lockheed zip code with individual zip codes for each of the 30 categories (the 27 causes of death plus three composites "ALL Cancer", "ALL diseases of the central nervous system", and "Total Unduplicated").[11] He then pools the death rates of all other Orange County zip codes and compares the pooled death rates for each cause of death with those observed in the Lockheed zip code. While Lockheed states that Dr. Cowan's testimony only relates to class certification,[12] his

---

[8] Cowan Rep. (ex. 1) at 3, 5-6; *see* Cowan Rebuttal Rpt. at 5.
[9] Cowan Rep. (ex. 1) at 9-11.
[10] Cowan Rep. (ex. 1) at 7. Causes of death included breast cancer, testicular cancer, non-Hodgkin's lymphoma, Hodgkin's lymphoma, leukemia, kidney cancer, bile duct cancer, liver cancer, lung cancer, anal cancer, multiple sclerosis, Parkinson's, blood clots, birth defects, ovarian cancer, bladder cancer, brain cancer, cancer of connective tissue, pancreatic cancer, prostate cancer, skin cancer, esophageal cancer, dementia, stroke, heart diseases & heart cancer, myocardial infarction, thyroid cancer, and two composite categories—all cancers and all diseases of the central nervous system.
[11] Cowan Rep. (ex. 1) at 8.
[12] Lockheed Mot. at 2.

comparison of death rates in 32819 with background rates in Orange County provides evidence of background risk, which the 11th Circuit recognizes as one of the three primary methodologies the Circuit recognizes as sufficient to establish causation. *See Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306–1311 (11th Cir. 2014). Lockheed does not object to the reliability of Dr. Cowan's data, the helpfulness of a zip code-by-zip code comparison, or the use of a Pearson Chi-square test to accomplish this purpose. Instead, Lockheed misrepresents Dr. Cowan's results, which directly support his conclusions about higher death rates in the Lockheed zip code. Specifically, Dr. Cowan found that "relative to other parts of Orange County, that death rates over a 22-year period are significantly higher for the Lockheed zip codes than in other zip codes or for all of Orange County."[13]

**B.    The results of Dr. Cowan's Chi-square support his conclusions that the death rates in the Lockheed zip code are significantly higher than in other Orange County zip codes.**

Lockheed's leading point, unsupported by any expert testimony, is that Dr. Cowan's conclusions are undermined because differences in individual death rate categories between 32819 and other Orange County zip codes reached significance 23% of the time when compared individually and 43% of the time when compared with the combined death rates of all other Orange County zip codes.[14] Presumably, Lockheed computed these values by counting the number of percentages reaching significance and dividing by the total number of comparisons made. This is a complete

---

[13] Cowan Rpt. (ex. 1) at 16.
[14] *See* Lockheed Mot. at 2,3, 7, 10.

distraction, ungrounded in any proposed statistical methodology, and not relevant to Dr. Cowan's analysis or conclusions. Tellingly, Lockheed ignores the bottom-line "Total Unduplicated" result, comparing all unique causes of death between 32819 (5.55%) with background rates in Orange County (4.69%), a difference whose significance Dr. Cowan calculated "using the Chi-square test. . . at the $(2.9 \times 10^{-16})$ level (the p-value for the test).[15] This uncontested fact independently supports Dr. Cowan's conclusion that death rates are "higher in the Lockheed zip code when compared to all other zip codes in Orange County pooled."[16]

Instead of refuting the "Total Unduplicated" result, Lockheed sets up a straw man argument attacking a conclusion Dr. Cowan does not make. Dr. Cowan never testifies that *each* individual cause of death he reviewed resulted in a statistically higher death rate in 32819 compared with other Orange County zip codes. Lockheed does not explain the relevance, let alone importance, of the *number* of disease categories that reached statistical significance compared with those that did not. As Dr. Cowan stated at deposition, he included various rare diseases where "the occurrences of deaths weren't large enough to allow a comparison."[17] That comparisons of death rates for these diseases did not have enough data to show them to be significantly higher in 32189 is to be expected and does not affect Dr. Cowan's analysis or conclusions.

