## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PHYLLIS GRAYSON; and PHILLIP
PENSON,

     Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION,

     Defendant.

Case No. 6:20-cv-1770

## LOCKHEED MARTIN'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE REPORT AND EXPERT TESTIMONY OF STEPHEN EMSBO-MATTINGLY, M.S.

Lockheed Martin Corporation (LMC) opposes Plaintiffs' motion to exclude the expert testimony of Stephen Emsbo-Mattingly, M.S. (Doc. 202).

## INTRODUCTION

Mattingly, an expert in environmental forensics with more than 30 years of applied chemistry experience, performed a three-phased forensic investigation of (1) Sand Lake Road Complex (SLRC), (2) Plaintiffs' proposed class area, and (3) the regional background area outside the proposed class area. (Doc. 237-3 at 9.)

In phase one, Mattingly examined more than 400,000 analytes from more than 7,500 samples collected at SLRC over an almost 40-year period, and found that "soil, groundwater, and surface water migration pathways were not plausible because [constituent of concern (COC)] distributions were localized to" SLRC. (Doc. 237-8.) In phase two, Mattingly conducted an offsite forensic analysis of surface soil and ambient air samples "to determine if chemical evidence demonstrates actual current

COC migration from SLRC to the Class Area." (Doc. 237-3 at 9.) Mattingly found that volatile compounds were not detected outside SLRC and that non-volatile compounds showed no spatial pattern or declining concentration gradient associated with offsite impact. (*Id.* at 17.) In phase three, Mattingly expanded his offsite forensic analysis to "subsurface soil samples throughout the study area capable of demonstrating surface enrichment of COC concentrations (e.g., declining concentrations with depth demonstrated by comparison of paired surface and subsurface soil samples)." (*Id.* at 10.) He found that "non-volatile analytes cited by the Plaintiffs demonstrated no declining gradient from SLRC . . . indicat[ing] no current or historical effect from SLRC." (*Id.* at 63.) Mattingly also performed chemical fingerprinting, which (1) "confirm[ed] the absence of current or historical atmospheric impacts to surface soil from SLRC," (2) "indicate[d] the dominant presence of vehicular and localized emissions throughout the study area," and (3) showed "the composition of metals and combustion byproducts varied by location with no spatial trend indicating widespread current or historical offsite releases from SLRC or any single fixed source in the Study Area." (*Id.* at 64.)

Mattingly's forensic examination of data—not merely a theoretical model—showed *no historical or current impacts from SLRC beyond its boundaries*:

> Multiple lines of evidence demonstrate the existence of numerous COC sources distributed throughout the Study Area. The first line of evidence is the absence of detectable concentrations for many COCs cited by the Plaintiffs . . . . Second, few of these COC detections exceed levels of regulatory significance. In fact, the concentrations detected in soil and air from the Class Area are among the lowest in the entire Study Area. Third, VOC exceedances are primarily associated with gasoline vapors not

industrial solvents. Fourth, the few significant detections of [volatile organic compound (VOC)] solvents . . . occurred throughout the Study Area. However, elevated concentrations of industrial solvents were localized with no regional trends. Collectively, these data refuted the allegation of current offsite releases from SLRC to the Class Area.

The non-volatile COCs were detected at low concentrations throughout the Study Area. However, the forensic confirmation sampling demonstrated no systematic surface soil enrichment proximal to SLRC. As with the VOCs in air, samples from the Class Area contained among the lowest COC concentrations in the Study Area. Second, surface enrichment was only significant for [benzo(a)pyrene (BAP)]; however, the enrichment did not decline with distance from SLRC. Rather, it occurred in isolated areas near roadways suggesting soot from vehicles or other localized combustion source(s). A significant fraction of the PAH detections was associated with the soil as opposed to atmospheric deposition from SLRC or any other point source. The absence of enriched COCs cited by the Plaintiffs in surface soils proximal to SLRC in any direction invalidates the claim that significant historical releases from SLRC adversely impacted workers and residents in the Class Area.

(*Id.* at 65.)

