1                    **UNITED STATES DISTRICT COURT**
                     **MIDDLE DISTRICT OF FLORIDA**
2                        **ORLANDO DIVISION**

3    **PHYLISS GRAYSON, individually** :
     **and on behalf of all others**   :
4    **similarly situated, ET AL.,**   :
                                        :
5         Plaintiffs,                   :
                                        :        Case No.:
6    v.                                 :        6:20-cv-1770-RBD-DCI
                                        :
7    **LOCKHEED MARTIN CORPORATION,**   :
                                        :
8         Defendant.                    :
     . . . . . . . . . . . . . . .      :
9                                       :
     **VERVICIA HENDERSON, on behalf**  :
10   **of herself and as personal**     :
     **representative of Craig**        :
11   **Henderson, ET AL.,**            :
                                        :
12        Plaintiffs,                   :
                                        :        Case No.:
13   v.                                 :        6:21-cv-1363-RBD-DCI
                                        :
14   **LOCKHEED MARTIN CORPORATION,**   :
     **ET AL.,**                       :
15                                      :
          Defendants.                   :
16   . . . . . . . . . . . . . . .      :
                                        :
17   **KARYN VANDESTREEK, as**          :
     **personal representative of the**:
18   **Estate of Daniel Vandestreek**   :
     **for and on behalf of the**       :
19   **estate and survivors thereof,** :
                                        :
20        Plaintiff,                    :
                                        :        Case No.:
21   v.                                 :        6:21-cv-1570-RBD-DCI
                                        :
22   **LOCKHEED MARTIN CORPORATION,**   :
     **ET AL.,**                       :
23                                      :
          Defendants.                   :
24   . . . . . . . . . . . . . . .      :

25

```
1                                    :
     MICHAEL DAVIS, on behalf of    :
2    himself and as personal        :
     representative of Carol Davis,  :
3                                    :
         Plaintiff,                  :
4                                    :      Case No.:
     v.                              :      6:22-cv-81-RBD-DCI
5                                    :
     LOCKHEED MARTIN CORPORATION,    :
6                                    :
         Defendant.                  :
7                                    :
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE DANIEL C. IRICK**
**UNITED STATES MAGISTRATE JUDGE**

Orlando, Florida
11:05 a.m.

```
Proceedings recorded by electronic recording.
Transcript produced by computer-aided transcription.
```

Transcribed by:
Suzanne L. Trimble, RPR, WACCR, CRR
U.S. Official Court Reporter
(407) 900-8775 | trimblecourtreporter@gmail.com
401 West Central Boulevard, Suite 4600, Orlando, Florida 32801

1                       A P P E A R A N C E S

2       For the Plaintiffs:           T. Michael Morgan
                                      Morgan & Morgan, P.A.
3                                     20 North Orange Avenue
                                      Suite 1600
4                                     Orlando, Florida 32801

5       For the Plaintiff
        Karyn Vandestreek:            Brent R. Bigger
6                                     Brian D. Murry
                                      Paul Knopf Bigger
7                                     840 S. Denning Dr., Suite 200
                                      Winter Park, FL 32789-4734
8
        For the Defendant
9       Lockheed Martin Corporation:  Christopher Torres
                                      David B. Weinstein
10                                    Ryan T. Hopper
                                      Raymond D. Jackson
11                                    Greenberg Traurig, LLP
                                      101 East Kennedy Boulevard
12                                    Suite 1900
                                      Tampa, Florida 33602
13
                                      Joel Nagler
14                                    Lockheed In-House Counsel

15      For the Defendant
        HSW Engineering:              Troy P. Cunningham
16                                    Lewis Brisbois Bisgaard & Smith
                                      2 Alhambra Plaza, Suite 1100
17                                    Coral Gables, FL 10005

18                    T A B L E   O F   C O N T E N T S

19      PROCEEDINGS                                          PAGE

20      Plaintiffs' Argument Re: Motion for Extension of Time ...6
        Plaintiffs' Argument Re: Motion for Protective Order ....10
21      Judge's Inquiry to Plaintiffs Re: Motions ..............11
        Plaintiff Vandestreek Argument Re: Extension of Time ....26
22      Defense Argument Re: Motion for Extension of Time .......33
        Defense Argument Re: Motion for Protective Order ........43
23      Judge's Ruling Re: Motion for Protective Order .........51
        Plaintiffs' Further Argument Re: Extension of Time ......52
24      Judge's Ruling Re: Motion for Extension of Time .........55

25

1                           P R O C E E D I N G S

2                   **THE COURTROOM DEPUTY:**  Case No. 6:22-cv-81, Michael

3       Davis v. Lockheed Martin Corporation; 6:21-cv-1363 Vervicia

4       Henderson, et al. v. Lockheed Martin Corporation and Universal

5       City Property Management Company III, LLC; 21-cv-1570 Karyn

6       Vandestreek v. Lockheed Martin Corporation, Universal City

7       Property Management III, LLC, and HSW Engineering, Inc.; and

8       6:20-cv-1770 Phyliss Grayson and Phillip Penson v. Lockheed

9       Martin Corporation.

10                  Counsel, please make your appearances for the record.

11                  **MR. MORGAN:**  Mike Morgan for the Plaintiffs.

12                  **MR. MURRY:**  Brian Murry for Karyn Vandestreek.

13                  **MR. BIGGER:**  Good morning, Your Honor.  Brent Bigger

14      here on behalf of Karyn Vandestreek.

15                  **MR. WEINSTEIN:**  Good morning, Your Honor.  David

16      Weinstein with Greenberg Traurig on behalf of Lockheed Martin.

17      To my right, my colleague Ray Jackson and to his right, my

18      colleague Christopher Torres, Ryan Hopper behind us, Your

19      Honor, and Joel Nagler from Lockheed Martin, in-house counsel.

20                  **MR. CUNNINGHAM:**  Good morning, Your Honor.  Troy

21      Cunningham on behalf of HSW Engineering.

22                  **THE COURT:**  All right.  Thank you.  And good morning,

23      everyone.  Thank you for being here.

24                  So just to set the ground rules here, first of all,

25      I'm going to, when I reference document numbers and cases, I'm

1    generally going to reference the Grayson case, 6:20-cv-1770.

2    Just so if I say document 230, for example, I'm referencing

3    that case.  I believe that all of the motions are pretty much

4    the same in all of them, if not identical.  But if there's ever

5    a reason for us to discuss a separate or different case or any

6    issue in a particular case, let me know, make sure you note it

7    for the record; otherwise, this hearing is going to be in

8    effect for all these Lockheed cases.  So that's kind of the

9    first thing I would say.

10           Second, I know there's a -- you all have a hearing

11   before Judge Dalton in not too distant future.  So that is also

12   just on my mind, just so you know that.  I know he intends to

13   address many things, including case management, in relation to

14   this case.  So keep that in mind as well.

15           I'm going to, kind of, tread lightly here.  And I

16   don't want to, kind of, step on anything that is going to --

17   he's going to do in relation to the case and management.  So I

18   give you that, just as kind of to inform the scope of what I do

19   here today.

20           So that being said, I want to address in particular

21   the two motions that I set this hearing for, and then I'll be

22   happy to address anything else I can and if the parties would

23   like.  But the first one is the 30(b)(6) motion, and then the

24   second one is the motion for an extension of time in relation

25   to the expert disclosure on general causation.  I know that

1    Plaintiff doesn't want me to -- or probably neither side wants

2    me to necessarily conflate these two issues, and I think the

3    defense, in particular, said that in the motion, and I don't

4    intend to, but they are somewhat related, and I think there's

5    going to be arguments, particularly by the Plaintiff, in

6    relation to both the motions coming together.

7         So I don't know -- I would normally have Lockheed go

8    first because it's a 30(b)(6) witness, but I, frankly, would

9    like to hear from Plaintiff first in relation to the extension

10   of time, because I believe they're going to discuss both

11   issues, and then I'm happy to kind of extricate the two issues

12   as we go on and discuss them.  So I would actually like to hear

13   from Plaintiff first in relation to their motion.

14        Mr. Morgan.

15        **MR. MORGAN:**  Yes, Your Honor.

16        So as we did put in our motion, I mean, this is one of

17   the last things that we would want to request given, you know,

18   Judge Dalton's strong words about how he wanted this case to

19   run.  I will say that since we met with Judge Dalton and had

20   been working on this case management schedule, I believe that

21   we've been as diligent as we have been in any case ever.  I

22   mean, we have been working nonstop on general causation,

23   getting all of the general causation opinions in.  We've also

24   then identified the bellwether pool, getting the bellwethers

25   in, and also working on specific causation opinions all at the

1    same time, and I think if you just -- which I know that you

2    have, but when you look at the docket, the bevy of motions that

3    have been filed shows the amount of work.  There hasn't been

4    much reduction in work.  I think as what was hoped for is that

5    there would be certain constituents or things that we would be

6    able to agree on.  In this case, we've been having a hard time

7    agreeing on the weather, right, as far as the way that this is

8    just portrayed.  And I'm not faulting anybody.  I'm just saying

9    that's where we are in this case.  So we've fought everything

10   pretty hard.

11          We had contracted with Dr. Sahu in Washington, and he

12   was also on some of the EtO trials that were recently in

13   Illinois over the summer, the Willowbrook trial, and ended up

14   testifying in those trials over a period of a couple of months

15   while he was also working on our case.  And following that, he

16   was hospitalized.