For example, Dr. Cowan includes eight rare causes of death whose combined

---

[15] Cowan Rpt. (ex. 1) at 15.
[16] Cowan Rpt. (ex. 1) at 16.
[17] *See* Cowan Tr. (ex. 2) at 244:4-245:6.

death count in 32819 between 1999 and 2020 was 20 out of 1561 total deaths,[18] and similarly low across all other Orange County zip codes.[19] Unsurprisingly, even though some of even these categories had a higher than background death rate in 32819, significant *p*-values were not achieved for every cause of death.[20] By Lockheed's logic, these categories should be given equal weight to, for example, ALL Cancer and ALL Diseases of Central Nervous System (for which there were much higher death counts across zip codes and significant *p*-values in the 32819 comparisons).[21] Looking at these in isolation to exemplify the nonsensical nature of Lockheed's argument, Lockheed's reasoning posits that because there are eight of those categories, and only two of the latter, there is significance only 20% of the time. Therefore, as 20% is lower than some unspecified threshold, there are no reliable conclusions to be drawn about death rates in 32819. Not so. In reality, there is not an observably significant difference for eight rare disease categories, but there *is* a significant difference for the ALL Cancer and ALL Diseases of Central Nervous System categories. Regardless, none of this relates to conclusions regarding the *total* death rate, represented by the "Total Unduplicated" category. As Dr. Cowan concluded, the combined death rate was significantly higher than the pooled death rate of all other Orange Counties,[22] and that of the majority of individual zip codes.[23]

---

[18] These included testicular cancer, Hodgkin's lymphoma, blood clots, anal cancer, multiple sclerosis, and thyroid cancer, bile duct cancer, and birth defects.
[19] Cowan Rpt. (ex. 1) at 28.
[20] Cowan Rpt. (ex. 1) at 14-15.
[21] Cowan Rpt. (ex. 1) at 14-15, 28.
[22] Cowan Rpt. (ex. 1) at 14.
[23] Cowan Rpt. (ex. 1) at 34-36.

Lockheed's remaining arguments on this point are meritless. Lockheed takes issue with Dr. Cowan's statement that he "highlight[s] those zip codes and causes of death where the likelihood of death in zip codes 32819 is significantly higher at the 95% confidence level."[24] Lockheed's only source for this criticism is the Reference Manual's statement that "[s]ignificance comes no closer to expressing the probability that the null hypothesis is true than does the underlying $p$-value."[25] Dr. Cowan is not commenting on the likelihood that the null hypothesis is true with respect to individually highlighted cells, but merely indicating that he identified comparisons in the reports' tables where the death rates were statistically significantly higher at the 95% confidence level.[26]

Lockheed next disputes Dr. Cowan's statement that the backup materials he provides show that "there are no substantial differences in death rates over time."[27] Lockheed does not explain how Dr. Cowan "is wrong", cites to no record evidence or authority, and does not explain why, even if there were differences in death rates over time, it would affect Dr. Cowan's zip code-by-zip code analysis across 1999-2020 to render his methodology unreliable.

Similarly, Lockheed's complaint about Dr. Cowan's alternative hypothesis "that the death rate for that cause is statistically significantly higher in the Lockheed zip code when contrasted to the death rate for that cause in the comparable zip code"

---

[24] Lockheed Mot. at 10.
[25] Lockheed Mot. at 10.
[26] Cowan Rpt. (ex. 1) at 13.
[27] *See* Lockheed Mot. at 6; Cowan Rpt. (ex. 1) at 11.