In the face of hundreds of thousands of data points, offsite sampling results, and multiple lines of forensic examination and evidence, Plaintiffs argue that "Mattingly fails to identify any methodological support for his conclusions." (Doc. 202 at 2.) Plaintiffs' arguments are unsupported by the science and therefore should be rejected.[1]

## ARGUMENT

Plaintiffs' arguments to exclude Mattingly's proffered expert testimony are facially invalid. Challenges to expert methodology premised on alleged unreliability or inadequacy without a scientific basis goes to the weight of the evidence rather than

---

[1]    A Glossary of Scientific and Technical Terms, including acronyms, used in this Response has been filed for the Court's convenience (Doc. 208).

admissibility and cannot be excluded. *Adams v. Laboratory Corp. of Am.*, 760 F.3d 1322, 1334-1335 (11th Cir. 2014). The "gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). As a threshold matter, the preliminary assessment of the gatekeeping function is "whether the reasoning or methodology underlying the testimony *is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.*" *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–593 (1993) (emphasis added)).

As a result, Plaintiffs' failure to challenge Mattingly's opinions on scientific grounds or as they relate to the facts at issue, should result in the summary denial of their motion. And because Plaintiffs only assert superficial critiques without a requisite scientific basis, they render inapposite the case law they cite for mostly undisputed propositions that do not apply to the facts at issue.

## I. Plaintiffs wrongly argue with no scientific support that Mattingly's analysis of sampling results should be rejected in favor of modeling.

Given the seriousness of their allegations, the Court rightly expected Plaintiffs' pre-suit investigation to have included offsite sampling. (Doc. 237-1 at 41:4–10.) The Court learned, however, that Plaintiffs performed no such sampling pre- *or* post-suit. (Doc. 237-2 at 7:23–8:5.) Without challenging the historical onsite sampling results, Plaintiffs argue that Mattingly's offsite sampling is unreliable. They do this by (1) selectively quoting the Reference Manual on Scientific Evidence, (2) ignoring the multiple lines of forensic evidence Mattingly used to render his opinions, and

(3) misinterpreting or misrepresenting data.

**A. The Reference Manual on Scientific Evidence endorses sampling not only to reveal chemical concentrations, but to confirm their identities.**

Sampling can not only determine chemical concentrations, but it can confirm the identities of those chemicals:

> one available choice for determining the concentrations of contaminants involves sampling those media and subjecting the samples taken to chemical analysis. The analysis will not only reveal the concentrations of chemicals in the media of concern, but should also confirm their identities. Environmental sampling and analysis is under way all over the world, at and near contaminated waste sites, in the vicinity of facilities emitting chemicals to air and water, and in many other circumstances.

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 528.

Sampling, like other scientific methods, has limits. Plaintiffs, however, provided no scientific basis to challenge its use. The Reference Manual asks four questions to assess samples: (1) are they representative, (2) can they represent contamination over time, (3) was the analytical work done properly, and (4) how is the lack of contamination interpreted? *Id.* at 529–30. Plaintiffs never asked these questions, and turned a blind eye to obvious answers.

Mattingly's samples are representative of offsite conditions. Mattingly used Visual Sampling Plan (VSP), a public software tool sponsored by EPA, DOD, and DOE "that helps determine how many samples are needed at what locations to ensure confident decisions." (Doc. 237-34 at 2.) VSP required 18 randomly selected sample locations to generate reliable results. (Doc. 237-33 at 65:3-67:21.) VSP was run three times for 54 potential locations, which were then reduced to 22 sampling locations

based on accessibility and security for sampling teams and equipment. (Doc. 237-34 at 4.) The offsite sample locations (designated CC, CR, GS, RB) are shown below:



**Figure 1. Forensic Study Area, Sample Locations, and Site Features.**

Second, Mattingly examined both the constituents Plaintiffs alleged in their Complaint, and scores of others. He examined soil samples for 169 analytes including VOCs, polycyclic aromatic hydrocarbons (PAH), polychlorinated biphenyls (PCB), dioxins, and metals. (Doc. 237-3 at 24–25, 28–31.) Air samples were examined for 155

analytes including VOCs and PIANO compounds (paraffins, isoparaffins, aromatics, naphthenes, olefins). (*Id*. at 24–27.) These were *more than four times as many constituents* than Plaintiffs alleged in their Complaint and *more than 15 times as many constituents* than they addressed in their general causation expert reports.[2] Mattingly sampled for these additional constituents to offer greater resolution into Plaintiffs' allegation of offsite impact.