17          The reason that that is important, and it's in our

18   motion is, he had contracted out the air modeling in this case,

19   and the air modeling for Grayson and all of the cases that

20   we've mentioned is essential to our liability argument to be

21   able to show the fate and transport of which chemicals and

22   constituents and where and what concentrations they actually

23   end up in.  Not to belabor the point, as I put it in the

24   motion, but the way that it works is when we start -- and we

25   did start this air modeling before the case began.  We did

1    start the preliminary efforts.  But in the preliminary efforts

2    they use assumptions based off what we know from the publicly

3    available data to model it out, then throughout discovery, as

4    we get that information, we have to refine with the actual data

5    that's there and then find out what data is not there and make

6    those assumptions.  And we laid out the process, but it's

7    thousands and thousands of calculations that need to be

8    verified.

9         What happened in this case is, despite our efforts, we

10   had a due date that we've said, We need final pencils down,

11   whatever we have is what we're going with on October 1, and

12   we'll have to live with that model based on the discovery.

13        As this Court knows, we were in a very lengthy battle

14   to get the discovery produced.  We're still in battles over the

15   privilege log that have not been resolved, other than the first

16   batch of documents, and so -- but in an effort to keep this

17   case on track with Judge Dalton's scheduling order we've said

18   October 1st.  October 1st comes around and Dr. Sahu just got

19   out of the hospital, and he said, Well, we need some more time,

20   and we go, Okay, a couple of weeks.  And that goes on and then

21   we're -- all of a sudden we're in November and my rhetoric to

22   them was simply I need this now, right, because this is crucial

23   to Dr. Sahu's testimony, to talk about the fate and transport

24   and the air modeling, and it's also essential for every one of

25   our liability -- or our specific causation experts to talk

1    about how that exposure affects and can lead to the end points

2    that we've identified in our general causation.  And without

3    it, we're -- I mean, we're stuck.  I mean, the case is

4    essentially over if we don't have that.

5           When the model came back or what we'll call the model

6    came back to Dr. Sahu, it wasn't that the numbers didn't

7    support our position.  It was that he found quality assurance

8    errors that he says that model was unreliable for the Court to

9    use.  As we probe further into it -- and I don't know enough

10   about James Clark, who was a third party modeler, to know,

11   other than what's been reported by Dr. Sahu, which is he seems

12   to be having some type of episodic event in his life.  He's

13   getting divorced, and he's all over the place.  We don't know

14   what's happened, but we also had him in three other

15   environmental exposure cases, in these EtO cases, and we had to

16   let him go from everything.  I mean, I just don't know what's

17   happened to him.  And so we're now in this situation that we

18   don't have the air modeler that we've been using since the

19   beginning of the case.  We still have the data, but the quality

20   assurance and the calculations that need to be run need to be

21   started over with that same data.  It's not new data that we

22   need.  It's not new information.  It's not new numbers.  The

23   numbers essentially are the numbers.

24          But as soon as finding this out, which was the day

25   that we filed our motion, we hired and contracted with another

1    air modeler named Andrew Gray and started this process right

2    away, and I know that the Vandestreek Plaintiffs also hired an

3    additional air modeler because we just don't know what else to

4    do, and essentially what would happen is all of these specific

5    causation Plaintiffs, the first 20 identified, would be

6    summarily dismissed because they can't prove their case without

7    this, and our experts on causation would never be able to

8    testify without showing the level of exposure, which is

9    essential to the specific causation doctrine in *McClain*.

10       And as far as the 30(b)(6), I agree that those two

11   things are not hand in glove.  Those are not the same exact

12   issue.  There is the December 1st deadline for liability

13   experts, and so the liability that we would be talking about

14   would be operational standard of care versus exposure data.

15   And so that's why we were requesting that before the

16   December 1st, so that we could show or attempt to show that

17   Lockheed could have done more to protect, not that we need that

18   data for this air modeling.  So I do want to be clear that

19   those two issues are different parts of liability and so I

20   don't mean to say that we need the 30(b)(6) for that data, if

21   that makes sense, Your Honor.

22       So with that, I mean, on the 30(b)(6), and the depos,

23   I'll leave it on the papers, but we did attempt to reach out

24   for dates.  We received none.  And then we did unilaterally

25   schedule it, which the rules permit at a certain point, because

1    I didn't want to wait and move to compel dates and then we

2    would surely have been outside of the timeline.  And so when we

3    didn't hear back for over 20 days, we assumed we were on the

4    right path and then we found out we weren't.

5         The 30(b)(6) depo was supposed to take place

6    yesterday.  We did not file the CNA.  We could have filed it,

7    but we didn't file it because of the Court setting this

8    hearing.  I didn't think it was appropriate that you would want

9    to see that at that point.  And I'm not trying to engage in any

10   of that gamesmanship.  I'm just saying we do need it for

11   standard of care.

12        And the four people that we've identified, I believe

13   one of them will be the 30(b)(6), but I don't know which one,

14   but they all go directly to liability.  We have -- a lot of the

15   discovery we've gone through identifies these four people as

16   being integral to the standard of care and the operations and

17   specifically to the designation of not being a major source,

18   not being a Title 5, which we believe is very important for the

19   data that may have been recorded otherwise but we wouldn't have

20   for our assumptions.  But that would be the extent of the

21   overlap between the models.  And I don't think that's even

22   necessary for what we're talking about in specific causation.

23        **THE COURT:**  All right.  I've got questions, but I

24   wanted to let you kind of say the whole thing first.

25        **MR. MORGAN:**  Okay.

1          **THE COURT:**  I didn't want to interrupt you and get you

2     off --

3          But so let's go back -- well, let's start at the end,

4     I guess, first.  So let's talk about the depositions first.

5     You were just talking about that.  One is, I now understand

6     that you want these depositions, including the 30(b)(6), for

7     standard of care, not air modeling.  I appreciate that

8     clarification because it was not clear to me, and, frankly, I

9     was kind of wondering how that information could ever be put

10    into an air model based on this timeline, and it seemed to me

11    that that was maybe a clear lack of diligence because it was

12    something that could never happen, based on the time that you

13    requested the depositions.

14         But I still have questions though.  I mean, even if

15    that is -- standard of care is the issue that you're talking

16    about, is that information that goes into the specific

17    causation expert reports, or is that related to an argument

18    that you're going to make later?

19         **MR. MORGAN:**  So it would go into whether or not we

20    would put forward a standard of care expert.  It wouldn't be in

21    our specific causation.  As far as the injury reports, no, sir,

22    it would not be part of that.  It would be the deposition to

23    decide whether or not we put forth a standalone expert on

24    specific causation for standard of care.

25         **THE COURT:**  And even if this deposition went forward

1       yesterday and the other ones went forward beginning of next

2       week, do you think you could retain and get an expert opinion

3       by the December 1 deadline?

4               **MR. MORGAN:**  I think so, yes.  I mean, I don't know --

5               **THE COURT:**  For standard of care?

6               **MR. MORGAN:**  If the deposition didn't bear fruit that

7       would lead to that assumption, then no.  But I think that what

8       we're looking at in the documents that we have about moving

9       numbers around or -- I don't want to speak out of turn, but I

10      think that it would have been enough that they could have said

11      this was an improper designation and that other data should

12      have been provided.  I mean, it wouldn't have been a long, you

13      know, thesis on the whole standard of care, but I believe there

14      are elements within that that would have allowed us to explore

15      that.

16              **THE COURT:**  I'm just not seeing -- I'm just not seeing

17      how you're going to decide to get an expert and then retain an

18      expert, then get a report all within a day or two.  I mean,

19      that's -- and especially in a situation in which we've had, you

20      know, a long runway to this, and if that was an expert that you

21      needed to decide whether you needed -- seems to me that those

22      depositions should have been noticed and happened earlier.

23              I'm not taking any criticism -- or giving any

24      criticism concerning how you noticed them.  I think that was

25      absolutely appropriate.  It's not that.  It's that, you know,

1    to the extent we're going to extend the deadline based on those

2    experts, it seems like that's something that you would have

3    known a long time earlier.

4        MR. MORGAN:  Well, and I didn't request to extend the

5    deadline based off those experts alone.  Like, that wasn't the

6    purpose of the extension, and had -- had we had our air

7    modeling, I wouldn't have requested an extension.  There's no

8    way I ever want to come to this Court and ask for an extension

9    on specific causation at all.

10        THE COURT:  Okay.  I appreciate that.  I appreciate

11    what you're saying.  And I do appreciate that you're not asking

12    to move the deadlines based just upon that, but I still have --

13    to me, to the extent they're conflated, it's a bit of a red

14    herring for me because I don't think that those depositions

15    necessarily relate to the extending the expert deadline in any

16    way that makes sense.

17        MR. MORGAN:  I don't either.

18        THE COURT:  Okay.

19        MR. MORGAN:  Right.  I mean, in fairness, I just felt

20    I was entitled to those depositions.  I noticed them at a point

21    that I wanted to have them taken, and to the extent there was

22    information that was helpful, I could incorporate it, and I

23    wanted it to happen before the December 1, and so --

24        THE COURT:  That's fair.

25        MR. MORGAN:  There's not -- I just wanted those

1    depositions at that time.

2         **THE COURT:**  Yeah.  That's fair.  I appreciate that.

3    So I have additional questions concerning the expert and the

4    modeling.  Okay.  And so I'm going to ask you some questions.

5    And, you know, I could see you responding to my questions that

6    these are -- this is information that's work product, and we

7    want to protect it somehow.  So I just want to get ahead of

8    that a little bit and say, look, to the extent you're going to

9    request an extension and it's based upon things that happened

10   between you and your expert, right, you can't use it as a sword

11   and a shield.  And I know you haven't made this argument yet,

12   but I just want to make sure we're kind of on the same page

13   because you may have to divulge some of the things that

14   happened if you want to show diligence in relation to this

15   expert, right, and so I just kind of say that at the front.