7

is undeveloped. Once again, Lockheed offers no explanation for why his null hypothesis is inappropriate or his alternative hypothesis is not a "correct corollary".[28] While this Court need not consider conclusory, unsupported arguments, *see Hannah v. Armor Correctional Health Services, Inc.*, 2021 WL 1777881, at *6 (M.D. Fla. Sep. 19, 2018) ) (citing *U.S. v. Perkins*, 204 F. App'x 799, 806 (11th Cir. 2006) ("With no substantive arguments to consider on these points, we do not address them"), Plaintiffs allege that emissions from the Lockheed facility contaminated the air, soil, and groundwater of the surrounding area.[29] As a result, they were exposed to toxic chemicals, which caused cancers, birth defects, and neurological and immunological injuries.[30] Dr. Cowan therefore examined whether the death rates between 32819 and other Orange County zip codes were the same, or higher in the zip code where Plaintiffs were exposed to these chemicals. He conducted a series of one-tailed tests examining death rates in other Orange County zip codes relative to 32819.[31] *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 577 n. 83 (3d ed.2011) ("Because most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate.").[32] Further, Dr. Cowan

---

[28] Lockheed Mot. at 5-6.

[29] *See* Plaintiffs' Fourth Amended Complaint (Doc. 89) ¶¶ 127-161.

[30] *See* Plaintiffs' Fourth Amended Complaint ¶ 192-268.

[31] *See* Cowan Tr. (ex. 2) at 123:3-20.

[32] *See also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1241 (W.D. Wash. 2003) (endorsing the propriety of a one-tailed test for statistical significance in a toxic substance case); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1164869, at *33 (D. Kan. Mar. 10, 2020).

provides all necessary data for Lockheed's experts to conduct significance testing on those instances where the death rate in a cause of death category was lower in 32819.[33]

Lockheed misrepresents two deposition excerpts purporting to corroborate that Dr. Cowan's Chi-square analysis did not confirm his conclusions.[34] First, Lockheed cites to testimony where Dr. Cowan was presented with an unsubstantiated, Lockheed-produced table at deposition for which defense counsel had "just [done] the math" and asked Dr. Cowan if he had performed a similar analysis.[35] Dr. Cowan's answer ("since I haven't reviewed this, I'm not sure what to say in response. I would like the opportunity to go back and tabulate myself") does not support Lockheed's attempted argument. Lockheed's second excerpt, from Dr. Wells, is even more misleading. Dr. Wells was asked about, and responded to, whether there was enough information to reject the null hypothesis looking at the Chi-square test $p$-values that did not show a significant correlation.[36] As Dr. Wells then explained, where the $p$-values were greater than the significance value of 0.05 as in the examples he is being shown, there is not enough information to reject the null hypothesis. Dr. Wells is not making any statement about the totality of Dr. Cowan's review, which he agreed was the "right analysis[,]"[37] or any of his conclusions.

Lockheed next proposes that the existence of zip codes with higher crude death rates for cancer than those in 32819 somehow negates the rest of Dr. Cowan's

---

[33] *See* Cowan Tr. (ex. 2) at 123:8-12.
[34] Lockheed Mot. at 11-12.
[35] *See* Lockheed Mot. at 11 (citing Cowan Tr. (ex. 2) at 232:23-233:24).
[36] *See* Lockheed Mot. at 12 (citing Wells Tr. (ex. 3) at 112:11-113:10).
[37] *See* Wells Tr. (ex. 3) at 19:22-24.

9

analysis.[38] Lockheed goes as far to say that ranking these death rates would make it "evident" that "death rates in 32819 were within the average of death rates" in Orange County.[39] Not only is this incorrect statement posited without any expert support, it is directly refuted by Dr. Cowan's *p*-value computation of the one variable Lockheed has chosen to spotlight. Specifically, when Dr. Cowan compared the ALL cancer death rate in 32819 with the pooled ALL cancer death rates in other Orange County zip codes, it showed that they were significantly elevated above background rates, yielding a *p*-value of 0.00.[40]