Onsite sampling results provide direct historical accounts of conditions at SLRC between 1985 and 2022, which Plaintiffs concede. (Doc. 237-7.) They argue, however, that current air samples cannot represent historical conditions (Doc. 202 at 5–7). But Plaintiffs ignore the fact that "non-volatile analytes (*e.g.,* metals, PAHs, dioxins, and PCBs) [in soil] provide[] evidence of current and historical COC sources." (*Id*. at 22.) Mattingly analyzed the available historical data and current offsite sampling data using several forensic methods:

> This forensic investigation employed multiple analytical methods to determine the concentration of 183 analytes to determine the origin of soil substances in the Class Area. These methods were selected to comprehensively characterize volatile and non-volatile emissions from SLRC and differentiate them from regional background. These forensic confirmatory results were combined with the available historical data to determine if contamination at SLRC was evident in the Class Area. The resulting database permitted forensic analysis of 36 analytes cited by the Plaintiffs plus many additional organic and inorganic compounds of forensic significance.

---

[2]   Through their general causation expert disclosures, Plaintiffs abandoned 27 of the 34 constituents they alleged. Only seven remain: TCE, PCE, 1,1,1-trichloroethane, toluene, xylene, chromium, and arsenic. Plaintiffs also added two constituents, formaldehyde and styrene, which were never pled in their Complaints. The only constituent Mattingly did not analyze was formaldehyde.

(*Id.* at 32.) Using several forensic tools, Mattingly found "ambient soil with infrequent enrichment from atmospheric particulates with no significant current or historical influence from SLRC in the Class Area." (*Id.*) For example, combined with the historical data from SLRC, the offsite sampling of non-volatile metals showed "(1) no surface soil detections in any spatial domain above FDEP's residential or industrial SCTLs and (2) no declining concentration gradient potentially indicating emissions from the site migrating towards the north, south, east, or west." (*Id.* at 41.) The below figures illustrate the historic and contemporary sampling results, for example, of arsenic and chromium concentrations at SLRC and offsite:



Arsenic concentrations                          Chromium concentrations

(*Id.* at 40–42.) Other non-volatile analytes, such as dioxin, PCBs, BAP, lead, and cadmium, also showed no declining gradient from SLRC. (*Id.* at 36.)

Further, because "[c]omparison of PAH patterns in surface and subsurface soil is an effective way to detect current and historical impacts[,]" Mattingly also compared paired surface and subsurface samples for pyrogenic PAHs. (*Id.* at 43.) Analyzing, for example, offsite sample locations CR01 and CR02, which are the northeast and southeast corners of Tangelo Park, Mattingly found that their results "were primarily attributed to soil with no significant PAH enrichment from atmospheric fallout." (*Id.* at 44.) The figure below illustrates Mattingly's findings:



**PAH Patterns in Class Area (East) Samples CR01 and CR02.**

(*Id.* at 47.)

Consistent with the Reference Manual, Mattingly's sampling work was properly performed.[3] Soil samples were collected "consistent with DEP-SOP-001/01 (most recent updates), as well as USA EPA Region 4 Soil Sampling Operating procedures (LSASDPROC-300-R4)." (Doc. 237-9 at 1.) Air samples were collected consistent with "EPA Method TO-15." (Doc. 237-10 at 3-1.) The samples were then analyzed by a National Environmental Laboratory Accreditation Program (NELAP) accredited laboratory. (Docs. 237-11–28.) The most Plaintiffs—*who themselves performed no sampling*—can muster is an invalid criticism that Mattingly did not include in his report a description of the publicly-available VSP software he used to aid with the selection of sampling locations and their number. (Doc. 237-34.)

Finally, Plaintiffs fail to address how Mattingly interprets the lack of contamination. As he notes throughout his report (Doc. 237-3) and his deposition (Doc. 237-33), the lack of contamination (i.e., a result below the detection limit for an analytical method) (Doc. 208 at 4) in the proposed class area was only one of several lines of forensic evidence confirming the lack of alleged impacts to the proposed class area from SLRC. The absence or non-detection (*Id.* at 12) of contaminants were shown not only for VOCs, but for non-volatile constituents susceptible to historical analysis and interpretation because of the atmospheric deposition influenced by "[g]ravity,

---

[3]   As Mattingly testified about his firm's quality control: "NOAA uses us as one of their primary subcontractors. It's because we have QC at every level of what we are doing." (Doc. 237-33 at 129:6-8.)

precipitation, [and] meteorological conditions." (Doc. 237-33 at 90:3-4.)