16        But here are my questions.  This other work that this

17   expert had, right -- so in the deposition, not -- sorry.  In

18   the affidavit I really see three things that are your diligence

19   here.  One is other work that the expert has.  Two is the

20   sickness by the expert, right?  And then three is that the

21   modeling has some kind of error in it.  Right, those are the

22   three things that I feel like I'm dealing with in terms of the

23   diligence argument.

24        So I want to explore all of those things.  So the

25   first is this other work that this expert had.  One, did you

1     know about it when you retained that person, and, two, is this

2     work for your firm or is it for some other firm?

3         **MR. MORGAN:**  So the cases that -- we're talking about

4     Dr. Sahu and the affidavit, correct?

5         **THE COURT:**  Mm-hm, that's right.

6         **MR. MORGAN:**  So we had used him, not in the case --

7     and some of this is recollection, so to the extent that it

8     comes back in not being 100 percent, I mean, just with that

9     clarity that I don't have it all the way, doubt it.  The work

10    that he was testifying for was not in our case.  It was not in

11    a case for the firm.  It was in the *Willowbrook* trial in

12    Illinois.

13        **THE COURT:**  See, I don't know the *Willowbrook* trial.

14    When you say it like that, it expresses to me some familiarity

15    that maybe it's your firm's case.  That's why.

16        **MR. MORGAN:**  Oh, no.  It was a big EtO verdict that

17    recently came down last month, and then there was the second

18    one where they lost, and it was -- just been in the news, so

19    that's why I bring it up.  It's an environmental exposure case

20    in Illinois, but it's not our case.  It is one of the cases

21    that we saw Dr. Sahu in, based off our experience that he had

22    the expertise to talk about the fate and transport.  And so,

23    yes, we knew about it.  We didn't know that it would take him

24    away from producing the report.  He gave us all of the

25    assurances that it wouldn't, that this is how he generally

1    operates, that he is the expert at the end; he has third

2    parties that come in, NP Limited and then James Clark

3    specifically the air modeler, and he's done it before; this is

4    his normal operating practice.  We were supposed to have it by

5    October 1st, which would have given us, you know, 60 days with

6    the information to have the final report that was defensible

7    and turned in.

8           So I'm not sure if I answered your questions, but

9    those cases -- we did know that he was involved in those

10   trials.  We did not know that it was going to take up that

11   amount of time right at our deadlines.  We did have concerns.

12   We do have him on other cases, an EtO case, an Ethylene Oxide

13   case, in West Virginia and one in Philadelphia.  Those

14   deadlines aren't yet.  They weren't running up against each

15   other.  We did purposely, you know, prioritize the earlier

16   deadlines.

17          **THE COURT:**  Because you can see how, you know, an

18   inquiry into to whether or not he's doing other work for your

19   firm, and that's taking up his time, other than complying with

20   the deadlines that this Court set could be a consideration.

21          **MR. MORGAN:**  I do, yes, Your Honor.

22          **THE COURT:**  So that's one thing.  But it seems to me

23   that the third party -- based upon what I'm hearing today, the

24   third party, Mr. Clarkson [sic], who's had the episodic issues

25   in relation to his life and he's been let go, he was working

1   for your firm at the time.

2          **MR. MORGAN:**  Work as a --

3          **THE COURT:**  As an expert.

4          **MR. MORGAN:**  As an expert?

5          **THE COURT:**  Yes.

6          **MR. MORGAN:**  Yes, Your Honor, he was.

7          **THE COURT:**  Okay.  So he was doing work in relation to

8   your firm at the time that we're talking about now?

9          **MR. MORGAN:**  Correct.

10         **THE COURT:**  Okay.  But I don't hear you saying

11  anything to me that Clarkson's work was late.  It's that it had

12  an error at the end.  Is that right?

13         **MR. MORGAN:**  So it was late.

14         **THE COURT:**  Okay.

15         **MR. MORGAN:**  But we had -- we had originally started

16  requesting this back in the beginning of the summer, because we

17  wanted to get as far as we could, and then we requested again

18  as a final deadline of October 1st to them, and they verified

19  that they would have it.  I mean, Sahu, I forget where he is,

20  at trial or in the hospital at this time, but they said it was

21  going to be no problem.  And then October 1st comes and we get

22  excuses back about why it's not ready and how they need more

23  time, and then, you know, it's going to be pushed out two weeks

24  and then it ends up not until November 12th that we actually

25  have something, and the reason we even have it was we said we

1    have to have it today, right, because we have to at least have

2    some time for the specific causation to process it, and if it's

3    not perfect, it's not perfect.  That's what we're going to have

4    to live with.

5         But when Dr. Sahu read it, he said the entirety of it

6    is unreliable, and that the quality assurance that would have

7    to go in and the way he failed to add in simple, simple

8    elements, like the size of the building, in not taking into

9    account the size of the building and only the stack, you know,

10   bringing the stack down to 4 feet off the ground.  It was

11   just -- it was so lacking that he knew immediately it was not

12   something he could ever submit to, and so he told us about that

13   unreliability then.

14   **THE COURT:**  Okay.  I appreciate that.  So my next

15   question to you is, when was the third-party modeling ready for

16   Dr. Sahu's review?

17   **MR. MORGAN:**  That day, on the --

18   **THE COURT:**  Which day?

19   **MR. MORGAN:**  So without the benefit of my e-mail

20   exchange, I think it was either November 10th or November 12th

21   was the day it finally came and it was readily available to him

22   that it was not proper.

23   **THE COURT:**  I know, but I just don't like necessarily

24   maybe how you qualified that.  What my concern is, is when was

25   the third-party modeler's information available to Dr. Sahu?

1          **MR. MORGAN:**  Oh, I see.  Let me make sure I

2    understand.  Are you saying when could he have requested it?

3    When could he have seen it?  When --

4          **THE COURT:**  Yeah.

5          **MR. MORGAN:**  -- would he have it available?

6          **THE COURT:**  I mean, just so you understand, the

7    purpose of my question is determining whether or not -- you

8    know, what if this information was ready for Dr. Sahu's review

9    in March, right, and he just decided to review it in November

10   because he was doing other trials.  That would be a concern to

11   me in relation to diligence.

12         **MR. MORGAN:**  Understood.  So, again, the way that the

13   process worked is there were preliminary models which made

14   assumptions and that, as we discover more information and go

15   through the discovery, hundreds of thousands of pages of

16   documents, we continue to make refinements to that.

17              So he had access and could have always called upon the

18   assumptions of the data, but he relied on this third party to

19   provide a final model.  That final model was not available to

20   him until the middle of November, despite it was supposed to be

21   available to him in the beginning of October.  But he has -- it

22   is a process that is generally -- he uses a third party.  While

23   it's complicated, but it's labor intensive, as far as the

24   calculations that need to be done, and it's routinely relied on

25   him to have a third-party modeler to talk about the fate and

1    transport, and he explains it that is his general practice and

2    how he's testified in other cases.

3            THE COURT: Yeah.  It's just -- you know, I'm just

4    still not completely sure on this question though.  So maybe

5    another way for me to ask it is, when were you all first aware

6    that Mr. Clarkson had issues?

7            MR. MORGAN:  So we knew that he was not giving us what

8    we asked for in October, right, and we realized at that point

9    that we were being put off to a point where we weren't being

10   given data; we weren't seeing anything; we were just told more

11   time was needed.  And, essentially, we were being put off

12   until -- and these conversations are third party through

13   Mr. Rocha, who was actually involved with him, until the

14   beginning of November, where I had a conversation with

15   Mr. Rocha that said, I need this now.  Right?  I can't wait.

16   We have to see it.  They've had, you know, an extra 40 days

17   from when they told us it would be due.  And that's later than

18   we wanted in the first place, but it was on timing and when we

19   would be able to use it.

20           THE COURT:  All right.  I appreciate that.

21   Mr. Morgan, let me just say I appreciate you answering these

22   questions off the top of your head, and I recognize that's what

23   you were doing.  So it may be that I need additional

24   information to rule and allow you an opportunity to verify some

25   of this.

 1          **MR. MORGAN:**  Sure.

 2          **THE COURT:**  But I do appreciate you giving me your

 3    best effort.

 4          Another question for you, you know, Mr. Sahu is sick,

 5    right?  It's very vague to me as to, one, what happened, and,

 6    two, how long he was hospitalized.  Can you answer those

 7    questions?

 8          **MR. MORGAN:**  I cannot.  I can get those answers for

 9    you.

10          **THE COURT:**  Okay.

11          **MR. MORGAN:**  I believe it was a respiratory issue, but

12    that's just totally off the top of my head.  I don't know the

13    exact length of time, but I can verify that now.

14          **THE COURT:**  Yeah.  I mean, if you could, that would be

15    helpful.

16          **MR. MORGAN:**  Yeah.  I would have to just reach out,

17    but I can find that answer.

18          **THE COURT:**  Okay.  Let me ask you this:  I want to

19    understand how Dr. Sahu's expert -- because I think you stated

20    that -- for me to understand this -- that his modeling is going

21    to be relied upon by other experts that you have concerning

22    specific causation to then give their expert witness opinions;

23    is that right?  Is this like a chain, like, they're going to

24    rely on him?

25          **MR. MORGAN:**  It is, Your Honor, yes, sir.

1          **THE COURT:**  Okay.  And how long do those experts need

2    to, I guess, use his model to produce their reports?

3          **MR. MORGAN:**  I think the question comes down between

4    need and want, right?

5          **THE COURT:**  Yeah.

6          **MR. MORGAN:**  And so the reason we requested 90 days

7    was from the modelers that we've spoken to now.  They believe

8    they need 45 days to complete the actual task of the modeling.