### 1. Distance from 32819 is irrelevant to Dr. Cowan's analysis.

Lockheed next asks this Court to eyeball a map and reject Dr. Cowan's analysis because, Lockheed claims, some zip codes with high cancer death rates are located "far away from 32819[.]"[41] First, as Lockheed correctly notes, distance from 32819 is not relevant to either the question Dr. Cowan set out to answer (about death rates in the Lockheed zip code compared with others in Orange County) or the comparisons he performed. Second, even if true, Lockheed fails to explain any import it would have. If anything, higher death rates in zip codes farthest away from 32819 would bias Dr. Cowan's results towards being unable to reject the null hypothesis and make any differences between 32819 and other Orange County zip codes *more* difficult to detect. Regardless, Lockheed's point here is best understood to relate to fate and transport,

---

[38] *See* Lockheed Mot. at 12-13.
[39] Lockheed Mot. at 12.
[40] *See* Cowan Rpt. (ex. 1) at 14.
[41] Lockheed Mot. at 14.

10

which is outside the scope of Dr. Cowan's testimony.[42]

### 2. The physical boundary of Dr. Cowan's zip code comparisons, which he determined before he began performing his calculations, is set by neutral geographic boundaries.

While Lockheed does not propose an alternative methodology by which to include and exclude zip codes, Lockheed claims, again without any evidence in support, that inclusion of certain zip codes in Lake and Osceola Counties would have changed Dr. Cowan's conclusions.[43] In restricting his analysis to zip codes within Orange County, Dr. Cowan "purposefully chose an objective and recognized geographic area. . . [so that he] could not be accused of introducing bias based on the selection of a comparator."[44] He excluded zip codes that overlapped across multiple counties where they were "primarily found in the second county".[45] Lockheed's criticism that he should have included non-Orange Counties in his analysis of Orange County zip codes is supported entirely by its own meritless claim that Dr. Cowan performed a "[c]learly. . . biased analysis."[46]. That Lockheed's experts had the opportunity to perform analyses testing the impact of these exclusions, yet failed to present any such analyses, should make it apparent that this argument is meaningless. Regardless, challenges like Lockheed's concerning the persuasiveness of the evidence are typically not within the purview of the district court. *See Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011). Expert testimony should only be excluded

---

[42] *See* Lockheed Mot. at 13-15, 18.
[43] Lockheed Mot. at 16.
[44] Cowan Rebuttal Rep. (ex. 4) at 5.
[45] Cowan Rep. (ex. 4) at 4-5.
[46] Lockheed Mot. at 16.

for failure to consider relevant evidence "where the flaw is large enough that the expert lacks good grounds for his or her conclusions[.]" *3M Combat Arms*, 2021 WL 948839, at *7 (N.D. Fla. Mar. 13, 2021).

Lockheed's caselaw on this point is irrelevant and unhelpful here. Four of the six cases do not concern statistical analysis and involve courts rejecting experts' testimony based on a literature review where the epidemiological evidence was unconvincing.[47] The remaining cases involved inadequately explained data exclusions and error-prone models, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 145 F. Supp. 3d 573, 588 (D.S.C. 2015), and a failure to consider potential alternative causal factors, *Am. Homeland Title Agency, Inc. v. Robertson*, 348 F. Supp. 3d 852, 867 (S.D. Ind. 2018), *aff'd*, 930 F.3d 867 (7th Cir. 2019). To the extent that Lockheed has identified any "salient explanatory variables[,]" Dr. Cowan addresses these in his confounding factor analysis, discussed below.

**C.    Dr. Cowan assigned a 100% *p*-value as a placeholder where raw data confirmed that further analysis would be unnecessary to his analysis.**

Lockheed argues, without explanation or citation to authority, that Dr. Cowan's use of "100%" as a placeholder value in his tables somehow obscures his analysis or was otherwise improper, incorrect, or misleading.[48] As Dr. Cowan explained, he input 100% in his tables where no significance testing was necessary