Rather than addressing the lines of forensic evidence Mattingly supported with hard data and analysis, Plaintiffs suggest without scientific support that the Court should accept modelling in its place. While models may be acceptable tools where no measurements have been made, they may also be less reliable than sampling, especially when the sampling is representative of the area and constituents, can provide historical insight, and was properly performed:

> Models are *idealized* mathematical expressions of the relationship between two or more variables. *They are usually derived from basic physical and chemical principles that are well established under **idealized circumstances**, **but may not be validated under actual field conditions**. **Models thus cannot generate completely accurate predictions of chemical concentrations in the environment**.*

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 531 (emphasis added). Further, absent sampling, a model may not be verified or calibrated so as to provide reliable values: "If sampling and analysis data are available for the same media, they can be compared with the modeling result, and efforts can be made to reconcile the two and arrive at the most likely values (or range of likely values)." *Id.* at 533. Thus, "a combination of both approaches—one acting as a check on the other—is often the most useful and reliable." *Id.* at 530. Here, however, Plaintiffs have failed to engage in any sampling and therefore cannot verify the reliability of their proposed model.

### B. Plaintiffs' selectively quote Mattingly's testimony to suggest that he agrees that sampling provides limited historical value.

The same way they misstate the efficacy of sampling versus modeling by selectively quoting the Reference Manual and ignoring the facts, Plaintiffs misstate

Mattingly's deposition testimony by selectively quoting him and ignoring his work. They argue that "Mattingly seemed to acknowledge the limitations of sampling data." (Doc. 202 at 5.) They then quote portions of his deposition testimony where he correctly notes that current air sampling may not provide historical insight into past emissions. (*Id.* at 5–7.) What Mattingly testified, however, was that he used air VOC sampling results to evaluate *current emissions*, and non-volatile soil sampling to evaluate *current and historical emissions* as non-volatile soil sampling results supplemented by the other lines of forensic evidence Mattingly examined can reveal presence or absence of historical atmospheric deposition:

> Q.   What part of that analysis can tell you about historical migration?
>
> A.   Well, if historical migration occurred, you would see enriched surface soils and a declining concentration radiating from the site.
>
> Q.   Okay. And that's with regards to heavy metals and PAHs, I believe you said. Correct?
>
> * * *
>
> Q.   I don't know if we have lag, but if I mischaracterized what you said, my apologies. But I believe you said you are looking for that pattern with heavy PAHs and metals?
>
> A.   And also the other constituents that are stable in the environment that were in the allegation. And I believe that included PCBs and dioxins.
>
> Q.   Got it.
>
> A.   We are just using the most stable, frequently-monitored COCs.
>
> Q.   Understood. So you wouldn't expect to see a pattern regarding VOCs in that analysis, would you?
>
> A.   Many VOCs, like trichlorethylene and tetrachloroethylene do exert that pattern at some sites, but my conclusions are primarily based on the

ones we started with which were the heavy PAHs, the metals and the chlorinated compounds, PCBs and dioxin.

Q.   Are you drawing any conclusions about the fate and transport of VOCs based on your soil analysis?

A.   The VOCs were primarily collected to evaluate current offsite emissions, and the other analytes were serving that purpose for both current and historical.

Q.   So to be clear, am I correct to understand that answer to mean you did not analyze historical emissions of VOCs as part of your analysis?

A.   That is correct.

(Doc. 237-33 at 80:12-82:3.)

Plaintiffs try to blur the distinction between air samples reflecting air dispersion and soil samples reflecting particle deposition and historical impact:

Q.   How would you try to analyze air impacts that occurred 15 years ago?

A.   We spent most of the early part of the day talking about this. But the air emissions will be -- will have a particulate component which does settle out in the near field and the far field and does exhibit a declining pattern if it is -- if the emissions are significant and they are released over a longer period of time. And so we are using the soil data with an emphasis on the heavy PAHs and the metals and the other heavy constituents and particle reactive constituents to evaluate historical discharges. We are not using the air data to evaluate the historical emissions.

(*Id.* at 124:16-125:5.)

Contrary to Plaintiffs' representations and argument, Mattingly testified that sampling is a line of forensic evidence that may show impact or lack of impact from historical emissions.