9    And so the extra 45 days was meant to allow them to

10   incorporate.  Obviously, in this case, Your Honor, they were

11   going to have three weeks, right, if everything had gone as

12   planned.  So they could do it.  And they had represented they

13   could do it, even though the time was getting shorter and

14   shorter.

15         The goal was to get it to them November 1, to give

16   them a full month to use the data to incorporate it.  That was

17   our intended goal, not what they would want, but definitely

18   that they could do it.  And even on November 10th, if Dr. Sahu

19   had got it to him, I believe they would -- I know we would have

20   got it done.  We had to get it done.

21         **THE COURT:**  Just so, and I think this is a benefit to

22   Lockheed too, to the extent they're going to come up and argue

23   in a moment, but, you know, when I look at the cause that's

24   been stated, right, and I think I said at the outset there are

25   three things.  You know, the fact that the expert has other

1    work and that is a delay, I just don't see that as good cause.

2    The fact that the expert is sick, and I'm just not -- unless

3    you give me some information, I'm not seeing that sickness as

4    being -- I mean, I have a feeling maybe he was hospitalized a

5    day or two.  That's how this feels to me.  I could be wrong.

6    You could tell me he was hospitalized for three weeks and that

7    may make a big difference, but I'm just not seeing that.  I

8    feel like you would know that.

9              **MR. MORGAN:**  I don't have that answer.

10             **THE COURT:**  Yeah.  So, you know, that could make some

11   difference.  To me, this is really an issue about this finding

12   an error in an expert's report and how that affects case

13   management going forward and how that affects the 16(b)(4).  I

14   don't frankly know that I have enough briefing on that to be

15   able to makes a decision right now or enough factual

16   information, and so I don't know that I will be able to give

17   you a decision today, and I understand that that affects -- the

18   deadline is December 1st.  So I mean, the deadline may be what

19   it is, and you all will have an opportunity to further brief

20   this, but the deadline is what it is.  It has not been moved.

21             But I'm going to ask Lockheed to come give me their

22   position, but I want to just say that first and you can think

23   about that.  And if you can give me additional information

24   about the expert's medical information, that would be helpful.

25             **MR. MORGAN:**  Sure.  And just in closing on that point

1    is, if the report had been done and Dr. Sahu had had the air

2    modeling on October 1st, that was what we were planning to do.

3    And he was also a general causation expert in this case.  So

4    it's not like he wasn't working on this case and diligently

5    working.  This is the way the case management order is set up

6    and that we scheduled it to be like this.  And but for this

7    wildly unforeseen circumstance with the air modeler -- I mean,

8    again, I don't want to defame him, but it is wildly

9    unprofessional, and I've never had it happen before.  We would

10   have been perfectly on schedule, and I didn't know, and so, I

11   guess, the error on us would be, you know, we would follow up

12   and we would be told nothing is wrong, but maybe we should have

13   pressed harder when we didn't get it, but that's not an

14   uncommon situation to have an expert backing us up and still

15   being able to complete it, because eventually their work comes

16   in done.

17            And so I understand.  But if this is not extended,

18   then we would be ending these 20 bellwethers on a technicality

19   of this deadline versus the merits of the case, and so to the

20   extent they did nothing wrong, this is totally created by the

21   litigation, we would ask for that extension.

22            THE COURT:  And, look, I appreciate that.  I mean, I

23   appreciate what you're saying there.  And I think that, you

24   know, Lockheed is going to argue, and maybe not rightfully so,

25   that you should have had experts with air modeling before the

1    case even started.  And so, I guess, my only kind of thing that

2    I want them to think about and address too is, I mean, Judge

3    Dalton wouldn't have set these deadlines if he thought they

4    should have already had the expert disclosures when the case

5    was started.  I mean, deadlines were set for a reason.  So I

6    mean, they had until, you know, December 1, right, to make this

7    disclosure, and to the extent something completely unforeseen

8    happens, I just -- you know, to comply with that deadline, you

9    know, that may be good cause.  So I'll leave it at that.  I

10   want to hear from Lockheed and then I'll hear from you again,

11   Mr. Morgan.

12          **MR. MURRY:**  May I just briefly address some --

13          **THE COURT:**  Sure.

14          **MR. MURRY:**  -- issues in the Vandestreek case?

15          **THE COURT:**  Yeah.  Yeah.  I apologize.  If I ever

16   leave you out, just stand up and let me know, just like that.

17          **MR. MURRY:**  Not a problem.  I know Your Honor said at

18   the beginning that if there's any differences, you know,

19   because I know these cases have been traveling together since

20   at least -- at least by my notes -- somewhere around October of

21   2021, November of 2021, when the Court issued their order.  And

22   I think one of the things the Court said -- we just have the

23   one case, obviously, Ms. Vandestreek.  I think Judge Dalton, I

24   think His Honor said, you know, You guys are kind of the tail,

25   and they're the dog.  And so I don't want the tail to get

1    lobbed off.  So I want to just say a few things, if I can.

2           Little differences in our case.  Our case was filed

3    August 10th, 2021, so substantially later than these other

4    cases that are there.  And I will say at the outset that I have

5    absolute confidence with Mr. Morgan's work, the work of his

6    firm.  We have worked very closely together, and it's been a

7    good, collaborative effort.  But just on behalf of my client, a

8    few things that I think are important for the record.  And

9    probably because I think Lockheed has painted with bit of a

10   broad brush on some of the things in their opposition.

11          For example, in our case we've only had one operative

12   CMSO.  There haven't been any motions to extend the deadlines.

13   We have met deadlines for general causation.  This is the first

14   time we're coming to ask for it, consistent with kind of the

15   tenor of the Court, as well as the way the cases have been

16   consolidated.

17          We had a separate modeling expert we were working with

18   early on.  Once these cases became essentially consolidated,

19   for all practical purposes, we told him to pause and stand

20   down, stop his work, didn't want to spend our client's money if

21   we didn't need to.

22          We learned, just like Mr. Morgan, a few weeks ago

23   now -- or, I guess, last week about what's happening with this

24   other individual, this subcontractor.  And I can say I've never

25   had that experience happen before in my cases, but I have had

1    oftentimes where in a complicated case I have an engineering

2    expert who is having someone else do data crunching or do work

3    for them.  I mean, you know, I can foresee how the situation

4    could have happened, but just haven't had it personally before.

5         At that point, we immediately contacted the modeler

6    that we had been working with and asked him to resume his

7    efforts right away.  Obviously, he's a little bit behind

8    schedule now, given that he had put things on pause.  His best

9    estimate to us was essentially 45 additional days is what he

10   needed.  I think he probably meant 60 because we called him

11   about, you know, 15 days before the end of the month.  But

12   essentially he's telling us, There's no way I can get you

13   anything more than 45 days from this December 1st deadline,

14   when we told him what the deadline was.

15        And similar to Mr. Morgan, you know, our specific

16   causation experts that we have otherwise specifically are going

17   to need to know the exposure history, the pathway.  Some of the

18   things that this air model is going to demonstrate is a

19   foundation for their opinions.

20        So we're in a similar boat, but there are just some

21   different procedural steps in the background that I thought

22   were important for the Court to know.  You know, I think, as I

23   read the Lockheed opposition, one thing that stuck out to me is

24   essentially the big point that they make is that we're not

25   going to be able to substantiate our claims, and I understand

1    their position on that.  When I look at it, if that's true now,

2    that's true December 1st.  It's also going to be true 60 or

3    90 days down the road.  And this Court, His Honor, Judge

4    Dalton, will dispose of our case on a summary judgment or some

5    other vehicle on the merits.  That just seems like a lot more

6    appropriate way to deal with this kind of a complicated toxic

7    tort case, especially given the circumstances that are very,

8    very, at least -- least to say, very, very unusual.  Something

9    I've never experienced in a case.  So I would just ask for the

10   Court to consider that, when we're looking at the extension

11   that we're asking for here.

12        And I promise, just like we have been with everything

13   else, we were not dragging our feet.  We're trying to be as

14   diligent as we can.  And we're working together very closely.

15   In situations like this, when we need to, we're going to keep

16   our other expert engaged, and he's going to finish his work as

17   well.  So, you know, if something else comes up, we're not

18   going to be in that situation.

19        **THE COURT:**  Okay.  I've a question for you.  I want to

20   ask this of Mr. Morgan as well, but let me ask you first

21   because you're up here.

22        Experts to disclose pursuant to this December 1

23   deadline, are there other experts that you intended to disclose

24   in relation to this?

25        **MR. MURRY:**  Yes.  Well, other specific causation

1   experts we intend to disclose.

2          **THE COURT:**  Yeah.  Is this -- are they all reliant

3   upon the air modeling, or did you have some that were

4   independent?

5          **MR. MURRY:**  Any of the specific causation experts that

6   deal with the specific causation of Daniel Vandestreek's brain

7   cancer are relying upon this air model and the exposure, the

8   foundational exposure pathway.

9          **THE COURT:**  Do you intend to disclose a standard of

10  care expert?

11         **MR. MURRY:**  Not at this time, but like Mr. Morgan, you

12  know, we obviously have reviewed the data.  We have reason to

13  believe that there are some irregularities in the work that's

14  being done, nothing that would have, on its own, given me

15  clarity to say I need to engage an environmental engineering

16  expert.  I've talked to some people, but I was hopeful that if

17  we had this corporate rep depo --

18         And, again, we've kind of been a little bit the tail

19  on the dog.  I'll be honest on that.  We were not really taking

20  the lead on that.  Mr. Morgan was.  And I appreciated his

21  efforts.  And I know, like him, it's been difficult at times

22  getting things nailed down on schedules.