---

[47] *See Kilpatrick v. Breg, Inc.*, 2009 WL 2058384, at *5 (S.D. Fla. June 25, 2009); Mc*Clain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005); *Williams v. Mosaic Fertilizer, LLC*, 2016 WL 7175657, at *11 (M.D. Fla. June 24, 2016) (Scriven, J.), *aff'd*, 889 F.3d 1239 (11th Cir. 2018); *In re Accutane Products Liability*, 511 F. Supp. 2d 1288, 1292 (M.D. Fla. June 15, 2007).
[48] Lockheed Mot. at 17.

because it would be impossible for the Lockheed rate to be significantly higher than the comparison zip code rate, either because there were no deaths in the Lockheed zip code for a particularly rare cause of death category,[49] or where death rates were lower in the comparison zip code.[50] Dr. Cowan reports all of these results, both in raw numbers,[51] crude death rates,[52] and odds ratios,[53] but did not compute the Chi-square *p*-values for these comparison points. If Lockheed was sincere that significance tests performed on the few instances where death rates for certain diseases were markedly lower than in the Lockheed zip code, Lockheed's "experts had the data that [he] provided. They could have done that."[54] They did not. Regardless, Lockheed cites to no authority that Dr. Cowan's analysis is misleading or inappropriate. *See Cahill v. Amer. Family Mut. Ins. Co.*, 610 F.3d 1235, 1238-39 (10th Cir. 2010) (finding that a court need not address conclusory arguments without citation to relevant authority).

Lockheed cites to two cases on unsubstantiated expert testimony but does not explain how they apply here. In *Frazier*, the court took issue with an expert's imprecise and highly suggestive language about what a forensic team would *expect* to find at a crime scene. *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004). The court found that the expert's testimony conveyed an "intrinsically probabilistic or quantitative idea" where "the probability it expresses is unclear", and excluded the

---

[49] *See* Cowan Tr. (ex. 2) at 108:9-14; 113:18-114:1.
[50] *See* Cowan Tr. (ex. 2) 116:6-16:20.
[51] Cowan Rep. (ex. 1) at 28-30.
[52] Cowan Rep. (ex. 1) at 31-33.
[53] Cowan Rep. (ex. 1) at 37-38.
[54] Cowan Tr. (ex. 2) at 123:8-12.

testimony both because it was imprecise, and because the expert did not provide a reliable foundation. *Id.* Lockheed has not made (and cannot make) either assertion here. Similarly, in *Cook*, the 11th Circuit affirmed exclusion testimony from a doctor concerning the adequacy of suicide prevention training where it either was "within the understanding of the average lay person" or "unsubstantiated by any factual basis." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111-12 (11th Cir. 2005). The court found that the expert failed to give "a generally accepted standard. . . [or] an explanation of how or why he believes the [defendants'] training to be inadequate." *Id.* at 1112. Lockheed does not make a similar argument here, where Dr. Cowan's conclusions follow logically from the statistical analysis he performed.

> **D. Lockheed blatantly misrepresents the record in arguing that Dr. Cowan ignored confounding factors and provides no support in criticizing his variable-adjustment methodology.**

Lockheed claims "it is unsurprising that [Dr. Cowan] did not address confounding factors and it is uncontroverted that he failed to do so."[55] This is simply not true. The majority of Dr. Cowan's rebuttal report is an analysis of potentially confounding factors,[56] performed in response to criticisms from Lockheed's experts,[57] and performed on data Dr. Cowan made available in the backup materials to his initial report.[58] Specifically, Dr. Cowan "analyzed the relationship of the variables

---

[55] Lockheed Mot. at 18.
[56] *See* Cowan Rebuttal Rpt. (ex. 4) at 9-19.
[57] Cowan Rebuttal Rpt. (ex. 4) at 9.
[58] *See* Cowan Rebuttal Rpt. (ex. 4) at 9.