**C.    Plaintiffs misrepresent data due to their careless treatment of the facts.**

At Mattingly's deposition, Plaintiffs presented him with "Table 2"—analytical results prepared by LMC's environmental remediation consultant, HSW Engineering—which Plaintiffs wrongly interpreted and misguidedly relied on:

**Table 2**
Summary of Analytical Results
Air Investigation Samples
Lockheed Martin Sand Lake Road Complex

| Analyte Name | Units | VISL | M087-A3 6/16/17 | M087-D5 6/16/17 | M087-E8 6/16/17 | M087-H7 6/19/17 | M087-K7 6/16/17 | M131-E8 6/16/17 | M131-G6.5 6/16/17 | M131-G9 6/16/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Chloroform | µg/m³ | 18 | 0.74 U | 640 | 0.46 U | 0.46 U | 4.4 | 12 U | 45 | 12 U |
| 1,1-Dichloroethane | µg/m³ | 260 | 1.4 I | 3300 | 0.29 U | 2.8 | 5.5 | 7.8 U | 230 | 7.6 U |
| 1,1-Dichloroethene | µg/m³ | 29,000 | 0.82 U | 110 I | 0.51 U | 2.1 I | 0.51 U | 14 U | 76 | 13 U |
| cis-1,2-Dichloroethene | µg/m³ | -- | 0.56 U | 44 U | 0.35 U | 1.3 I | 0.35 U | 9.4 U | 3.5 U | 9.2 U |
| Tetrachloroethene | µg/m³ | 1,600 | 28 | 480 | 12 | 3.7 | 330 | 3300 | 95 | 3300 |
| 1,1,1-Trichloroethane | µg/m³ | 730,000 | 390 | 20000 | 9.9 | 16 | 140 | 77 | 2100 | 230 |
| Trichloroethene | µg/m³ | 100 | 4.0 | 560 | 0.57 I | 14 | 67 | 15 U | 1100 | 15 U |
| Vinyl chloride | µg/m³ | 93 | 0.49 U | 38 U | 0.31 U | 0.31 U | 0.31 U | 8.2 U | 3.0 U | 8.0 U |

Misunderstanding what the "Table 2" results actually show, Plaintiffs argued to this Court that when Mattingly was "confronted with *air samples* from June 6, 2017 showing *air* trichloroethylene concentrations at over 6,000,000 µg/m3, [he] admitted that his sampling program and analyses were incapable of determining whether there were offsite impacts on that day." (Doc. 202 at 7 (emphasis added).) The problem, however, is that these samples were ***not*** of outdoor air. Instead, they were vapor samples, taken between soil grains underneath a concrete slab, in an area where there was a tank containing TCE. Exposing Plaintiffs' carelessness, "Table 2" notifies its reader that the sample results are "VISLs – Vapor Intrusion Screening Levels (based on the chemical-specific toxicological properties, *default soil properties* and commercial exposure factors for a default commercial scenario utilized by USEPA in its Vapor

Intrusion Screening Level calculator." (Doc. 237-35 at 2 (emphasis added).)

Further, when counsel for LMC asked HSW's corporate representative what

Table 2 was, he confirmed that they were *indoor* sub-slab sampling results:

> Q.   Can you just tell us what it is, please?
>
> A.   This is analytical data that was collected inside the general services building that I alluded to earlier.
>
> Q.   And was this a record created and maintained by HSW?
>
> A.   Yes, it was. This is the air data that I mentioned.
>
> Q.   And where in the general services building was this particular data collected from, if you recall at all?
>
> A.   This was the fab ops building. And these were sub-slab vapor samples that were collected immediately below the concrete slab inside the building.
>
> Q.   These are not outdoor air samples, are they?
>
> A.   No.
>
> Q.   What exactly are these samples of?
>
> A.   The pore spaces in the soil that's underneath the building. Pore spaces being the air that's in-between the soil grains.

(Doc. 237-36 at 7:19–8:13.) Not only do Plaintiffs misrepresent the multiple lines of

forensic evidence Mattingly examined, but they also misrepresent the facts on which

they rely. Paradoxically, Plaintiffs' argument that Mattingly's sampling is unreliable

only reveals the unreliability of their own arguments, which should be rejected.