23         If the deposition had yielded information that we

24  believed an environmental engineering expert could review and

25  rely upon, I was confident that that's not a lengthy report.

1    It's the kind of thing that I wouldn't like to do in that short

2    of a time, but I thought that if I needed it, I could get it

3    done, given people that we have previously talked to and we've

4    worked with.  It's a pretty discrete area on that.  But at this

5    time, I currently don't have one right now.

6            And our case is a wrongful death case.  So an

7    economist would be the only other real damages expert, and the

8    economist is going to be able to prepare a report and disclose

9    any information that relates to the economic damages in the

10   case.

11           THE COURT:  Okay.  So there are -- that economist is a

12   separate expert that's not relying upon the air handling data?

13           MR. MURRY:  Yes, Your Honor.  As I read the deadline

14   in the CMSO, it's essentially general causation and then

15   specific and any other experts you think you might need.

16           THE COURT:  Sure.

17           MR. MURRY:  So for our case, that would be an

18   economist for the damages, potentially standard of care, but as

19   I said, I don't have anybody that's retained right now and

20   didn't have an intention to, absent what we learn from the

21   corporate rep deposition.

22           THE COURT:  And I asked this question and I don't know

23   if -- I asked this question because, to the extent I did move

24   the December 1 deadline, it would be only in relation to the

25   air handling modeling, right?  So any other experts, specific

1    causation or otherwise, that deadline holds.  I've seen zero

2    cause to move it as to, for example, an economist, right, or

3    any other expert that does not rely upon air handling data.

4         MR. MURRY:  Yeah.  I would say that if I were to

5    define it, Your Honor, the request for extension is, at a

6    minimum, anything related to specific causation, but as far as

7    the all other experts portion of the CMSO, the air modeling

8    piece, the problems we've had there do not relate to that.

9         THE COURT:  Why should I extend it beyond air handling

10   at all?  I mean, to me, this is the only causation I'm seeing

11   is related to Dr. Sahu and the air handling.

12        MR. MURRY:  Well, because like our neuro-oncologist,

13   our specific causation expert related to Mr. Vandestreek's

14   cancer, he wants to rely upon the work to show that -- that

15   would demonstrate clearly that there were the exposures that

16   were --

17        THE COURT:  Yeah.  So that's fine.  I'm saying

18   anything that relies upon the air handling, any expert who

19   relies upon the air handling data to make their opinion is

20   arguably in play here.  Like, we're talking about it.  But to

21   the extent the expert does not rely on air handling data to

22   come to their conclusion, there is just no basis for me to move

23   that expert.  This isn't going to be kind of like a

24   free-for-all, like, of the other experts get moved because we

25   have one issue in relation to air handling.  Does that make

1  sense?

2        MR. MURRY:  It does, Your Honor, very much.  And I

3  don't want to speak for Mr. Morgan and his clients, but for our

4  case that would -- that would not be a problem.

5        THE COURT:  All right.  I appreciate that.

6        Mr. Morgan, do you want to address that?

7        MR. MORGAN:  That's all we're requesting, Your Honor.

8  We're not asking for moving any other deadlines and

9  specifically stayed out of however the Court deals with it, but

10  just the air handling or air modeling and experts that rely on

11  that for their causation opinion specifically, no -- nobody

12  outside that scope.

13        THE COURT:  Okay.  I appreciate that clarification.

14  Thank you.

15        MR. MURRY:  I was going to sit down, but does Your

16  Honor have any more questions?

17        THE COURT:  No, no.  That's it.  Thank you.  I

18  appreciate it.

19        MR. MURRY:  Thank you, Your Honor.

20        THE COURT:  I'll give you an opportunity at the end as

21  well.

22        MR. WEINSTEIN:  If I may, Your Honor.  The focus of

23  the argument you've heard this morning has been the events of

24  the last couple of weeks of Dr. Sahu.  That's not the context

25  here, Your Honor.  You were in attendance in October of 2021

1    when Judge Dalton could not have been more clear to everyone in

2    the courtroom that this case should not have been filed without

3    adequate expert work to back up the claims.

4            THE COURT:  Okay.  Can I just stop you there?  Because

5    I hear you, like, you know, I was there.  I've read the

6    transcripts.  This has been an issue that's come up many times

7    during this case.  I think I've made a similar admonition in

8    relation to some discovery hearings in this case.

9            But what I don't want to do is conflate the possible

10   Rule 11 issue or, slash, you know, you win the case on summary

11   judgment issue or class certification or whatever, with the

12   extension of a particular deadline that was given, right?

13           So Judge Dalton gave that deadline, and so my only

14   concern is whether the deadline that he gave should be extended

15   for some particular reason.  To me, that's a totally separate

16   issue from whether or not this case was appropriately brought

17   pursuant to Rule 11, right?

18           MR. WEINSTEIN:  And I'm not making a Rule 11 argument,

19   Judge.

20           THE COURT:  I know, but it does -- that's exactly what

21   it feels like, and I think Judge Dalton was making a Rule 11

22   admonition when he said that, and also you all did quote his

23   Rule 11 admonitions in your papers.

24           MR. WEINSTEIN:  I'm sorry, Your Honor.

25           THE COURT:  That's definitely been raised is the

1      issue, and that's how it feels to me.

2           **MR. WEINSTEIN:**  For a different reason, Your Honor, if

3      I may.  And the reason is, that everyone was on notice, you

4      know, from day one, right, this modeling was required.  This

5      isn't something that came up last moment.

6           And let me march through very briefly, if I may, Your

7      Honor, the timeline.  So that was October 2021, that hearing.

8      And in January 2022, the Court correctly states, Judge Dalton

9      did extend the deadlines, but he did it with an admonition, and

10     what he said was -- he unmistakably warned, as we said in our

11     papers, "You're going to have a limited time to do that, in

12     other words, the expert work.  It's not going to be subject to

13     your expert's schedule or what he or she thinks in a perfect

14     world that they might like to have."  Okay.  So Judge Dalton

15     was very clear.

16          **THE COURT:**  So I totally agree, and I read that.  And,

17     just, I'm very familiar.  But what we have here -- and I think

18     that the cause, as I've already stated, related to the expert

19     schedule and related to, frankly, probably the expert's illness

20     because I'm not seeing that as being a big thing here, is

21     probably not good cause.  I totally agree.

22          So my situation that I feel like I'm looking at right

23     now is, the allegation here is that the subcontractor for the

24     expert kind of went off the rails, right, had some kind of

25     divorce, his life fell apart.  He gave them a bad product that

1   their expert reviewed, saw was bad, and now they need to

2   correct that.  That's, to me, a totally unforeseen issue.  And

3   maybe you disagree.  And maybe there's case law saying that

4   that's not a good enough reason, but, frankly, it's not a

5   situation I've ever dealt with before.

6          And I'm not familiar with the case law on it.  You

7   know, I'm happy to admit that.  And so I feel that I might need

8   more briefing on this issue, because, to me, it's a discrete

9   issue, because I agree with everything you're saying concerning

10  Judge Dalton and what he's saying, and I agree that a lot of

11  their cause isn't good.  So I'm on board with you on a lot of

12  that.  I just don't know if this particular issue concerning

13  the errors in the expert report is good cause or not under

14  16(b)(4).

15          **MR. WEINSTEIN:**  Let me address that issue, if I may.

16          **THE COURT:**  Sure.

17          **MR. WEINSTEIN:**  And I hear you loud and clear.

18          **THE COURT:**  Yeah.

19          **MR. WEINSTEIN:**  So thank you.

20          It's a question, Your Honor, of you need a certain

21  amount of runway to land an aircraft.  By lack of diligence,

22  they left themselves with inadequate runway.  That's not our

23  problem.  It's theirs.  And the case law is very clear that

24  unless they can show diligence, you don't get to the next

25  element, you know, under the rule, as you know.  And the cases

1    say the inquiry ends there.

2          So let's talk about diligence.  So from the January --

3    I'm sorry.  From the October hearing, if you look at Dr. Sahu's

4    affidavit, it's not -- it's a statement.  It's not signed under

5    penalty of perjury.  But let's take him at his word.  He wasn't

6    assigned, by his own admission, to an October 2022 modeling

7    deadline until June, so from the time of an unmistakable

8    hearing, you and Judge Dalton, the Plaintiffs waited

9    eight months to tell their own expert that he had an October

10   deadline, eight months.

11         Then in September, the hearing that you conducted, the

12   discovery hearing, you made it very clear that there was a

13   tight deadline and asked, quote/unquote, "Where's the

14   modeling?"

15         Now, Dr. Sahu was deposed three days later, Your

16   Honor, on September 23.  And what he said is shocking.  I'll

17   quote from page 6 -- page 14 -- I'm sorry, Your Honor -- 13 and

18   14 of the transcript, this subcontractor, Dr. Clark's name came

19   up.

20         So we inquired:  "But will he," in other words,

21   Dr. Clark, "be performing the modeling in this case?"

22         Dr. Sahu's answer at line 2, page 14:  "Again, I'm not

23   sure whether he or someone else will.  I've just worked with

24   him and interacted with him up to -- up to this point."  So

25   three days after that, he's saying I don't even know that it's

1    Clark.   There's no way that they could have turned it around.

2              We were so surprised by that testimony, that, you

3    know, 30 pages later, Your Honor, at page 47, we returned to

4    the question to make sure we heard it right.   And the question

5    at line 17 of page 47, Your Honor, is:   "Will you be using

6    Dr. Clark to perform air modeling in this case?"

7              "I'm not sure sitting here right now."

8              "Have you had conversations with him regarding that

9    possibility?"