[Lockheed's experts] cite to the death rates in the dataset[,]. . . and reconduct[ed] [his] analysis with a variable of particular interest to [Lockheed's experts] – age."[59]

### 1. Dr. Cowan analyzed potentially confounding variables.

As Dr. Cowan explains, "[f]or a variable to be a confounding variable, it must actually have a correlation with the variable being studied."[60] He tabulates the correlations between causes of death and the variables Lockheed's experts identified to be potential confounders, including distance from 32819, population size, population density, median income, and ethnicity.[61] Of the 270 correlations reviewed, only seven were more than 20% of the variability associated with a certain variable (with two of those disappearing at 25% variability),[62] from which Dr. Cowan concluded that "no adjustment along the types that Dr. Rouhani and Dr. Mundt suggested … would make any difference to the rate at all."[63] Lockheed does not address this analysis, and instead introduces a *new* set of variables for which it argues— again without any exposition—that Dr. Cowan should have conducted a similar review.[64] While none of Lockheed's experts have shown that these factors would change Dr. Cowan's analysis or conclusions, Plaintiffs' expert Dr. Kendall did consider alternative sources of environmental exposures, air emissions, and traffic

---

[59] Cowan Rebuttal Rpt. (ex. 4) at 10.
[60] Cowan Rebuttal Rpt. (ex. 4) at 9.
[61] *See* Cowan Rebuttal Rpt. (ex. 4) at 11.
[62] Cowan Rebuttal Rpt. (ex. 4) at 10-11 .
[63] Cowan Tr. at 139:17-20; *see also id.* at 141:10-19; Cowan Rebuttal Rpt. (ex. 4) at 10-11 .
[64] Lockheed Mot. at 18 (These include "(1) environmental exposures; (2) alternative sources of air emissions; traffic emissions; (3) exposures to household chemicals; (4) diet and health practices; (5) education; or (6) access to health care.").

emissions, and found no substantial impacts that would suggest why deaths in 32819 should be significantly higher than Orange County generally.[65]

Lockheed relies on *Hendrix*, where the court excluded an expert's differential etiology analysis and agreed with the district court that none of the sources in the expert's literature review "come close to providing useful evidence of a definitive causal link [for one causation opinion]. . . and none provide even marginal support for [another causation opinion]." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198-9 (11th Cir. 2010). While Dr. Cowan's analysis is relevant to general causation as it goes to establishing the relevant background rate of various at-issue diseases, he is not performing a differential etiology analysis and "draw[s] no conclusions about causation."[66] Regardless, Dr. Cowan did run an analysis of the variables Lockheed's experts identified as potential confounders, including what they considered to be the most important consideration—differences in age demographics.

## 2. Dr. Cowan performed an appropriate age-adjustment analysis for death rates for all causes of death for each zip code.

Dr. Cowan conducted a regression analysis of death rates in each of the 43 zip codes to the average age in each zip code.[67] He ran the regression analysis "three times since Lockheed's experts mention age and median age, and percent of persons in age groups at risk."[68] He then chose the regression with the greatest predictive power,[69]

---

[65] *See* Kendall Rebuttal Rpt. (ex. 5) at 20-21.
[66] Cowan Rpt. (ex. 1) at 16.
[67] Cowan Rebuttal Rpt. (ex. 4) at 11-15.
[68] Cowan Rebuttal Rpt. (ex. 4) at 12.
[69] *See* Cowan Rebuttal Rpt. (ex. 4) at 11-13, Table 2.

and found that "[a]lmost all the causes of death show the same outcomes regardless of which death rate (crude or one of the age-adjusted) is used."[70] "Prostate Cancer, Lung Cancer and Stroke in 32819 [became] statistically significantly higher", while certain diseases with comparatively low rates of death (<.15%), including "Ovarian Cancer, Parkinson's Disease and Brain Cancer remain elevated but are no longer significantly different."[71] Notably, the results of this age-adjustment was an *increase* in computed odds ratio for combined cancer deaths, with the result remaining highly significant (p<0.000).[72] Dr. Cowan found that age adjustments did not affect his conclusions, and noted that "if the age adjustments have no impact on my opinions, and if age has the strongest relationship as a confounding variable, then none of the other confounding variables will have any impact on my conclusions."[73] Instead of criticizing his methodology, Lockheed attempts to introduce a new standard, without legal authority, expert testimony, or record evidence, that the CDC or FDOH promulgate the only acceptable methodology by which to conduct age-adjustment analysis.