## II.   Mattingly disclosed a clear method and process to his sampling plan.

Plaintiffs wrongly argue that:

> there is no evidence that [Mattingly] employed any method to design his

air and soil sampling plan. [Mattingly's] Report and Attachments are devoid of any discussion of how his sampling program was designed, how sample locations were selected, or how sample intervals were determined. Likewise, there is no discussion about any specified probabilities or measurements of representativeness, and no evidence that representativeness was a consideration at all in [his] study design.

As Plaintiffs should know, Mattingly conducted offsite sampling at 22 separate locations that were identified using VSP, and testified:

Q.   Well, when you say US EPA protocol, I'm thinking that there's a certain one. Like, for instance, TO-15 is a protocol for conducting air samples with chromatography. If you look under objecti[ves] and sampling methodology here in Exhibit 6, it references US EPA Region 4 Soil Sampling Operating procedures, and then there's a code for that, LSASDPROC-300-R4. Is that the protocol that you are mentioning -- that you are referring to?

A.   Hang on. Let me just look here on my computer, and I'll give you some numbers which will make the VSP a little more official. It's VSP 7 -- 7.17. That's the protocol I used.

(Doc. 237-33 at 40:10–23.) The VSP protocol required 18 randomly selected sample locations for reliable results. (Doc. 237-33 at 65:3-67:21.) To ensure sufficient samples, VSP was run three times to generate 54 potential locations, which were then reduced to 22 locations based on accessibility and security. (*Id.* at 58:7-25.)

That Plaintiffs only critique is that Mattingly did not disclose "a standard protocol for doing background studies" (Doc. 237-33 at 49:5–6) generated by publicly available software, rather than critiquing the reliability of that software is revealing. Plaintiffs—who did no sampling—and were advised of the specific software Mattingly used to generate sampling locations, do not challenge the reliability of the software tool sponsored by EPA, DOD, and DOE. (Doc. 237-34.)

Mattingly also disclosed the objectives of his field sampling plan and methodology:

> The objective of the pilot study was the development of a reference database of COC concentrations representative of the ambient background within the Study Area. The variability of COC concentrations in soil and air provided a scientific basis for determining if current or historical SLRC emissions created measurable offsite impacts in the Class Area. Specifically, these forensic confirmation data evaluated the degree to which the Class Area was significantly different from the regional background. If the Plaintiff allegations were correct, then these data would exhibit a declining concentration of regulatorily significant COCs (those that exceed regulatory limits) from the Main Plant through the Class Area and Regional domains. If the Plaintiffs allegations were not correct, then these data would contain undetectable COCs or regulatorily significant COCs with no declining concentration gradient from the Main Plant, through the Class Area, and Regional domains.
>
> Spatially diverse sampling locations were selected based upon similarity to residential properties and commercial areas in the Class Area. Forensic confirmation samples were collected by matrix-specific methods as described below.

(Doc. 237-3 at 17.)

The field samples were collected using detailed EPA protocols (Docs. 237-8–9) and analyzed at a NELAP accredited laboratory using NELAP accredited parameters. (Docs. 237-11–28.) Mattingly then analyzed the sample results using the various lines of forensic examination detailed in his report and only partially described in this response. Plaintiffs' arguments are meritless.

### III. Mattingly's forensic analysis of subsurface samples and regional background locations have facial methodological support.

Plaintiffs argue, again without scientific support, that Mattingly's sub-surface soil analysis in the third phase of his forensic analysis, is arbitrary and unreliable. (Doc.

202 at 13–16.) They base this on Mattingly's comment that the method of comparing surface samples with subsurface samples is "common sense." Plaintiffs overstate a pithy response to a subject Mattingly explained in his expert report, which they ignore: "Surface soil accumulates non-volatile hydrophobic COCs over time. Subsurface soil contains ambient substances in natural soil or fill." (Doc. 237-3 at 62.) Mattingly further explained that:

> COC detections in subsurface soil help characterize soil at each sampling location. Low levels of heavy metals and combustion products were observed in almost every sample throughout the Study Area. This is not surprising since these ubiquitous contaminants pre-existed the arrival of humans and development of Orlando. Nevertheless, human development nearly always increases and alters the ambient concentrations creating the need for residential and industrial environmental standards and specialized methods for determining "site-specific" background.