10             "Well, we've discussed modeling in general.   I mean,

11   he does modeling."

12             And then we return to: "Have you had written

13   communications with him" -- but it's Dr. Clark -- "regarding

14   this case?"

15             Answer:   "I don't believe so."

16             "You have Dr. Clark's address?"

17             "No."

18             "You have Dr. Clark's phone number?"

19             "I'm not sure actually."

20             So this is September 23rd, right?   Sahu admits that

21   he's not even given the October deadline until June, and then

22   June, July, August, and almost all of September passed, almost

23   four months and he has engaged Clark.   So it's not surprising,

24   you know, that by November, just a couple of months later,

25   there is no Clark report.   How could there be?   And so the lack

1    of diligence here, you know, whether Dr. Sahu or otherwise

2    doesn't matter.  The cases are clear, and we've cited four of

3    them, two of which are toxic tort cases, that a party's

4    dissatisfaction with his or her experts, you know, doesn't do

5    it.  That's not good cause under the case law.

6         And Judge Dalton made it clear that the experts -- you

7    know, the vagaries of the expert's schedule, et cetera, et

8    cetera, was not going to be good grounds.

9         But you can take a look -- one can take a look, pardon

10   me, Your Honor, at Sahu's declaration and his deposition and

11   conclude -- diligence, I mean, how could he not have

12   communicated with his modeler as of September 23rd, didn't know

13   his phone number, didn't know his address, and satisfy a

14   diligence standard?  It's just not possible, Your Honor.

15        And that's why the context -- again, we're not making

16   any type of a sanctions argument here.  That's why the context

17   matters, though, because between the unmistakable admonitions

18   of this Court in October of 2021, it's eight months, according

19   to Sahu's testimony, if you will, before he's even given an

20   October deadline, four more months passed before, before this

21   Clark incident, and then when he's deposed again in late

22   September, it's clear from his sworn testimony, two different

23   places in his depo, he hadn't even retained Clark.

24        So they just left themselves in a position by waiting

25   until the last minute where they could never have gotten a

1    proper air model done, number one, and, two, they clearly can't

2    demonstrate diligence, you know, if in October -- I'm sorry --

3    on September 23rd, 2022, the third-party subcontractor is not

4    engaged, and he's had no written communications with him.  And

5    under the case law, Judge, that ends the inquiry.  The

6    Plaintiffs have the burden of showing diligence, and unless

7    they can clear that burden, it's over.

8           And if you look at the schedule, Your Honor, and I

9    know the Court's well aware of this, but if you chart out what

10   would happen if these deadlines were extended 90 days, it

11   crashes the entire back end of the schedule.  I mean, Judge

12   Dalton would have two months or so, you know, to deal with --

13   you've seen the motions that were filed on both sides.  I agree

14   with Mr. Morgan both sides have worked really hard, but there

15   are like 40 filings.  We expect there to be a similar volume on

16   specific causation.  None of this would be fully briefed until

17   the end of May of 2023.  There is an August trial date.  And

18   then we would roll from there on to the other cases.  So it's

19   going to -- it would crash this case and then the case that

20   follows and then the case that follows.

21          And as the Court I'm sure can appreciate, this

22   litigation is extraordinarily excessive, and so there's real

23   prejudice here.

24          Thank you for your patience, Judge.  I'll be happy to

25   answer any questions that you have.

1          **THE COURT:**  No.  I appreciate that.  One of the

2     issues, you know, in this situation is this is framed as a

3     motion to extend an expert disclosure deadline, but as you

4     mentioned, it affects all of the deadlines in the case.  And in

5     fact, the motion itself does state a one-month extension would

6     at least be necessary to the summary judgment and *Daubert*

7     deadline of April 3rd to May 1st, and that's not a deadline I

8     can extend.  So that's somewhat -- and this motion was referred

9     to me.  So this would either be something that I would, you

10    know, in the normal course confer with Judge Dalton about or I

11    would do a report and recommendation.  That's the kind of

12    posture we would be in here, which of course wouldn't be ripe

13    for 28 days because you all would have an opportunity to object

14    and then a response to the objection.  It's just not efficient.

15         So I'm kind of caught in this place right now where it

16    may be that Judge Dalton rules on some of this.  It may be that

17    I, you know, deny some of this and deny some without prejudice

18    because it's not really for me.  In other words, *Daubert* and

19    other extension deadlines are really not for me.  Those are for

20    Judge Dalton.  I would never move those deadlines without the

21    consent of a district judge.  So that is some of my concern

22    here.

23         Let's talk about the witnesses in the deposition for a

24    moment though.  Let's shift gears.

25         **MR. WEINSTEIN:**  If I may, Your Honor, Mr. Torres

1    will --

2         **THE COURT:**  Okay.

3         **MR. WEINSTEIN:**  -- address the 30(b)(6) issues.

4         **THE COURT:**  That's fine.  All right.

5         **MR. WEINSTEIN:**  And if I could make just one final --

6         **THE COURT:**  Sure.

7         **MR. WEINSTEIN:**  -- very brief point, Judge.  In a case

8    like this, you know, the Defendant is in a really tough

9    position, right?  The Defendant should do a presuit

10   investigation.  They file a complaint, right?  They had a

11   two-year run on this.  And then we get 30 days from the

12   provision of this model to respond.  It's a very short period

13   of time.  So anything that affects the schedule here, Your

14   Honor, would be extraordinarily prejudicial.

15        Again, thank you for your patience.

16        **THE COURT:**  No.  And I mean, that's a good point too.

17   I mean, just to build off of that, I mean, this motion was

18   filed on November 17th, and so based upon the extensions that

19   are being requested here, there's just no way, even if I had

20   granted it that day, that I could have made these deadlines

21   make any sense.  Because, you know, this is an expert who is

22   going to be relied upon for other experts.  So we have at least

23   two layers here.  I mean, you know, this -- the whole runway

24   argument does have some merit to me.  I mean, it seems to me

25   that on November 10th, right, I think that's right, that's when

1    Mr. Morgan first learned this was an issue, but at that point,

2    it's either perfect or you have nothing.  I mean, that's part

3    of the problem.

4              I'll let you address everything later, Mr. Morgan, but

5    I just want to, kind of, put some of that out there.

6              I appreciate it.  Thank you.

7              **MR. WEINSTEIN:**  Yes, sir.

8              **THE COURT:**  Mr. Torres.

9              **MR. TORRES:**  Thank you, Judge.

10             After hearing everything I've heard this morning, I'm

11   not sure whether we're really arguing about deposition

12   scheduling at this point, but --

13             **THE COURT:**  Yeah.  If we're not -- because one thing

14   I'll say is that I don't -- even if I did extend for some

15   period of time the expert disclosure deadlines, it would not

16   apply to these witnesses, right, because these are -- to the

17   extent there's a standard of care expert, that ship has sailed,

18   in my opinion, and that would have had to have already

19   happened.  And so I don't -- I don't -- I think these issues

20   are not conflated.

21             And if there's no issue, Mr. Torres, I would be happy

22   to hear that, or if we can agree on some dates I would be happy

23   to get the depositions because it seems like the depositions

24   should go forward.  They're appropriately noticed.

25             **MR. TORRES:**  We're not suggesting that the depositions

1    should not go forward.  What we've asked for was protection to

2    reschedule them to just really address people's schedules, the

3    availability of the witnesses, the availability of the lawyers,

4    holiday scheduling, people's travel schedules, all those sorts

5    of things.  And what we've effectively asked for was a

6    three-week extension on those.

7           And what's important here, Your Honor, obviously, is

8    we have to present a 30(b)(6) witness.  Presenting an

9    unprepared 30(b)(6) witness is as bad as not presenting one at

10   all.  And it's something that we take really serious, and we

11   spent alone --

12         **THE COURT:**  Can we separate the issues first though?

13   What about the four other witnesses?  Can those go forward next

14   week?

15              **MR. TORRES:**  Excuse me?

16         **THE COURT:**  The four other witnesses, can those go

17   forward next week?

18         **MR. TORRES:**  Well, I have proposed dates.  We went out

19   to the witnesses and got dates, and those dates are in our

20   motion for protection.  So we asked for the depositions of the

21   28th, the 29th, the 30th, and the 1st, which were

22   ostensively -- Plaintiffs argued -- they oppose the protective

23   order in light of the December 1 deadline for liability

24   reports, which is aside -- set aside for now.  So what we've

25   proposed, based on their availability, and we've got two

1   witnesses who are retired we had to find.  Ron Perlman,

2   retired, he's scheduled for November the 28th.  We got dates of

3   December 20, January 5, January 11, January 24, which we have

4   proposed to Plaintiffs.

5           Lisbeth House, who does work for the corporation, was

6   scheduled for on November the 29th, and the dates of her

7   availability that she provided were January 10 and 12, 17

8   through 19, 23 to 26.

9           Allen Turner, who was scheduled for November the 30th,

10  we provided the week of December 12, and I believe, I want to

11  say, that the 19th and the 20th, which I don't have in my

12  notes.

13          And Mike Meredith, who is also retired, the week of --

14  he was scheduled for December the 1st, and we tried to -- the

15  period we got for him was the week of December the 12th.

16          So, again, we're not -- we're not -- we're not

17  suggesting that these depositions should not go forward.  We're

18  just simply trying to get them on dates where the witnesses and

19  counsel are all available on these issues, and they're all fate

20  and transports, reportedly fate and transport related issues,

21  which I have -- I have largely handled in this case, together

22  with the statistics.  So they do require their availability.

23  They do require their preparation.  And that's all we've asked

24  for in this case.  And I'm not going to belabor the issues that

25  we spent the last, you know, hour or so discussing.