### 3. Lockheed presents no factual support that Dr. Cowan's age-adjustment analysis would have been different using CDC or FDOH guidelines, and no legal authority for this being required.

Lockheed neither references any facts or expert testimony indicating why an age-adjustment calculation must be performed following CDC or FDOH guidelines. *See Guantanamera Cigars Co. v. SMCI Holding, Inc.*, 2022 WL 1160409, *16 (S.D. Fla.

---

[70] Cowan Rebuttal Rpt. (ex. 4) at 15.
[71] Cowan Rebuttal Rpt. (ex. 4) at 15.
[72] *See* Cowan Rebuttal Rpt. (ex. 4) at 14.
[73] Cowan Rebuttal Rpt. (ex. 4) at 15.

17

Apr. 20, 2022). ("The only thing before the Court is unsubstantiated attorney argument that a marketing expert should consider [certain materials]. This is insufficient to justify exclusion."). Dr. Cowan conducted his age-adjustment analysis in accordance with Lockheed's own experts' suggestions about how to perform such comparisons.[74] Further, Dr. Cowan, who worked for the CDC, testified that his age-adjustment methodology was a variation of the CDC's methodology.[75] Specifically, the CDC categorizes specific age groups and assigns each a respective weight, which Dr. Cowan did but using different age brackets.[76] He testified that he was "sure that the CDC is not offering [its specific age group breakdown] as the only methodology[.]"[77] and that "there are a number of textbooks that talk about age adjustments, and they mention the CDC, but they don't necessarily offer the exact same methodology as the CDC." He conducted his age-adjustment analysis in accordance with similar analyses he has seen in epidemiological and biostatistical literature.[78] Indeed, as he explained, "[t]his is a broader issue within statistics. The CDC is only one of several places that publishes. . . [The FDOH guidelines] don't use these categories either."[79] Moreover, Plaintiffs' expert Dr. Wells, Professor of Statistical Sciences at Cornell University,

---

[74] Cowan Rebuttal Rpt. (ex. 4) at 12; *see also* Cowan Tr. (ex. 2) at 206:1-6 ("Q. And why did you not follow the CDC or the Florida Department of Health? A. Well, because the experts who were rebutting me, Dr. Rouhani and Mundt, suggested different things. They talked about the median, they talked about the mean, they talked about the percent of the older people."); *id.* at 210:12-211:21; 221:20-23.
[75] Cowan Tr. (ex. 2) at 213:2-21.
[76] Cowan Tr. (ex. 2) at 220:9-20 ("[T]he only difference between [what the CDC has] in their example is 11 categories and I had three"); *see also id.* at 213:2-21; 214:6-15.
[77] Cowan Tr. (ex. 2) at 215:9-25; *see also id.* at 222:12-18; *id* at 248:24-249:2 ("[T]here are a number of textbooks that talk about age adjustments, and they mention the CDC, but they don't necessarily offer the exact same methodology as the CDC.").
[78] Cowan Tr. (ex. 2) at 250:20-2.
[79] Cowan Tr. (ex. 2) at 221:15-19; *see also id.* at 249:3-8.

agreed that Dr. Cowan's regression analysis was the appropriate method of performing age-adjustment comparisons, calling it "the typical way" to address potential confounders.[80] Regardless, Lockheed's experts did not perform any age-adjustment under the CDC or FDOH methodology showing that this would actually affect Dr. Cowan's analysis or conclusion.

**E.    Lockheed ignores its own experts and epidemiological standards in arguing that Dr. Cowan be required to adopt a multiple comparison method to show significance at a *p*-value of 0.000013.**

Lockheed relies on an uncited article subtitled "*Is the Bonferroni Correction Really So Bad?*" to contend that Dr. Cowan was required under *Daubert* to perform a Bonferroni adjustment or a similar multiple comparison method.[81] The article does not support this proposition,[82] and Lockheed fails to bridge the gap between the article's actual conclusions and Dr. Cowan's analysis.