(*Id.* at 63.) Comparing surface and subsurface soils helps identify enrichment by atmospheric deposition. That is why Plaintiffs quote Mattingly out of context and fail to disclose the explanation he provided of an example that Plaintiffs thought was a declining gradient representing offsite impact, but was not. This is the discussion that preceded Mattingly's "common sense" statement:

> Q.   These are declining gradients of concentrations, are they not?

> A.   Not really. Let me show you one. Let's look at GS05. Remember, what we are doing here is we are comparing the surface and the subsurface, and your figure nicely displays both. In the case of [sample location] GS05, you have a lower concentration at surface and a higher concentration below surface. This is the same thing that happens at [sample location] RB03. So the question is what's more likely? Is that surface receiving atmospheric deposition or is it simply receiving contaminates from the property, from the soil on the property, from depth? The answer is in this case, there's no surficial enrichment. That's

the first test. And then is there a declining gradient? Well, these surfaces
did not have surface emissions, so, no, this is not a declining gradient.

(Doc. 237-33 at 114:19–115:8.)

Plaintiffs also argue that Mattingly departed from EPA procedure by
"collect[ing] subsurface soil immediately below the surficial soil sample from the 2″ to
3″ depth interval." (Doc. 237-3 at 17–18.) The procedure they quote provides:

> Surface soils are generally classified as soils between the ground surface
> and 6 to 12 inches below ground surface. The most common interval is 0
> to 6 inches; *however, the data quality objectives of the investigation may dictate
> another interval*, such as 0 to 3 inches for risk assessment purposes.

(Doc. 202 at 15 (emphasis added).) Plaintiffs, however, ignore the plain language that
"data quality objectives of the investigation may dictate another interval," which is
what Mattingly used because his goal was to "maximize geological comparability of
surface and subsurface soil samples" for a forensic examination:

> Atmospheric particulates accumulate in the surficial soil and do not
> typically migrate to deeper soil depth intervals. Preliminary inspection of
> soils in the Study Area indicated that surficial geological strata generally
> extended to 3" or more. In order to maximize geological comparability
> of surface and subsurface soil samples, the sampling plan stipulated that
> the field team collect subsurface soil immediately below the surficial soil
> sample from the 2" to 3" depth interval.

(Doc. 237-3 at 17–18.)

Plaintiffs finally argue that Mattingly "arbitrarily divides [offsite] sample
locations into 4 subgroups based on 90 degree directional quadrants." (Doc. 202 at
17.) This allegedly arbitrary division is a compass:



What Mattingly did was divide the offsite sample locations into the four cardinal directions of north-south-east-west by drawing an "X" through the center of the current SLRC. Contrary to Plaintiffs' argument, this was not arbitrary, it was a conventional division.

## CONCLUSION

Plaintiffs have failed to meet the standard necessary for Mr. Mattingly's exclusion under Rule 702. They make arguments with no requisite scientific basis, which requires denial. *Hendrix*, 609 F.3d at 1193. The most Plaintiffs can do is argue about the weight of the evidence rather than its admissibility. *Adams*, 760 F.3d at 1334-1335. Accordingly, their motion should be denied.

Dated: November 18, 2022                          Respectfully submitted,

                                                  /s/ Christopher Torres
Francis A. Citera*                                David B. Weinstein (FBN 604410)
citeraf@gtlaw.com                                 weinsteind@gtlaw.com
Gretchen N. Miller*                               Christopher Torres (FBN 0716731)
millerg@gtlaw.com                                 torresch@gtlaw.com
**GREENBERG TRAURIG, LLP**                        Ryan T. Hopper (FBN 0107347)
77 West Wacker Dr., Ste. 3100                     hopperr@gtlaw.com
Chicago, Illinois 60601                           Raymond Jackson (FBN 1028350)
Telephone: (312) 456-6583                         jacksonra@gtlaw.com
Facsimile: (312) 899-0320                         Christopher R. White (FBN 1022219)
                                                  whitech@gtlaw.com
*Specially admitted*                              **GREENBERG TRAURIG, P.A.**
                                                  101 E. Kennedy Blvd., Ste. 1900
                                                  Tampa, Florida 33602
                                                  Telephone: (813) 318-5700
                                                  Facsimile: (813) 318-5900

*Attorneys for Defendant Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I certify that on November 18, 2022, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic

filing to counsel of record.

                                 /s/ Christopher Torres
                                 Attorney

*ACTIVE 683130921*