1          **THE COURT:**  I just haven't -- I haven't heard any

2     cause why the depositions shouldn't just go forward next week.

3          **MR. TORRES:**  It was -- it was merely their

4     availability, Your Honor.

5          **THE COURT:**  When you say "their availability," I mean,

6     what do you mean?  Two of them work for Lockheed, right?

7          **MR. TORRES:**  Excuse me?

8          **THE COURT:**  Two of them work for Lockheed?

9          **MR. TORRES:**  Two of them work for Lockheed.  One is --

10    one is -- one, who was --

11         **THE COURT:**  So why are they not available next week?

12         **MR. TORRES:**  I am not available next week.

13         **THE COURT:**  That's not a good reason.  You have a

14    large firm.

15         **MR. TORRES:**  We are a large firm.  I will not argue

16    with you regarding that.  I was not available next week.  And

17    that was the accommodation that I asked Mr. Morgan for, that he

18    said he could not provide because they needed these depositions

19    for their modeling, which is no longer the case.

20         **THE COURT:**  It's just -- you know, I haven't heard --

21    I've heard no cause for a motion for protective order in

22    relation to these four witnesses.  So the four fact deposition

23    witnesses, they just need to go forward.  They were properly

24    noticed, and they need to go forward.

25              I mean, I do feel a lot of resistance in relation to

1    discovery from you all, which is unfortunate because you think

2    you have other very strong arguments that are getting lost

3    somewhat in the discovery resistance.

4         And so, like, that just needs to go forward.  Your

5    availability is not a reason to reschedule those depositions.

6         **MR. TORRES:**  I do want to clarify something for the

7    Court because I don't want the Court to get that impression

8    because that is not right.  We've produced 188,000 documents.

9         **THE COURT:**  I know, but, look, you give me these long

10   explanations -- you give me these long explanations, when

11   really it's just you're not available next week.  So just say

12   that.  So I feel like it's a little bit of -- it's not

13   completely clear.  It's not coming across completely clear to

14   me and cooperative.  So I would just encourage you all to work

15   on that.

16        But if it's just your availability next week, there's,

17   you know, four other attorneys sitting at these tables, and

18   there's many more attorneys at your firm.  So I think that's --

19   they should go forward.

20        **MR. TORRES:**  Thank you, Judge.

21        **THE COURT:**  Let's talk about the 30(b)(6), though.  I

22   do think you need to appropriately prepare your 30(b)(6), as

23   you've said.  I think that is appropriate cause to maybe push

24   this off a little bit.  Also properly noticed though -- I mean,

25   when is your 30(b)(6) witness available such that you'll have

1    them properly prepared?

2         **MR. TORRES:**  We proposed the week of December the

3    12th, and he is the witness who is unavailable this week, and

4    he does require preparation.  We probably pulled a few thousand

5    pages of documents for that preparation alone.

6         **THE COURT:**  Okay.  Mr. Morgan, the week of

7    December 12.

8         **MR. MORGAN:**  So, Your Honor, on all these issues,

9    look, I'm obviously here hat in hand so I'm not trying to do

10   anything too oppositional.  But I would say, even for

11   Mr. Torres's accommodation, if we could move those depos.  Now,

12   I'm hearing the Court's thoughts on the standard of care, and I

13   understand that now.  Knowing that that's not an issue for me,

14   that this is really now a discovery type issue, if we can do it

15   within the first half of December for those, so I can use those

16   depositions for meaningful discovery, I would be agreeable,

17   knowing the Court's position on the standard of care.

18        **THE COURT:**  Okay.  I appreciate that.  Let me just --

19   but I want to get the 30(b)(6) at least pinned down.

20   December 12th, does that work?

21        **MR. MORGAN:**  I'll make it work.

22        **THE COURT:**  Mr. Torres, December 12?

23        **MR. TORRES:**  Yes, Your Honor.

24        **THE COURT:**  All right.  That works.  Mr. Morgan, are

25   you telling me with the other four witnesses you want an

1    opportunity to confer with Mr. Torres some more?

2         MR. MORGAN:  If he's able to produce those witnesses

3    in the first half of December versus January where we have a

4    March discovery cutoff, then I would be amenable to work,

5    knowing the Court's position on you don't have enough time

6    anyway.  I get that.  I understand that.  And so I'm not trying

7    to hold his feet to the fire.  He did relay to me he had that

8    trip, and I told him generally I would do it, but I couldn't

9    until we knew the Court's position.

10        So I wouldn't want to do them January 22 or

11   February 5th, but if we could do them in December, I would make

12   that accommodation to get it done.

13        THE COURT:  Can you commit to doing them in the first

14   half of December?

15        MR. TORRES:  We will confer with the witnesses and

16   make whoever is available available, but I'll certainly confer

17   with Mr. Morgan.

18        THE COURT:  I mean, that's just not a good enough

19   answer though.  I don't think that's what you're looking for

20   either.  I just don't know.

21        MR. MORGAN:  Right.

22        THE COURT:  I mean, they're properly noticed

23   depositions right now.  I can just order they happen next week.

24   So if that's not good enough, then they're going to have to

25   notice them again, and we're going to have to go through this

1    process again.  Like, either you commit to doing them the first

2    half of December -- because I think that's what's agreed is the

3    only reason I say that -- or they can go forward next week.

4            **MR. TORRES:**  So we've provided Michael Meredith the

5    week of 12/12, Allen Turner the week of 12/12 or the Monday or

6    Tuesday of the following week.  Ron Perlman, December the 20th,

7    and we had January dates.

8            The only witness we would have to work with is Lisbeth

9    House regarding her availability.

10           **THE COURT:**  Is she a Lockheed Martin employee?

11           **MR. MORGAN:**  She is a Lockheed Martin employee.

12           **THE COURT:**  I don't anticipate that being an issue

13   then.

14           **MR. TORRES:**  They close up the last week of the year,

15   but I will certainly speak with her.

16           **THE COURT:**  Well, we don't want it the last week of

17   the year.  We want it before then.

18           **MR. TORRES:**  I understand.  That's why I'm saying

19   that.

20           **THE COURT:**  Okay.

21           **MR. TORRES:**  Yeah.  I hear you, Judge.

22           **THE COURT:**  Mr. Morgan, is that good enough, or do you

23   want me to order them to happen next week?

24           **MR. MORGAN:**  I guess we order them for next week.  I

25   mean, I can't -- I can't take that -- the way that our

1    conferral process has gone, it's been --

2           **THE COURT:**  I mean, I can see.  To me, this is a

3    frustrating process too.  So I hear you.  This is the problem.

4    I mean, I can -- I am happy to set deadlines and hold parties

5    to them or you can confer about it, but I just see this

6    conferral thing going around in circles a little bit, right in

7    front of my eyes, frankly.  So --

8           **MR. TORRES:**  I don't -- I respectfully don't agree,

9    Your Honor.  I've just told them the week of December the 12th

10    for two of the witnesses.  We just said December the 12th for a

11    30(b)(6) witness.  And, you know, if December the 20th doesn't

12    work for Ron Perlman, I guess he goes next week.  If we can't

13    get a date in the beginning of December for Lisbeth House, I

14    guess she goes next week.  I hear what you're saying.

15           **THE COURT:**  I mean, I just feel like I have to move

16    this case along.  I'm going to set them.  They're going to go

17    next week.  I'm going to deny the motion for protection as to

18    them.

19          That said, the parties can agree still to have them go

20    later, right?  So if you all want to get together and agree, I

21    mean, two of them can be available the week of December 12th

22    and that's good for you, Mr. Morgan, perhaps you do that.  If

23    the other ones can't move their schedules to comply, then they

24    happen next week --

25           **MR. MORGAN:**  Sure.

1      **THE COURT:** -- what you're saying, Mr. Torres.  So

2      let's do that.  As to the 30(b)(6), it's granted in part to

3      December 12th to give you all an opportunity to prepare their

4      witness properly.

5      **MR. TORRES:**  Thank you, Judge.

6      **THE COURT:**  That's as to that motion.  So I can rule

7      on that motion today and I have.

8      So I said I would give Plaintiffs an opportunity to

9      address the other motion again after, after Lockheed went.  So

10     I'm happy to do that now.  Do you have anything else,

11     Mr. Morgan?

12     **MR. MORGAN:**  Just briefly, Your Honor.  One of the

13     things, just to address the testimony of Dr. Sahu where they

14     were speaking about the air modeling, is that throughout the

15     process of the general causation depositions, the issues of

16     specific causation have been continually conflated and asked,

17     Do you have specific causation opinions here, and the answer

18     is, of course, No.  The June assignment of a final deadline --

19     it wasn't, Hey, get started today, we need models.  These are

20     things that started back before the case was filed.  But that

21     was following the general causation reports that had just been

22     done, and so that's when we assigned -- we need it by October,

23     done, for the December 1st deadline.

24     One of the things that I think is taken a little bit

25     out of context is talking about Dr. Clark -- or not doctor,

1    James Clark.  Do you know who James Clark is?  In this case,

2    Dr. Sahu goes with the company NP Limited, right?  That's the

3    third party.  That party contracts with the air modelers.  What

4    he was referencing in that testimony is he didn't know

5    specifically who NP was using, but he knew who he was using.

6    So if the question had been followed up, Did you know NP

7    Limited, then the answer would be, Of course.

8           And in fact, on page 134, line 7 through 10, Mr. Rocha

9    again clarifies this point by just saying, "And you're aware

10   whether those implementation efforts have been underway for

11   some time now?"

12          And he says, "I am and they have, yes."  And he's

13   talking specifically to the modeling.