Essentially, Lockheed posits that instead of testing for *p*-values less than 0.05—the standard in epidemiological analyses—that results should be deemed insignificant unless there is a "*p*-value of 0.000013."[83] Further, Lockheed points to no analysis that would indicate multiple comparison adjustments and would render Dr. Cowan's zip code comparisons non-significant. *See U.S. v. McCluskey*, 954 F. Supp. 2d 1224, 1262

---

[80] Wells Tr. (ex. 3) at 153:13-21.

[81] *See* Lockheed Mot. at 21-22, FN 25 (citing Doc. 204-24, Tyler VanderWeel & Maya Mathur, *Some Desirable Properties of the Bonferroni Correction: Is the Bonferroni Correction Really So Bad?*, in 188 American Journal of Epidemiology 617-618 (2018)).

[82] *Id.* "[T]here are considerations concerning the Bonferroni correction which suggest that its use, and reporting by its standard perhaps accompanied by other metrics as well may not be entirely undesirable." The authors do not specify what those contexts would be or when they would be required for reliable analysis.

[83] Lockheed Mot. at 22.

(D.N.M. 2013) (denying *Daubert* challenge that contained "conclusory and speculative" arguments "without persuasive citation to authority"). Regardless, Dr. Cowan explains why a multiple comparison adjustment is inappropriate for epidemiological datasets. Specifically, Dr. Cowan set out to "identify[] the number of significant differences to demonstrate the number and type of differences[,] and that application of Bonferroni's method would "dilute[] the full set of tests so that there is only a five percent change that one out of 3,870 is significant due to chance alone[,]"[84] and was nothing more than a "red-herring to distract the reader to consider a different analysis."[85] As Lockheed's experts acknowledge, a Bonferroni correction would not identify which positives are false positives, but would wildly inflate the amount of Type II errors (false negatives).[86] Because of this, Bonferroni adjustments and similar multiple comparison adjustments are widely disfavored in epidemiological analyses,[87] and, notably, Lockheed's expert Dr. Rouhani could not identify any examples of the use of Bonferroni adjustments in epidemiological analyses.[88]

## V.    CONCLUSION

For these reasons, this Court should deny Lockheed's motion.

Date: November 18, 2022

Respectfully submitted,

*/s/ T. Michael Morgan*
T. Michael Morgan

---

[84] Cowan Rebuttal Rep. (ex. 4) at 8.
[85] Cowan Rebuttal Rep. (ex. 4) at 8.
[86] Rouhani Dep. Vol. II (ex. 6) at 156:14-157:09.
[87] Cowan Rebuttal Rep. (ex. 4) at 8 (citing Perneger 1998); *see also* Rouhani Dep. Vol. II (ex. 6) 161:17-162:21; Cowan Tr. (ex. 2) at 261:7-13 ("This paper advances the view, widely held by epidemiologists, that Bonferroni adjustments are, at best, unnecessary and, at worst, deleterious to sound statistical inference.") (quoting Perneger 1998).
[88] Rouhani Dep. Vol. II (ex. 6) 161:17-162:03.

FL Bar No. 62229
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Frank M. Petosa
FL Bar No. 972754
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
8151 Peters Road, 4th Floor
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 327-5366
F: (954) 327-3018

Rene F. Rocha*
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
400 Poydras St., Suite 1515
New Orleans, LA 70130
rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

Michael F. Ram*
mram@forthepeople.com
Marie N. Appel*
mappel@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923

*Pro Hac Vice
Attorneys for the Plaintiffs

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 18, 2022, a true and correct copy of

the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies

of the foregoing document will be served upon interested counsel via transmission of

Notices of Electronic Filing generated by CM/ECF.

*/s/ T. Michael Morgan*
T. Michael Morgan
FL Bar No. 62229