14          I agree that I would have preferred a much longer

15   runway, right, and in a perfect world I would have been able to

16   do that.  But when we look at what we've done in this case, the

17   diligence of getting these experts going, the taking the

18   defense experts, the motion practice that's involved and the

19   deadlines, we just weren't provided with a long runway.  And I

20   understand why.  We got off to a late start.  And I understand

21   the Court's admonition about how we should have done it, and I

22   believe that we were on case running as fast as we can and then

23   we just had somebody come out of nowhere and cold-cock us.

24   That's how I feel about -- like, this is a hat in hand

25   situation that we've never had it.

1          And so I agree that this shouldn't happen.  I agree

2     that I shouldn't have to be here asking for this extension, but

3     to lose this entire case for these 20 plaintiffs on a

4     technicality seems less than the meritorious.  And the

5     prejudice that Lockheed would actually suffer in this would be

6     worse because if these 20 are thrown out, these aren't the end

7     of the cases.  It just starts back over.  Specific causation,

8     another round of cases, another round of filings come up, and

9     now the Court's actually pushed back even further, taking more

10    resources.

11         So I do apologize that I'm here asking for this.  I

12    don't want to ask for this, but we're in this situation.

13         **THE COURT:**  All right.  Here's the thing.  I agree

14    with you to the extent that this is too consequential a

15    decision to be made based upon the information that I have.

16    That's kind of where I agree with your argument there.

17         I also think that I've heard a lot of information

18    today that wasn't necessarily in the briefing or wasn't really

19    that much in the briefing.  It needs to be expounded upon.  And

20    I think I've asked those questions of you today.  And I think

21    with that information, I think Lockheed deserves an opportunity

22    to address that information and brief it now that they, I

23    think, realize that -- where my focus is in relation to this.

24         And I think I've also already indicated that the

25    expert's schedule or the expert's illness, which, again, I just

1   can't see as being too consequential.

2          MR. MORGAN:   It was COVID for a couple of days is what

3   the report I got back.

4          THE COURT:   Yeah.   I mean, that's something you have

5   to be aware of, that your expert might get COVID nowadays.

6          MR. MORGAN:   I understand.

7          THE COURT:   Yeah.   It's just part of litigating.   But

8   I think that was -- you know, those things are really not good

9   cause under 16(b)(4) to me.   I mean, the issue is, you have

10  kind of a unique factual situation that I have some information

11  about but not a whole lot, that could be consequential and

12  could result in an extension in this case or maybe not.   And

13  Lockheed should have an opportunity to address that.   So what I

14  would like to do -- also, I think that the deadline being

15  sought to be extended is a little bit too broad.

16         So I'm going to do two things -- well, three things.

17  One is, I'm going to deny the motion to the extent it requests

18  the extension of any expert disclosure that's unrelated or the

19  expert's opinion would not rely upon the opinion of Dr. Sahu.

20  So it's denied to that extent.   So the December 1 deadline

21  holds as to everyone who wouldn't otherwise rely upon Dr. Sahu.

22  Now, I don't know exactly who that is, but I can tell you it is

23  an economic expert, for example.   It is other experts that

24  relate to anything else that's not a reliance upon Dr. Sahu.

25         MR. MORGAN:   I understand.

1          **THE COURT:**  Second, I want to deny without prejudice

2     the rest of the motion to the extent it requests an extension

3     of that December 1 deadline, and I want to then get briefing on

4     that issue because I'm sure you're going to file another

5     motion, and I want to set that briefing on a schedule that will

6     allow the issue to be fully briefed for Judge Dalton, in case

7     he does want to consider it.  He may still refer it to me, and

8     that's obviously his choice, but he may also want to have this

9     information before he has his hearing.

10          Is that December 9?  Is that the date?

11          **MR. MORGAN:**  Seventh, I believe.

12          **THE COURT:**  Is that the 7th, December 7th?

13          **MR. MORGAN:**  Yeah, the 7th, Your Honor.

14          **THE COURT:**  The 7th, okay.  I want to have this fully

15     briefed by the 7th, understanding that, you know, it's

16     impossible I think, right, for you to get Dr. Sahu's opinion by

17     the 1st.  So to me, the deadline -- I don't really feel that

18     what I've -- by extending this briefing (unintelligible audio)

19     I'm doing anything wrong, right, because -- is that a fair

20     assessment that --

21          **MR. MORGAN:**  Right.  I don't want to comment on

22     whether I think you're doing anything wrong.  That's not --

23          **THE COURT:**  No.  I'm saying that what I want you to

24     comment on is whether or not Sahu's expert opinion is

25     impossible at this point for you to comply with the deadlines.

1    Because if it's impossible at this point, then me saying I need

2    briefing later doesn't matter in relation to the case.

3            **MR. MORGAN:**  Well, look, if the deadline stands, I

4    have to submit something.

5            **THE COURT:**  Yeah.

6            **MR. MORGAN:**  I have to like -- I know what's going to

7    happen, but I can't not submit --

8            **THE COURT:**  Yeah.  So that's fair.  That's a fair

9    assessment.  I appreciate that.  That's good information for

10   me.

11           So what I'm going to do is this, is I'm going to

12   extend it until I resolve it, okay, or Judge Dalton resolves

13   it.  So in other words, you need to be prepared to give

14   something.  So I'm saying, don't stop preparing whatever you're

15   going to prepare because Judge Dalton on the 7th could say,

16   Today is your deadline.  Right?

17           **MR. MORGAN:**  Yes, sir.

18           **THE COURT:**  It's denied.  So today is your deadline

19   because now Judge Irick's stay as extended is expired, right?

20   But I'm going to stay that December 1st deadline for Dr. Sahu

21   and anybody who relies upon Dr. Sahu until this issue is

22   resolved.

23           **MR. MORGAN:**  Understood.

24           **THE COURT:**  Okay.  So how long do you need to file the

25   motion?  I would prefer it if you filed your motion by perhaps

1    the 30th and then Lockheed had until the 5th to respond.  Is

2    that fair?

3              **MR. MORGAN:**  That's fine, Your Honor.  We'll get it

4    done.

5              **THE COURT:**  Okay.

6              **MR. MORGAN:**  And just for -- I just want to make sure

7    I restate it so I'm very clear.  I'm not going to talk about

8    workload.  I'm not talking about the illness.  What we're

9    focused on is the --

10             **THE COURT:**  Well, you can talk about it.  I'm just

11   saying I'm not inclined to --

12             **MR. MORGAN:**  I understand.  I'm not going to waste the

13   Court's time with that because I understand the position.

14             More details around these independent facts of what

15   led to this nature and to the extent that that's where the

16   focus is for this motion.  Correct?

17             **THE COURT:**  I think that's what I'm most interested

18   in.  I'm not saying you can't raise any argument.  So if you

19   want to raise the other arguments, raise them.  But to me, the

20   thing that is most at issue here is this unforeseen

21   circumstance related to Dr. Clark slash Dr. Sahu and when that

22   happened is why, you know, your side was diligent in relation

23   to that.

24             **MR. MORGAN:**  I understand, and we'll focus our brief

25   on that.

1        **THE COURT:**  All right.  From Lockheed's perspective,

2    any concerns about the briefing, the order, any clarifications

3    needed?

4        **MR. TORRES:**  No, Your Honor.  We understand the

5    Court's ruling and we'll certainly comply.

6        **THE COURT:**  Okay.  Maybe Judge Dalton says, Well,

7    look, you know, you have five days to get your expert report

8    but otherwise denies it.  I just don't know what's going to

9    happen, so that's why I want you all to be prepared that on the

10   7th he may say you get what you get.

11       **MR. MORGAN:**  Right.  And just to be clear, we have not

12   stopped.  We've actually doubled efforts to try to keep going.

13   Like, this is not where we want to be.

14       **THE COURT:**  Right.  I hear you.

15       Anything else from the Vandestreek case?

16       **MR. MURRY:**  No.  I think Your Honor has read my mind.

17   I was going to suggest holding it up until Judge Dalton because

18   of Your Honor's recognition that if it affects *Daubert* or

19   summary judgment deadlines, his Honor needs to weigh in

20   anyways.  So, Your Honor, you knew exactly -- I mean, went

21   where I was thinking.

22       **THE COURT:**  Yeah.  I think that this cause issue is

23   something that I think he at least wants to be fully aware of.

24   I'm not saying that, again, I may resolve it, but I just want

25   him to have all of the information and it fully briefed for him

1    when he does have his status conference, in case he does want

2    to deal about it or in case it affects his other considerations

3    concerning case management.  Because it's my understanding you

4    all should be prepared to discuss all case management issues at

5    his hearing.

6            All right.  Well, that's all I have from my end.  I'll

7    do a written order that will state this and just kind of

8    summarize my findings here.

9            Anything else from the Plaintiffs in the case?

10           **MR. MORGAN:**  No, Your Honor.

11           **MR. MURRY:**  No, Your Honor.

12           **THE COURT:**  Anything from the defense?

13           **MR. WEINSTEIN:**  No, sir, Your Honor.

14           **THE COURT:**  Nothing.  All right.  Thank you all.  Then

15    we'll be in recess.

16           (WHEREUPON, this matter was concluded at 12:15 p.m.)

17                    -      -      -

18                   **CERTIFICATE OF REPORTER**

19    I certify that the foregoing is a correct transcript from the
      official electronic sound recording of the proceedings in the
20    above-titled matter.

21

22    s/Suzanne L. Trimble_____        12/12/22
      Suzanne L. Trimble, CRR, RPR, WACCR         Date
23    U.S. Official Court Reporter

24

25